UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
MURASHEA "MIKE" BOVELL,

                     Plaintiff,                         15 Civ. 8594

       -against-                          **COMPLAINT**

CITY OF MOUNT VERNON, New York,
Commissioner TERRANCE RAYNOR,
Individually and in his Official Capacity,
Deputy Commissioner RICHARD BURKE,
Individually and in his Official Capacity,            **Jury Trial Demanded**
Captain MICHAEL GOLDMAN, Individually
and in his Official Capacity, Sergeant ROBERT
WUTTKE, and Lieutenant PAUL NAWROCKI,
Individually and in his Official Capacity,

                   Defendants.
-----------------------------------------------------x

       Plaintiff, MURASHEA "MIKE" BOVELL" through his attorneys, The Bellantoni Law

Firm, PLLC for his complaint states as follows:

## NATURE OF THE ACTION

1.      This is an action for, *inter alia,* economic, compensatory and punitive damages

and attorney's fees, proximately resulting from defendants' unlawful conduct, acting individually

and in concert with one another, to perpetuate an atmosphere if racial discrimination within the

City of Mount Vernon Police Department, including discrimination and retaliation against the

plaintiff.

## JURISDICTION

2.      The Court's jurisdiction over the plaintiff's federal claims is invoked pursuant to

28 U.S.C. §1331, 28 U.S.C. §1343 and supplemental jurisdiction over the plaintiff's state law

claims pursuant to 28 USC § 1367. Plaintiff filed a complaint with the United States Equal

1

Employment Opportunity Commission premised on racial discrimination and retaliation in

violation of, *inter alia,* Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e,

*et seq.* The United States Department of Justice, Civil Rights Division duly issued to the plaintiff

a notice of the right to institute a lawsuit dated August 17, 2015.

## THE PARTIES

3.      Plaintiff, MURASHEA "MIKE" BOVELL, (hereinafter "Officer Bovell") is a

domiciliary of the State of New York and a resident of the Northern Counties, New York.

4.      Officer Bovell is a Caribbean born naturalized American individual whose race is

identified as black.

5.      At all times relevant to this complaint, Officer Bovell was a police officer

employed by the City of Mount Vernon, New York.

6.      Defendant CITY OF MOUNT VERNON, New York (the "City") at all times

relevant herein was a municipal corporation  organized  under the laws of the State of New York

and located in Mount  Vernon, New York, which operates and controls the Mount Vernon Police

Department (the "Department").

7.      Defendant Commissioner TERRANCE RAYNOR (hereinafter "Commissioner

Raynor") is sued herein in his individual and official capacities relative to the various causes of

action pleaded herein and was at all times employed by the City of Mount Vernon, New York as

a law enforcement officer and Commissioner of the Department.

8.      In that capacity, he had the authority to affect the terms and conditions of Officer

Bovell's employment; he also had the authority to investigate, and thereafter remedy the

atmosphere of racial discrimination and disparate treatment of black officers in the Department.

2

9.      Defendant Deputy Commissioner RICHARD BURKE (hereinafter "Deputy Commissioner Burke") is sued herein in his individual and official capacities relative to the various causes of action pleaded herein and was at all times employed by the City of Mount Vernon, New York as a law enforcement officer. Defendant Burke is Caucasian.

10.     At all times relevant to this complaint, Defendant Burke was the Deputy Commissioner of the Department.

11.     In that capacity, Defendant Burke had the authority to affect the terms and conditions of Officer Bovell's employment; he also had the authority to investigate, and thereafter remedy the atmosphere of racial discrimination and disparate treatment of black officers in the Department.

12.     Defendant MICHAEL GOLDMAN ("Captain Goldman"), sued herein in his individual and official capacity relative to the various causes of action pleaded herein and was at all times employed by the City of Mount Vernon, New York as a law enforcement officer. Defendant Captain Goldman is Caucasian.

