UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MURASHEA "MIKE" BOVELL,

                Plaintiff,

  -vs-

CITY OF MOUNT VERNON, New York,
Commissioner TERRANCE RAYNOR,
Individually and in his Official Capacity,
Deputy Commissioner RICHARD BURKE,
Individually and in his Official Capacity,
Captain MICHAEL GOLDMAN, Individually
and in his Official Capacity, Sergeant ROBERT
WUTTKE, and Lieutenant PAUL NAWROCKI,
Individually and in his Official Capacity

                Defendants.
_____

Civil Action No.:
7:15-cv-08594-CS

# STATEMENT OF MATERIAL FACTS NOT IN DISPUTE PURSUANT TO SDNY LOCAL RULE 56.1

       Defendants, the City of Mount Vernon ("City"), Captain Michael Goldman "Goldman"), Lieutenant Paul Nawrocki ("Nawrocki") and Sergeant Robert Wuttke ("Wuttke") (collectively, "Defendants"), by their attorneys, Coughlin & Gerhart, LLP, as and for its Statement of Material Facts Not in Dispute, respectfully submits to this Court as follows:

    **Note**: All citations below are to ECF filings in this matter and to those exhibits annexed to the Declaration of Paul J. Sweeney, Esq., dated May 4, 2017, consisting of deposition transcripts and documents disclosed during discovery.

### Plaintiff's Assignments to the Detective Bureau

    1.    The Plaintiff began his employment as a Police Officer with the City of Mount Vernon Police Department in July, 2007. [Dkt. 1, ¶18].

2. Plaintiff served in the Patrol Division until July 1, 2010, when he was transferred to Detective Division (also known as the "Detective Bureau") where he was assigned to the Narcotics Unit. [Ex. A, p. 25-26; Ex. J, p. 2].

3. Plaintiff left the Detective Division and was reassigned to the Patrol Division on January 28, 2011. [Ex. J, p. 3].

4. Plaintiff remained in the Patrol Division until December 1, 2011, at which time he was again reassigned to the Detective Division where he worked in the Narcotics Unit. [Ex. J, p. 4; Ex. A, p. 27, ln. 13-14].

5. While working full time in the Narcotics Unit of the Detective Division in 2013, Plaintiff was also taking college courses. [Ex E, p. 1, ¶ 2].

6. Plaintiff had a midterm scheduled on March 15, 2013 during one of his assigned shifts. [Ex. E, p. 2, ¶ 1].

7. On March 13, 2013, Plaintiff submitted a Compensatory Time Request to take time off on March 15, 2014 in order to take the midterm. [Ex. G; Ex. E, p. 2, ¶ 1].

8. Plaintiff was denied the time off to take his midterm because there were no other field training officers assigned for that day. [Ex. G; Ex. E, p. 2, ¶ 1].

9. On July 29, 2013, Plaintiff submitted an MV-5 Officer's Report ("MV-5") requesting a transfer out of the Detective Division on July 29, 2013 [Ex. H], a request he later withdrew [Ex. A, p. 121, ln. 8-11];

10. Plaintiff later became aware that, as of January 1, 2014, the Patrol Division would change their work schedule from rotating shifts to "steady" or non-rotating shifts. [Ex. E, p. 1, ¶ 2; Ex. I, p. 2].

11. On December 5, 2013, Plaintiff submitted a second MV-5 requesting out of the Detective Division, Narcotics Unit. [Ex. I].

12. The Mount Vernon Police Department granted Plaintiff's request and re-assigned him to the Patrol Division. [Ex. L].

13. Plaintiff was transferred back to a Patrol Division on January 1, 2014, which remains his current assignment. [Ex. A, p. 28, ln. 4-13].

### Detective Designations and Promotion

14. The City's mayor is responsible for designating detectives. [Ex. NN, p. 88, ln. 11-12].

15. The City's mayor during the 2013-2014 time frame was Ernest Davis, an African-American male. [Ex. NN, p. 98, ln. 17-19; Ex. PP, p. 39, ln. 7-8].