13.     In that capacity, he had the authority to affect the terms and conditions of Officer Bovell's employment; he also had the authority to investigate, and thereafter remedy the atmosphere of racial discrimination and disparate treatment of black officers in the Department.

14.     Defendant ROBERT WUTTKE ("Sgt. Wuttke"), sued herein in his individual and in official capacity relative to the various causes of action pleaded herein and was at all times employed by the City of Mount Vernon, New York as a law enforcement officer.  Defendant Wuttke is Caucasian.

15.     In that capacity, Defendant Wuttke had the authority to affect the terms and conditions of Officer Bovell's employment; he also had the authority to investigate, and thereafter remedy the atmosphere of racial discrimination and disparate treatment of black officers in the Department.

16.     Defendant Lieutenant PAUL NAWROCKI ("Lt. Nawrocki"), sued herein in his individual and in official capacity relative to the various causes of action pleaded herein and was at all times employed by the City of Mount Vernon, New York as a law enforcement officer. Defendant Nawrocki is Caucasian.

17.     In that capacity, he had the authority to affect the terms and conditions of Officer Bovell's employment; he also had the authority to investigate, and thereafter remedy the atmosphere of racial discrimination and disparate treatment of black officers in the Department.

18.     Officer Bovell began his employment as a police officer with the City of Mount Vernon Police Department in July 2007.

19.     In 2010, Officer Bovell was assigned to the Narcotics Unit of Detective Division of the Department for approximately eight (8) months.

20.     Despite his reassignment to a unit of the Detective Division, Officer Bovell was not promoted to the position of Detective.

21.     After his 8-month assignment, Officer Bovell returned to the Patrol Division.

22.     In 2011, Officer Bovell was assigned to the Narcotics Unit of the Detective Division for a second time.

23.     Officer Bovell worked in the Department's Narcotics Unit from 2011 until 2013.

24.     When Officer Bovell began his Narcotics Unit assignment in 2011, the Unit was operated by two (2) supervisors and consisted of two (2) Hispanic Officers and (4) Black Officers.

25.     In Spring 2013, Sergeant Sean Fegan ("Sgt. Fegan") (Caucasian) was assigned as a supervisor of the Narcotics Unit.

26.     Sgt. Fegan previously worked in the Detective Division under Lt. Daniel Fischer ("Lt. Fischer"), (Caucasian) along with Sergeant Robert Wuttke (a Caucasian) and Detective Camilo Antonini (Caucasian).

27.     In and around the same time period, defendant Richard Burke was appointed as the Deputy Commissioner of the Department.

28.     Deputy Commissioner Burke, who was retired from the Department, had previously worked in the Department during the era of Lt. Daniel Fischer.

29.     Under the prior supervision of Lt. Fischer, the Detective Division had a reputation for using excessive force, corruption and racism.

30.     When Officer Bovell was asked in 2010 to be reassigned to the Detective Division, he declined due to its reputation under Lt. Fischer.

31.     When Sgt. Fegan was assigned as a supervisor of the Narcotics Unit, the Unit consisted of two (2) black officers– Officer Bovell and Officer Wendel Griffin ("Officer Griffin"), two (2) Hispanic officers – Officer Garcia and Detective Antonini and one (1) Caucasian officer, Officer Darren Light (hereinafter "Officer Light").

32.     Sgt. Fegan and Detective Antonini routinely made racist comments to one another about the black citizens of Mount Vernon such as, "Fuck these niggas, they ain't shit and will never be shit", "this place (the City of Mount Vernon) is a shit hole".

33.     Officer Bovell has heard Sgt. Fegan state in substance, "Damn niggas have no sense, they should just die", to which Detective Antonini replied in substance, "Let's just take their money."

34.     On numerous occasions, while conducting search warrants on suspect's vehicles and homes Officer Bovell would observe Detective Antonini recover money and say, "Did anybody see this?" as he concealed the money in his pocket.

35.     Sgt. Fegan was aware and consented to Detective  Antonini's stealing the black suspect's money.

36.     On one occasion, when Detective Antonini realized that Officer Bovell objected to his taking the money, he put it back.