16. The City's police commissioner during the 2013-2014 time frame, Terrance Raynor, is an African-American male. [Ex. NN, p. 98, ln. 17-19; Ex. PP, p. 39, ln. 7-8].

17. Plaintiff conceded that no other officer, black or white, who has "asked out" or requested to be re-assigned away from the Detective Division, has received a detective shield. [Ex. A, p 143, ln. 24-25].

18. Plaintiff recalled that Officer Briley, who also "asked out" of the Detective Division after completing more than eighteen (18) months in the Detective Division, was not designated a detective. [Ex. A, p. 144, ln. 18].

19. Plaintiff has not filed a personal grievance, an Article 78 or any other legal proceeding regarding his failure to be designated a detective. [Exhibit A, p. 152, ln. 19-21].

20. Other police officers were not immediately designated a detective upon their 18th month anniversary of service in the Detective Division. [Ex. M].

21. Camilio Antonini was not designated a detective until he reached 22 months of service with the Detective Division. [Ex. M, p. 6; Ex. NN, p. 97, ln. 8].

22. Robert Wuttke was not designated a detective until he reached 22 months of service with the Detective Division. [Ex. M, p. 6; Ex. NN, p. 97, ln. 11].

23. Mark Symonette was not designated a detective until he reached 21 months of service with the Detective Division. [Ex. M, p. 6].

24. Johanna Santos was not designated a detective until she reached 48 months of service with the Detective Division. [Ex. M, p. 7].

25. At some point, former Deputy Commissioner Burke's son (a Caucasian male) was assigned to the task force unit, which Plaintiff considered a "promotion." [Ex. A, p.138-139].

26. Following complaints from certain officers who felt this "promotion" was unfair, Deputy Commissioner Burke's son was immediately taken off the unit. [Ex. A, p. 138-139].

27. Sergeant Sexton, Sergeant McEachin and Sergeant Scott (all African American) were promoted to Lieutenant. [Ex. A, p. 155, ln. 22-25].

### Plaintiff's Performance Evaluation

28. The City maintains a protocol relevant to performance evaluations in the Administrative Guide which applies to all members and outlines discrete criteria for analysis. [Ex. K-2].

29. According to policy, annual evaluations must be conducted by the supervisor that is currently assigned as the squad supervisor. [Ex. NN, p. 119-120].

30. Sgt. Wuttke was in charge of evaluating Plaintiff for the time period of April 2013 to March 2014. [Ex. NN, p. 118, ln. 12-21].

31. Sgt. Wuttke received instructions from Lt. Gallagher who explained how to pull stats, or how to have stats pulled, and how to complete the evaluation in general. [Ex. NN, p. 123, ln. 11-15].

32. On April 24, 2014, Sgt. Wuttke requested Plaintiff's records from Support Services Division ("SSD") in order to complete Plaintiff's evaluation. [Ex. NN, p. 146, ln. 11-13; Ex. T].

33. The records Sgt. Wuttke received from SSD show Plaintiff had written 1 parking summons, 8 UTTs, 0 VCO summons, and made 1 arrest between April 1, 2013 and March 31, 2014. [Ex. T, p. 2; Ex. NN, p. 149, ln. 15-17].

34. Sgt. Wuttke evaluated Plaintiff, giving him a satisfactory in eight (8) categories and a "needs improvement" in two (2) areas: Attitude as well as Quantity and Quality of Work. [Ex. U].

35. Sgt. Wuttke provided his rationale for all deficient areas in the comments section of the evaluation, noting that Plaintiff's productivity numbers were below average. [Ex. U, p. 2].

36. Plaintiff appealed the evaluation "in its entirety". [Ex. V].

37. Following the Plaintiff's appeal, Sgt. Wuttke, again, requested Plaintiff's records from SSD. [Ex. NN, p. 224, ln. 6-11; Ex. W].