37.     During the summer of 2013, the Narcotics Unit conducted a search warrant on a suspect's home and vehicle Officer Bovell observed Detective Antonini take $100 from a black female suspect's purse and place it in his pocket.

38.     When the black female suspect asked where her $100 was, Detective Antonini denied ever seeing the money.

39.     The black female suspect also asked Sgt. Fegan, who knew that Detective Antonini had taken her money, where it was and he told her to "go make a complaint if you want…I don't know about any money."

40.     Officer Bovell and other officers have repeatedly observed Detective Antonini using unnecessary force against black male prisoners in his custody by repeatedly punching and slapping them around; his aggression became worse when Sgt. Fegan came to the Unit.

41.     Detective Antonini developed a reputation on the street for brutalizing black citizens.

42.     Sgt. Fegan was aware of and condoned Officer Antonini's racist conduct, having witnessed Detective Antonini's abuse of black citizens on numerous occasions.

43.     Sgt. Fegan often made discriminatory and condescending remarks to the black police officers in the Narcotics Unit.

44.     Sgt. Fegan treated the non-black officers in the Narcotics Unit much more favorably than the black officers.

45.     Sgt. Fegan also spoke to black police officers in a condescending manner, but did not speak to Caucasian or Hispanic officers in the same manner.

46.     For instance, in July 2013 Sgt. Fegan told Officer Bovell, "I want you to pick up that fucking bag and take it outside."

47.     When Officer Bovell told Sgt. Fegan that his comment was inappropriate, Sgt. Fegan ordered him to create an "MV-5" transfer request.

48.     Officer Bovell advised Sgt. Fegan that he would be requesting a transfer from the Narcotics Unit due in large part to his demeaning and racially discriminatory remarks and conduct.

49.     When Officer Bovell informed Sgt. Fegan that he could not work in this kind of environment, Sgt. Fegan assured him that it "would get better."

50.     Despite his racism, Sgt. Fegan wanted Officer Bovell on the Narcotics Unit because Officer Bovell had a high number of arrests.

51.     Officer Light (Caucasian) was treated favorably, including being granted time off while black officers were required to work.

52.     Officer Light also posed a safety risk to the officers in the Unit, due to his severe alcoholism and mental stability as evidenced by a past incident where officers discovered him pointing a gun to his own head.

53.     In early August 2013, a black individual who was arrested by Officer Garcia and Detective Antonini was registered by them as a confidential informant ("CI").

54.     A few days later, Sgt. Fegan assigned Officer Bovell, Detective Antonini and Officer Garcia to be a "pick up team" (to stop identified individuals upon instruction who were known to be in possession of narcotics) in the area of South 7th Avenue and West 3rd Street.

55.     Sgt. Fegan and Detective Antonini, paired together as a team, stopped a vehicle in the area of South 7th Avenue and West 3rd Street.

56.     Officer Bovell and Officer Griffin responded to the location.

57.     Officer Bovell overheard the CI inform telling Detective Antonini where in the vehicle the drugs were located; Detective Antonini recovered multiple bags of PCP from the indicated location and arrested the individual identified by the CI as the buyer.

58.     Sgt. Fegan and Detective Antonini explicitly condoned the illegal sale of narcotics by allowing the CI to retain the drug sale proceeds in order for them to boost their arrest numbers.

59.     The CI did not use pre-marked "buy money"; in exchange for the CI's information on the identity of his buyers, Sgt. Fegan allowed the CI to openly sell drugs on the streets of Mount Vernon in order to increase arrest numbers.

60.     In November 2013, Officer Bovell was constructively discharged from Narcotics Unit based on Sgt. Fegan and the Unit's hostile work environment, by way of the overt and oppressive discrimination toward black police officers and the black residents of Mount Vernon.