38. On August 26, 2014, Sgt. Wuttke received an email from SSD showing Plaintiff had written 7 parking summonses, 3 TTs, 2 VCOs, and made 3 arrests between April 1, 2014 and August 21, 2014. [Ex. W].

39. In November 2014, Sgt. Wuttke requested another productivity report from SSD. [Ex. NN, p. 225, ln. 4-9].

40. At that time, the productivity report received from SSD indicated that Plaintiff had made 30 arrests. [Ex. X].

41. Sgt. Wuttke issued an "Amended Evaluation" dated January 23, 2015. [Ex. Y; Ex. A, p. 183-184].

42. In the Amended Evaluation, Sgt. Wuttke evaluated Plaintiff, giving him a satisfactory in nine (9) categories and a highly effective in "Quantity/Quality of Work". [Ex. Y].

43. Sgt. Wuttke apologized to Plaintiff for the inaccuracies in Plaintiff's first evaluation in a telephone conversation that Plaintiff recorded. [Ex. Z; Ex A, p. 184, ln. 9-15].

44. Plaintiff never appealed the Amended Evaluation. [Ex. A, p. 192-193].

### Plaintiff's Write Ups as Chronic Absent

45. The City's Administrative Guide outlines the City's policy on "Chronic Absence Control". [Ex. K-1].

46. City policy provides that members may be identified as Chronic Absentees if they satisfy one (1) or more of the following criteria:

> (1) Three (3) absences in a six (6) month period that occur only on :(a) the first or last day of the members' work week; and/or (b) Saturdays, Sundays or holidays;
> (2) Six (6) or more absences in the prior twelve (12) months;
> (3) An average of ten (10) or more absences over the prior three (3) calendar years.

[Ex. K-1, p. 1].

47. On March 27, 2014, Captain Roy Hastings emailed Patrol Division supervisors informing them that MVPD records indicated several members met the Department's "Chronic Absent" designation and directed all sergeants to review their records and forward reports of "Chronic Absent" recommendations to the Patrol Division office "ASAP". [Ex. N].

48. On March 29 2014, Sergeant Wuttke reviewed the records of his assigned officers, which included Plaintiff. [Ex. NN, p. 133, ln. 8-19].

49. MVPD records reflect that Plaintiff had reported sick on three (3) occasions within a six (6) month period, and that each instance occurred on the first or last day of Plaintiff's schedule workweek. [Ex. O; Ex. NN, p. 137, ln. 3-19].

50. Sgt. Wuttke documented Plaintiff's designation as a Chronic Absentee in his MV-93 Supervisory Report ("MV-93") and forwarded the report to his superior, Captain Goldman. [Ex. O].

51. Based on Captain Hasting's direction, fourteen (14) members of the MVPD, including Plaintiff, were designated Chronic Absentees. [Ex. P].

52. Plaintiff testified that his own superior, Lieutenant Curzio (a Caucasian male) was also counseled for qualifying as a Chronic Absentee. [Ex. A, p. 176, ln. 18].

53. According to the MVPD policy, at the sole discretion of the Commissioner, for so long as he/she is designated as Chronic Absentee, the Member may have any or all of the following applied to him/her: (A) Charges and Specifications; (B) Change of assignment; (C) Authorization for off duty employment revoke; and (D) Ineligible for voluntary overtime. [Ex. K-1, p. 2].

54. Sgt. Wuttke's MV-93 recommended no disciplinary action against Plaintiff for violating Department's Chronic Absentee policy. [Ex. O, p. 2; Ex. K-1 p. 4].

55. Sgt. Wuttke acknowledged that, while Plaintiff met the criteria for Chronic Absent, no action should be taken given that Plaintiff "did not report sick for the entire years of 2012 and 2013." [Ex. O].

56. Captain Goldman, the MVPD Executive Officer, concurred with Sgt. Wuttke's recommendation of no punishment in his endorsement. [EX. Q].

57. Neither Sgt. Wuttke nor Captain Goldman took any further adverse action against Plaintiff for his Chronic Absentee status beyond a verbal counseling. [Ex. Q].