61.     Officer Bovell completed a second MV-5 reassignment form to return to Patrol.

62.     Prior to his reassignment to Patrol, Detective Antonini told Officer Bovell in substance, "Don't you know what's going on in here?" He then pointed to his skin and said, "It's a race war. Black and white."

63.     According to Departmental policy and New York Civil Service Law Article 58, where an officer has worked in a detective capacity for at least 18 months, s/he is to receive a promotion to the detective title and accompanying compensation.

64.     Non-black police officers in the Department assigned to the Detective Division are routinely promoted to Detective and receive their gold shield within 18 months of commencing their assignment.

65.     Black officers assigned to the Detective Division are not promoted or given their gold shield until well after the 18 month time frame, if at all.

66.     Officer Bovell, who was assigned to the Detective Division for 3 years, never received his gold shield, a promotion to the Detective title or just compensation.

67.     The refusal of the Department administration to issue Officer Bovell a gold shield/promotion to detective constitutes an adverse action and a significant career setback.

68.     Officer Griffin (black), who was assigned to the Detective Division for 4 years, had not received his gold shield or a promotion to the Detective title.

69.     Officer Montika Jones (black) was not promoted to detective or given her gold shield until long after she served her 18 months in that capacity.

70.     Non-black officers in the Department who served less than 18 months in the Detective Division have been promoted to detective and received their gold shield.

71.     Officer Kelly Hunt (Caucasian) served no time in the Detective Division and received a promotion to detective and as well as a gold shield.

72.     Officer Richard Capraro (Caucasian) served only 12 months in the Detective Division and received a promotion to detective and received a gold shield.

73.     The Department, through Deputy Commissioner Burke and Captain Goldman, continues to promote less qualified non-black officers over black officers.

74.     For example, Officer Avion Lee (black) is an overly productive police officers who has been employed on in the Department for 2 years.

75.     Defendants Burke and Goldman have recently promoted and assigned newly appointed non-black officers to the Task force and Narcotics with only months after graduating from the police academy, completely disregarding Officer Lee's tenure and productivity.

76.     Defendant Burke disparately reprimanded a black officer for being in a motor vehicle accident on duty through no fault of his own by taking sixteen (16) hours of accrued time.

77.     When the black officer appealed the disciplinary action, Deputy Commissioner Burke retaliated against him by suspending the black officer for seven (7) days without pay, while other white officers receive a lesser penalty for the same type of incident.

78.     In February 2014, defendant Sgt. Wuttke was appointed to be Officer Bovell's supervisor on patrol.

79.     Sgt. Wuttke had been demoted a few years prior, had a reputation for condescending and demeaning conduct toward black subordinates and had been involved in a car accident while he was intoxicated and operating a patrol vehicle on duty.

80.     Sgt. Wuttke had not attended Supervisor School prior to assuming supervision over Officer Bovell.

81.     Upon information and belief, Sgt. Wuttke and Sgt. Fegan have a close relationship.

82.     On March 15, 2014, Officer Bovell called out sick from work in accordance with Departmental procedures.

83.     On March 29, 2014, defendant Wuttke informed Officer Bovell that, although he had an Immaculate attendance record for the past two (2) years, he was issuing Officer Bovell a write-up for being "chronically sick" for being absent three times since January 2014.

84.     The decision to impose a write up against Officer Bovell for his sick time usage was made by defendant Wuttke in conjunction with Captain Hastings (Caucasian) and Lieutenant John Curzio (Caucasian).

85.     Upon information and belief, similarly situated non-black police officers have not received written reprimands under the same circumstances.

86.     Certain police supervisors (Caucasian) have called out sick over nine (9) times within a six (6) month time span and have not received a write-up or a verbal warning.

87.     In and around May 2014, defendant Wuttke was assigned to conduct Officer Bovell's yearly written performance evaluation, despite the fact that he had only supervised Officer Bovell since February 2014 and having no supervisory training.

88.     On May 5, 2014, defendant Wuttke issued Officer Bovell a false and adverse written performance evaluation, unrelated to his actual performance.