58. On March 29, 2014 Plaintiff submitted an MV-5 regarding being named Chronic Absent, titled "concern/sick day discriminatory retaliation." [Ex. R].

59. In the MV-5 of March 29, 2014, Plaintiff did not claim that being named "Chronic Absent" was due to his race.

60. In his MV-5 of March 29, 2014, Plaintiff stated "this course of action is a direct discriminatory retaliation against me by Captain Hastings Lieutenant Curzio and Sergeant Wuttke along with other levels of management due to my personality and position as a field training officer and for being sick," [Ex. R, p. 1], and, "I should not be punished for genuinely feeling sick and being the only FTO on the 4x12 tour." [Ex. R, p. 2].

61. Plaintiff did not suffer any negative career consequences because of the Chronic Absentee designation. [Ex. A, p. 170 and 171].

**Plaintiff's Internal Complaint**

62. Plaintiff claims that he had a discussion with Judy Williams, Commissioner of Human Resources to discuss his complaints. [Ex. A, p. 180-181].

63. Plaintiff claims that Ms. Williams told him to put his complaints in writing to give her "something she can work with" so that she could "schedule an appointment with the mayor." [Ex. A, p. 182, ln. 7-9].

64. At the time, Plaintiff understood that the City would rely on his written complaint in order to launch an investigation. [Ex. A, p. 182, ln. 22-23].

65.     On May 6, 2014 Plaintiff submitted a Confidential Harassment Complaint Form to Commissioner Williams. [Ex. F].

66.     Plaintiff's May 6, 2014 complaint characterized the harassment as "bullying, race", and noted to "see attached". [Ex. F].

67.     The written narrative attached to Plaintiff's May 6, 2014 complaint does not address any complaints pertaining to a hostile work environment while assigned to the Detective Division in 2011 - 2013. [Ex. E].

68.     The written narrative attached to Plaintiff's May 6, 2014 complaint does not address any complaints pertaining to racial discrimination while assigned to the Detective Division in 2011 - 2013. [Ex. E].

69.     The written narrative attached to Plaintiff's May 6, 2014 complaint does not detail the commission of a crime or violation of MVPD rules or regulations by Detective Antonini while assigned to the Detective Division in 2011 - 2013. [Ex. E].

70.     The written narrative attached to Plaintiff's May 6, 2014 complaint does not detail the commission of a crime or violation of MVPD rules or regulations by Sgt. Fegan while assigned to the Detective Division in 2011 - 2013. [Ex. E].

71.     The written narrative attached to Plaintiff's complaint states in relevant part:

> Since his appointment, Sgt Fegan repeatedly displayed condescending behavior towards me and other members of the unit. Sgt. Fegan also displayed signs of favoritism repeatedly and micromanagement along with some unsavory acts. He constantly displayed his willingness to do anything to get large amounts of arrests by any means I guess to exceed the previous supervisor. A few months went by and I found it to be so intolerable to the point it was over bearing and advised Sgt. Fegan that I wish to be reassigned out of the unit due to his inappropriate behavior and lack of Supervision skills[.]
> *****

> A few months went by and his behavior continued, so I requested to be out of the unit and reassigned to patrol. Patrol had recently implemented steady tours and I was also attending school at the time so figured this would be the best decision for me due to the complications of being in the unit. Sgt Fegan apparently had problems with me attending school and requesting time off at times.

[Ex. E, p. 1].

### Denial of Con-Ed Overtime Work

72. As long as an officer is qualified for Con-Edison ("Con-Ed") overtime, their name is placed on a list. The officer in the patrol division clerk's office calls down the list of qualified officers to assign overtime. Once an officer is assigned an overtime shift, the officer is placed at the bottom of the list. [Ex. NN, p. 240-241].

73. An officer may be disqualified from being placed on the Con-Ed overtime list. For example, an officer is disqualified if they appear on the Chronic Absent list, if they are out injured, or on modified or restricted duty. [Ex. NN, p. 242, ln. 3-6].