89.     For example, Officer Bovell had one of the highest performance and productivity levels in the Department, yet defendant Wuttke rated his productivity as "poor" and" below average".

90.     Defendant Wuttke indicated on Officer Bovell's evaluation that he had only one (1) arrest between January 1, 2014 and March 31, 2014.

91.     In fact, Officer Bovell had approximately 12 arrests on Patrol – 10 of which were initiated by Officer Bovell as un-dispatched arrests.

92.     Defendant Wuttke intentionally failed to include in Officer Bovell's written evaluation his performance in the Narcotics Department that year, which was also highly productive.

93.     During the evaluation period, Officer Bovell was proactive in making over 50 non-dispatched arrests between narcotics and patrol.

94.     Officer Bovell appealed his written performance evaluation.

95.     Defendant Wuttke later admitted to Officer Bovell that the arrest information he included on Officer Bovell's written performance evaluation was false.

96.     On March 31, 2014, Officer Bovell complained to Commissioner Terrence Raynor, Deputy Chief Dumser, Lt. Glen Scott, Captain Michael Goldman and Captain Hastings of ongoing racial discrimination against himself and other black officers in the Department.

97.     No action was taken by Commissioner Terrence Raynor, Deputy Chief Dumser and Captain Hastings to investigate and/or remedy the racial discrimination in the Department or against Officer Bovell as a result of his complaints.

98.     In 2014, Sgt. Fegan was promoted to Detective Sergeant after only having approximately 1 year as a Sergeant in Narcotics Unit, over Sergeant Anthony McEachin (black) who had over 2.5 years of productive experience as a Narcotics Supervisor.

99.     On or about May 6, 2014, Officer Bovell filed a complaint of racial discrimination with the City of Mount Vernon Commissioner of Human Resources, Judy Williams, alleging racial discrimination within the Department (the "City Harassment Complaint").

100.    Officer Bovell's City Harassment Complaint alleged that defendant Wuttke, Lt. Curzio, Captain Hastings and Sgt. Fegan were engaging in racial discrimination against him.

101.    Officer Bovell also informed Ms. Williams about the corruption that was going on in the Narcotics Unit.

102.    Officer Bovell followed up with Ms. Williams by phone regarding his complaint and was advised that she would "look into" the situation and get back to him.

103.    To date, Officer Bovell has not received any contact from the Department of Human Resources regarding his complaint of racial discrimination.

104.    In May 2014, after filing his complaint of racial discrimination, Officer Bovell was told by Lt. Chris Gallagher, "when you do things like this you become a target."

105.    On July 28, 2014, Office Bovell responded to work for a previously scheduled overtime detail involving Consolidated Edison ("ConEd").

13

106.    A police vehicle is always dispatched with the officer in connection with the ConEd overtime details due to traffic control.

107.    Sgt. Wuttke refused to dispatch a police vehicle for Officer Bovell to utilize during the detail and that he would have to be on foot.

108.    Officer Bovell, who was sick in the first instance, advised that he was going home since foot patrol for the detail would cause his condition to worsen.

109.    When Officer Bovell returned to work the next day, Officer Bovell was advised that he was no longer eligible for any ConEd overtime details.

110.    The computer system indicated, "DO NOT HIRE FOR CONED OVERTIME" for Officer Bovell.

111.    While working on patrol, Deputy Chief Dumser approached Officer Bovell and asked how he was doing.  Officer Bovell replied that he was just hanging in there to which Deputy Chief Dumser replied in front of other officers, "I don't see no rope."

112.    On September 9, 2014, Officer Bovell injured his right knee while effecting an arrest during his employment with the Department.

113.    Since that time, Officer Bovell has been subjected to further harassment, retaliation and discrimination.

114.    In accordance with GML §207-c, Officer Bovell executed a HIPAA-compliant authorization for the Department and the City's duty doctor to obtain and any all of his medical records related to the September 2014 on-the-job injury.