74. Plaintiff was hired for a Con-Ed overtime assignment on July 28, 2014. [Ex. A, p. 202, ln. 2-5].

75. When Plaintiff reported for the Con-Ed detail on July, 28, 2014, Sergeant Wuttke told him that there were no police vehicles available for him to use during this particular detail. [Ex. A, p. 202, ln. 12-15].

76. Plaintiff recalls that, at the time he reported for the Con-Ed detail on July, 28, 2014, the availability of police vehicles were limited due to maintenance issues. [Ex. A, p. 201, ln. 8-12].

77. Upon hearing that there was no police vehicle available for the Con-Ed assignment, Plaintiff went home and did not work the Con-Ed assignment. [Ex. A, p. 200, ln. 17].

78. The following day, Police Officer Jeremy Villanueva, who worked in the administrative office, texted Plaintiff to tell him that he had been taken off the Con-Ed overtime list. [Ex. S].

79. In response to being told he had been taken off the Con-Ed list, Plaintiff texted back, "whoever is responsible in making cars available needs to do their job." [Ex. S].

80. Plaintiff's text does not claim that his removal from the Con-Ed list was based on race. [Ex. S, p. 2].

81. Plaintiff does not know who removed him from the Con-Ed list. [Ex. A, p. 204, ln. 23-24].

### EEOC Complaint

82. Plaintiff's EEOC charge dated July 30, 2014 states: "On March 29, 2014, my supervisor gave me an unfair write up which I reported to management. Mr. Wuttke then retaliated against me by issuing another unfair and inaccurate evaluation." [Ex. RR].

83. Plaintiff's EEOC Charge dated July 30, 2014 does not address any complaints pertaining to a hostile work environment while assigned to the Detective Division in 2011 - 2013. [Ex. RR].

84. Plaintiff's EEOC Charge dated July 30, 2014 does not address any complaints pertaining to racial discrimination while assigned to the Detective Division in 2011 - 2013. [Ex. RR].

85. Plaintiff's EEOC Charge dated July 30, 2014 does not address any complaints pertaining to the denial of Con-Ed overtime work on July 28, 2014. [Ex. RR].

86. Plaintiff's EEOC Charge dated July 30, 2014 does not address any complaints pertaining to the commission of crime or violation of MVPD rules or regulations by Detective Antonini while assigned to the Detective Division in 2011 - 2013. [Ex. RR].

87. Plaintiff's EEOC Charge dated July 30, 2014 does not address any complaints pertaining to the commission of crime or violation of MVPD rules or regulations by Sgt. Fegan while assigned to the Detective Division in 2011 - 2013. [Ex. RR].

### Incidents Involving Individual Defendants

88. Plaintiff testified that in 2013 Sergeant Fegan "made a joke", while Plaintiff was in the back of the car on the way to conduct a search warrant, saying in substance "[d]amn n_gger have no sense. They should just die," to which Detective Antonini replied in substance, "let's just take their money." [Exhibit A, p. 72, ln. 5-13; Dkt. 1 ¶ 33].

89. Plaintiff testified he was "half-asleep" in the back of the car during this exchange between Sgt Fegan and Detective Antonini. [Ex. A, p. 69, ln. 7-8]

90. Plaintiff has testified that Sgt. Fegan has never used the racial epithet "n_gger" towards him. [Ex. A, p. 118, ln. 17-25].

91. The Complaint does not allege that Sgt Fegan, Detective Antonini or Sgt Wuttke used a racial epithet directed at Plaintiff. [Dkt. 1].

92. Plaintiff had a duty to report misconduct committed by other police officers under the rules and regulations of the MVPD. [Ex. A, p. 790, ln. 18-23; p. 81, ln. 2].

93. Plaintiff testified that he did not report any misconduct allegedly committed by Detective Antonini to anyone in his chain of command, except allegedly during a meeting with

Sgt. Fegan in July 2013. [Ex. A, p. 78, ln. 13; Ex. A, p. 84, ln. 17-25; Ex. A, p. 105-106; Ex. A, p. 110, ln. 21-22].