115.    Despite signing and providing the foregoing release and authorization to the Department in connection with his September 2014 injury, Lt. Paul Nawrocki ("Lt. Nawrocki")

has repeatedly required Officer Bovell to disclose personal HIPAA protected medical information to a third party agency, Disability Management Associates ("DMA").

116.    Lt. Nawrocki has falsely represented that DMA was only being used by the City to manage medical records in connection with 207-c claims.

117.    In fact, DMA representatives are being used by the Department to harass and intimidate Officer Bovell by, *inter alia,* asking personal questions unrelated to his September 2014 injury, calling his doctor's office to obtain information about when Officer Bovell will be appearing for his appointments, following him to his personal doctor's and physical therapy appointments and trying to sit in on his private doctor's appointments with him.

118.    By letter dated January 29, 2015, Lt. Nawrocki threatened Officer Bovell that if he does not meet with a representative of DMA and discuss his personal health information, he will face disciplinary action up to and including termination of his 207-c benefits.

119.    Lt. Nawrocki's letter was personally delivered to Officer Bovell's home in Dutchess County by two (2) Internal Affairs officers as a means of intimidation and retaliation.

120.    By letter dated February 26, 2015, Deputy Chief Goldman ordered Officer Bovell to, *inter alia,* meet and cooperate with a nurse employee of DMA.

121.    Deputy Chief Goldman's February 26, 2015 letter was personally delivered to Officer Bovell's home in Dutchess County by two (2) Internal Affairs officers as a means of intimidation and retaliation.

122.    Deputy Chief Goldman's letter required Officer Bovell to sign the unlawfully broad authorizations within 10 days or face disciplinary action.

123.     Before the expiration of 10 the day period, Deputy Chief Goldman informed Officer Bovell that he was being disciplined for not signing the HIPAA forms within 10 days, which letter was placed in Officer Bovell's personnel file.

124.     Lt. Nawrocki also required Officer Bovell to complete an MV-5 Form to explain why he would not sign unlawfully broad authorizations allowing, *inter alia,* the City's outside counsel, with access to his medical records.

125.     In 2015, when Officer Bovell called in to the desk to advise that he would be leaving the house to attend physical therapy, he informed Sgt. Tommy Gallagher (Caucasian) that he was waiting for the approval for a second surgery, to which Sgt. Gallagher replied that he (Officer Bovell) would have to be a "boss" in order to get approved for surgery, like his brother was.

126.     Sgt. Gallagher's brother, Lt. Chris Gallagher (Caucasian), was approved for his knee surgery.

127.     Lt. Chris Gallagher is another management level Department member who engages in racist remarks.

128.     For example, upon information and belief, in and around January 2014, Lt. Gallagher was involved in an altercation with a black male to whom he made racist remarks and physically "roughed up".

129.     In March 2015, Officer Bovell received a Letter of Caution in connection with his refusal to acquiesce to the Department's unlawful orders for him to meet with DMA representatives, provide personal information to DMA representatives and allow DMA representatives to accompany him to his personal doctor's and physical therapy appointments.

130.    Lt. Nawrocki threatened Officer Bovell, who was in pain and out on disability, that if he did not drive from Dutchess County to the Department in Mount Vernon and meet with a representative of DMA his benefits would be terminated.

131.    Officer Bovell requested that the DMA representative come to his home, to which Lt. Nawrocki responded, that was "too far for her to drive."

132.    Officer Bovell met with a nurse representative of DMA, who began questioning him about an injury that he sustained in 2002, which was also not relevant or material to the September 2014 injury.

133.    The City violated Officer Bovell's confidential HIPAA protected medical information by disclosing the same to DMA regarding a past injury in 2002 that was completely unrelated to his September 2014 injury.

134.    Members of DMA followed him to his personal doctor's appointments and harassed him for personal information, despite Officer Bovell having already executed HIPAA authorization for DMA to access his medical records related to the September 2014 injury.