94. The only "record" Plaintiff made of the July 2013 office meeting with Sergeant Fegan was a MV-5 requesting to be transferred out of the Detective Division, which Plaintiff later withdrew. [Ex. A, p. 97, ln. 25; Ex. A, p. 98, ln.2; Ex. A, p. 121, ln. 3-11; Ex. H].

95. The MV-5 from July 2013 does not make any report of misconduct by Detective Antonini. [Ex. H].

96. The MV-5 from July 2013 does not make any report of misconduct by Sgt. Fegan. [Ex. H].

97. The MV-5 from July 2013 does not claim any hostile work environment within the Detective Division. [Ex. H].

98. The MV-5 from July 2013 does not claim any racial discrimination within the Detective Division. [Ex. H].

**Plaintiff's Injury and Subsequent GML 207-c Benefits**

99. The City retains Disability Management Associates ("DMA") as its agent to monitor and obtain medical documentation in connection with the processing of General Municipal Law Section ("GML") § 207-c injured on duty claims. [Ex. PP, p. 81].

100. On September 9, 2014, Plaintiff injured his right knee while on duty and applied for GML §207-c benefits, which were subsequently granted. [Dkt. 1, ¶ 112; Ex. MM].

101. By letter dated October 27, 2014, the City alerted Plaintiff as to his obligations as a beneficiary under GML § 207-c. [Ex. AA, p. 1 and 2].

102. Rule No. 4 in the October 27, 2014 letter states "Periodic reviews may be made in the cases of persons receiving Section 207-c disability benefits for the purpose of determining

whether they continue to be entitled to disability benefits and, in furtherance thereof, the City of Mount Vernon may take such action as is appropriate under the law." [Ex. AA, p. 1].

103. Plaintiff was advised by a letter dated January 29, 2015 that a Nurse from DMA would be contacting him in the next few days to set up an appointment to meet with him, and his "failure to meet with and/or communicate with the DMA Nurse Case Manager in a timely manner" may be deemed a violation of his responsibility under GML § 207-c, and could result in termination of his 207-c pay benefits. [Ex. AA p. 3].

104. Plaintiff was not the only officer who was assigned to work with DMA. [Ex. BB].

105. On February 9, 2015, Plaintiff telephoned Lieutenant Nawrocki and inquired what would happen if he did not comply with DMA and was advised that non-compliance could result in termination of his 207-c benefits. [Ex. OO, p. 112, ln. 21-24].

106. On February 11, 2015, Lt. Nawrocki ordered Plaintiff to report to Police Headquarters on February 13, 2015 to be interviewed by a nurse case manager from DMA. [Ex. OO, p. 114].

107. On February 13, 2015, Plaintiff refused to sign a HIPAA release given to him by the DMA nurse and refused to be interviewed by the DMA nurse. [Ex. OO, p. 114, ln. 13-17].

108. Lt. Nawrocki ordered plaintiff to complete two MV-5 Reports regarding his tardiness and refusal to cooperate. [Ex. OO, p. 114, ln. 13-17; Ex. DD].

109. In a letter dated February 26, 2015, Plaintiff was ordered to execute enclosed HIPAA authorizations and return them within ten (10) days. [Ex. AA p. 4].

110. The City has sent similar follow-up letters to other police officers who did not cooperate with DMA as requested. [Ex. CC].

111. The HIPAA form and letter dated February 26, 2015 were personally delivered to Plaintiff at his residence by Lt. Lifrieri of the Internal Affairs Division. [Ex. HH, p. 2].

112. The Internal Affairs Division conducts home visits for all members that are out on long-term GML § 207-c injuries. [Ex. OO, p. 120, ln. 19-23].

113. The Internal Affairs Division conducts random spot check home visits of anybody out injured for any length of time. [Ex. OO, p. 120, ln. 19-23].