135.    Lt. Nawrocki directed Officer Bovell to allow members of DMA to accompany him to his doctor's appointments, which would have effectively defeated the doctor-patient relationship and was not a bargained for condition of the Collective Bargaining Agreement with the City.

136.    When Officer Bovell refused to allow anyone from DMA into his doctor's visits, Lt. Nawrocki threatened him with disciplinary action up to and including termination of his 207-c benefits.

137.    Lt. Marcel Oliferes also directed Officer Bovell to allow the members of DMA to accompany him to his personal doctors' appointments.

138.    Lt. Oliferes ordered Officer Bovell to complete an MV-5 explaining why he would not allow DMA representatives into his doctor's visits with him.

139.    Officer Bovell has at all times met with the City's duty doctor, complied with his requests, and appeared for any and all requested independent medical examinations in connection with the September 2014 injury.

140.    By letter dated June 10, 2015, counsel for Officer Bovell communicated to Commissioner Raynor that no provision of GML §207-c requires him either to speak or meet with any representatives from DMA or that he allow them to accompany him to his doctor's visits.

141.    The June 10, 2015 letter informed Commissioner Raynor that the Department was unlawfully ordering and coercing Officer Bovell to provide DMA access to information over and above that required under GML §207-c and/or the Department's Collective Bargaining Agreement as a result of its disparate and retaliatory treatment of Officer Bovell.

142.    The June 10, 2015 letter ordered that the Department, which was facilitating a harassing course of conduct of Officer Bovell through DMA, cease contacting Officer Bovell and that the Department cease its retaliatory actions toward Officer Bovell.

143.    The June 10, 2015 letter was copied to, *inter alia,* Mayor Ernie Davis, Deputy Chief Goldman, Lt. Paul Nawrocki, Lt. Marcel Oliferes and Disability Management Associates, Inc.

144.    By hand delivery on or about June 15, 2015 by two (2) Internal Affairs officers to his home in Dutchess County, Deputy Chief Goldman terminated Officer Bovell's GML §207-c benefits for refusing to cooperate with DMA, despite having no legal authority to require Officer

Bovell to communicate with DMA over and above executing HIPAA authorizations for DMA to obtain his medical records for the September 2014 injury.

145.    As a result of terminating his 207-c benefits, Officer Bovell has been unable to attend physical therapy sessions, which have significantly hindered his recovery, contributed to his physical pain and suffering, has increased his recovery time, caused further damage to his knee injury and interfered with and/or prohibited a full recovery of his injury.

146.    Like Officer Bovell, the 207-c benefits of Sgt. Jennifer Carpenter (black) were also terminated in retaliation for her raising complaints about discrimination.

147.    The City of Mount Vernon has been on notice of the discriminatory and racially disparate treatment of its black officers since at least January 2014 through the complaints made directly to Mayor Ernest Davis by Sgt. Jennifer Carpenter (black female).

148.    Sgt. Carpenter was threatened by Lt. Hunce that she would "suffer" if she wrote up a Caucasian female officer for falling asleep on the job.

149.    Sgt. Carpenter informed Mayor Davis in person that she and other black officers had been subjected to disparate treatment while non-black officers are permitted to get away with acts of misconduct, some of which are criminal in nature.

150.    Neither Mayor Davis, Commissioner Raynor, Deputy Commissioner Burke, the Department of Human Resources, the Police Department administration, nor the individually named defendants have taken any steps to investigate and/or quash the racial discrimination occurring within the Department.

151.    Mayor Davis, Commissioner Raynor, Deputy Commissioner Burke, the Department of Human Resources, the Police Department administration, and the named

defendants have taken no steps to investigate and/or quash the racial discrimination occurring within the Department.

153. An additional example discrimination in the Department is the discriminatory suppression of the advancement of black sergeants by the promotion of Sergeant Daniel Fischer from an expired Lieutenant's list.

154. Upon information and belief, Lt. Fischer had taken and failed the most recent Lieutenant's test, while three (3) black Sergeants ranked in the top three (3) positions on the list.