114. Plaintiff received a non-punitive counseling memo, dated March 6, 2015, arising out of his refusal to follow lawful orders of the Department. Plaintiff was given ten (10) days to rebut the counseling memo. [Ex. EE, p. 2].

115. Plaintiff emailed Captain Goldman on March 6, 2015 attaching certain medical reports and a HIPAA release, and requested that the counseling memo be removed from his Personnel file. [Ex. FF].

116. By letter dated March 13, 2015, Captain Goldman acknowledged receipt of the above, and advised Plaintiff that since the memorandum was non-punitive and did not constitute discipline, it would not be removed from his file. [Ex. GG].

117. By letter dated April 13, 2015, Plaintiff was awarded GML § 207-c benefits for his injury on September 9, 2014, effective the date of injury. [Ex. PP].

118. By letter dated June 10, 2015, Plaintiff's attorney requested that Commissioner Raynor direct DMA to cease contacting Plaintiff "for any reason, including any appearances at or attempt to accompany Officer Bovell to his doctor's and physical therapy visits". [Ex. HH].

119. By letter dated June 15, 2015, Plaintiff was advised that, due to his failure to cooperate with DMA and the City, his GML 207-c benefits were being terminated. [Ex. II].

120. By letter dated June 22, 2015, Plaintiff appealed this termination. [Ex. JJ].

121.    The City scheduled a hearing on the matter for July 22, 2015, appointing Deputy Commissioner Burke to preside over the appeal. [Ex. KK].

122.    On July 20, 2015, Plaintiff requested an adjournment of the hearing he requested. [Ex. KK, p. 3].

123.    The hearing, rescheduled for August 26, was, again, adjourned at Plaintiff's request until October 14, 2015. [Ex. KK, p. 4].

124.    On October 9, 2015, Plaintiff requested, for a third time, that the October 14, 2015 hearing be adjourned. The hearing was rescheduled for November 3, 2015. [Ex. KK, p. 6].

125.    On the evening before the November 3, 2015 hearing, and after business hours, Plaintiff's counsel faxed the City's counsel a letter stating that she believed that Deputy Commissioner Burke had an inherent conflict in presiding over the hearing. [Ex. LL].

126.    Neither Plaintiff nor his counsel attended the noticed hearing on November 3, 2015.

127.    Plaintiff never filed a grievance regarding his dispute with City's use of DMA. [Ex. B, p. 31-32].

128.    Plaintiff testified that DMA did not harass or intimidate him on account of his race. [Ex. B, p. 22, ln. 22].

129.    While Plaintiff was out on GML§ 207-c leave, he underwent three surgeries to his right knee, all of which were authorized by the City. [Ex. C, p. 64, ln. 11-14].

130.    The third surgery was conducted to correct a defect of the meniscus which was a bi-product of the second surgery. [Ex. C, p. 64, ln. 15].

131.    Despite a delay in receiving physical therapy, Plaintiff would have still required the third surgery to correct the meniscal tear caused by the second surgery. [Ex. C, p. 64, ln. 8-15].

132.    Plaintiff suffered no permanent injuries arising out of the delay in physical therapy. [Ex. C, p. 61-62].

133.    Plaintiff's treating physician testified that despite any delay in physical therapy, Plaintiff would have ended up needing the third surgery. [Ex. C, p. 64, ln. 15].

134.    Plaintiff's treating physician testified that Plaintiff was likely able to return to light duty. [Ex. C, p. 64, ln. 25].

135.    Plaintiff has received his full and tax-free GML 207-c wage benefits since September 2014 (except for a vacation he took in 2015). [Ex. A, p. 224-225].

Dated:  Binghamton, New York
        May 4, 2016

                                S/Paul J. Sweeney
                                Paul J. Sweeney, Esq.
                                Bar Roll No. PS0167
                                COUGHLIN & GERHART, LLP
                                *Attorneys for Defendants,*
                                *City of Mount Vernon, Captain Michael*
                                *Goldman, Sergeant Robert Wuttke, and*
                                *Lieutenant Paul Nawrocki*