155. Upon information and belief, Lt. Fischer was thereafter unlawfully promoted from the expired Lieutenant's list over the black Sergeants who had scored in the highest positions on the new, unexpired list.

156. To date, under the command of Det. Sgt. Fegan, there remains only one (1) black officer in the Narcotics Unit.

157. The City is subject to *Monell* liability because the City maintained a policy, practice or custom, whereby it committed, condoned, and/or remained deliberately indifferent to racial discrimination by maintaining a custom or practice of discriminating against Officer Bovell and other law enforcement officers based on their race.

158. The discriminatory practices were so persistent and widespread that they constitute actual and/or constructive acquiescence of the City's policy makers, including Mayor Davis, Commissioner Raynor and Deputy Commissioner Burke.

159. The City's high-level supervisors and/or persons responsible for preventing racial discrimination failed to properly investigate, prevent, remedy, or correct the unlawful conduct, including Mayor Davis, Police Commissioner Raynor, Deputy Commissioner Burke and the Department of Human Resources.

160.    The City's inadequate training/supervision was so likely to result in discrimination that the City's policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

161.    The City's policymakers, including Mayor Davis, Police Commissioner Raynor, Deputy Commissioner Burke and the Department of Human Resources knew of and failed to correct the discriminatory conduct and unlawful conduct.

162.    At all times relevant herein, the individually named defendants were working and acting in their official capacity and in furtherance of their employment by the City of Mount Vernon, New York.

163.    At all times relevant herein, the City of Mount Vernon is liable for the acts of the individually named defendants under the theory of *respondeat superior.*

164.    Officer Bovell has been caused to suffer, *inter alia,* anxiety, anger, sleeplessness, physical injury, physical pain and suffering, emotional pain and suffering, economic injuries, damage to his professional advancement and otherwise been rendered sick and sore.

## AS AND FOR A FIRST CAUSE OF ACTION

165.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "164".

166.    Under the theory that the defendant City of Mount Vernon is liable to the plaintiff for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e.

## AS AND FOR A SECOND CAUSE OF ACTION

167.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "166".

168.    Under the theory that the individually named defendants are liable to the plaintiff for retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e.

## AS AND FOR A THIRD CAUSE OF ACTION

169.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "168".

170.    Under the theory that the individually named defendants are liable to the plaintiff for violations of his right to Equal Protection under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A FOURTH CAUSE OF ACTION

171.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "170".

172.    Under the theory that the City of Mount Vernon is liable to the plaintiff under *Monell* for violations of his right to Equal Protection under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

**AS AND FOR A FIFTH CAUSE OF ACTION**

173.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "172".

174.    Under the theory that the individually named defendants are liable to the plaintiff for racial discrimination in violation of New York Executive Law §296.

**AS AND FOR A SIXTH CAUSE OF ACTION**

175.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "174".

176.    Under the theory that the individually named defendants are liable to the plaintiff for retaliation in violation of New York Executive Law §296.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

177.    Repeats and realleges as if set forth in their entirety paragraphs "1" through "176".

178.    Under the theory that the City of Mount Vernon is liable to the plaintiff for the discriminatory and retaliatory acts and omissions of the individually named defendants in violation of New York Executive Law §296 under the theory of *respondeat superior*.

WHERFORE, a Judgment is respectfully requested:

1.   Awarding against all defendants economic damages with statutory interest;

2.   Awarding against all defendants compensatory damages as the jury may determine;

3.   Awarding against the individually named defendants punitive damages as the jury may determine;

4.   Awarding costs, disbursements and reasonable attorney's fees; and

5.   Granting such other and further relief as the Court deems just and proper.

Dated: Scarsdale, New York
       November 2, 2015

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff,*
*Murashea "Mike" Bovell*

By: _____
       Amy L. Bellantoni (AB3061)
       2 Overhill Road, Suite 400
       Scarsdale, New York 10583
       (914) 367-0090 (t)
       (914) 367-0095 (f)