# EXHIBIT 1(b)

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X

MURASHEA "MIKE" BOVELL,

                    Plaintiff,

-against-                   Civil Action No:
                              7:15-CV-08594-CS

CITY OF MOUNT VERNON, NEW YORK,
COMMISSIONER TERRANCE RAYNOR,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY, DEPUTY COMMISSIONER
RICHARD BURKE, INDIVIDUALLY AND
IN HIS OFFICIAL CAPACITY,
CAPTAIN MICHAEL GOLDMAN, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY,
SERGEANT ROBERT WUTTKE, AND
LIEUTENANT PAUL NAWROCKI, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - X

HELD AT:      Office of Corporation Counsel
             2 Roosevelt Square
             Mount Vernon, New York 10550
             November 1, 2016
             12:00 p.m.


             Examination before Trial of the
Plaintiff, MURASHEA BOVELL, pursuant to
Court Order, held at the above time and
place before a Notary Public of the State of
New York.


            J & L REPORTING SERVICE
             of Westchester, Inc.
        50 Main Street, Suite 1000
       White Plains, New York 10606
           (914) 682-1888
          Lisa Dobbo, Reporter

2

A P P E A R A N C E S:

THE BELLANTONI LAW FIRM, PLLC
Attorneys for the Plaintiff
Office & Post Office Address
2 Overhill Road, Suite 400
Scarsdale, New York 10583
BY:  AMY BELLANTONI, ESQUIRE


COUGHLIN & GERHART, LLP
Attorneys for the Defendants
Office & Post Office Address
99 Corporate Drive
Binghamton, New York 13904
BY:  PAUL J. SWEENEY, ESQUIRE


A L S O   P R E S E N T:

Alec Francis

3

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom said deposition is taken.

IT IS FURTHER STIPULATED AND AGREED, that all objections, except as to form, are reserved to the time of trial.

```
 1                          M. BOVELL              4

 2                 MURASHEA BOVELL, stating his

 3                 business address as 1 Roosevelt

 4                 Square, Mount Vernon, New York

 5                 10550, having been duly sworn

 6                 by Notary Public, Lisa Dobbo,

 7                 testified as follows:

 8                 MR. SWEENEY:  Let's mark these.

 9                 (Whereupon, Defendant's Exhibit

10         DD, Letter 10-27-14, was marked for

11         Identification.)

12                 (Whereupon, Defendant's Exhibit

13         EE, Letter 1-29-15, was marked for

14         Identification.)

15                 (Whereupon, Defendant's Exhibit

16         FF, Letter 2-26-15, was marked for

17         Identification.)

18                 (Whereupon, Defendant's Exhibit

19         GG, Letter 3-6-15, was marked for

20         Identification.)

21                 (Whereupon, Defendant's Exhibit

22         HH, Letter 3-13-15, was marked for

23         Identification.)

24                 (Whereupon, Defendant's Exhibit

25         II, Letter 4-13-15, was marked for
```

```
1                    M. BOVELL                    5

2              Identification.)

3              Q.    Officer Bovell, this is the

4       resumption of your deposition from last

5       week.  As you may recall, I'm Paul Sweeney

6       with the law firm Coughlin & Gerhart and I

7       represent the city and the other defendants

8       in the lawsuit that you have brought.

9              I think -- I will assume the same

10      ground rules apply:  If I ask a question and

11      you answer it the way I asked it that you

12      understood question; is that a fair

13      assumption?

14                    THE WITNESS:  I would like the

15                    opportunity to state that I don't

16                    understand the question.

17                    MR. SWEENEY:  You can certainly

18                    state you don't understand the

19                    question and I'll rephrase it if

20                    necessary.

21              Q.    If you answer the question

22      after I rephrase or otherwise, I'll assume

23      that you understood the question; is that a

24      fair assumption?

25                    A.    All right.
```

M. BOVELL                    6

Q.    Are you on any medications that will prevent you from testifying here today?

A.    No, I just took some painkillers, that's it; over-the-counter.

Q.    Over-the-counter?

A.    Yeah.

Q.    If you need to take a break at any time other than when a question is pending before you, feel free to take that break; okay?

A.    Okay.

Q.    I think when we broke last, Officer Bovell, we were getting into the area of your line of duty injury.

As I understand it, you sustained a line of duty injury on September 9th, 2014 when you injured your right knee; is that correct?

A.    Approximately that time.

Q.    In your Complaint at Paragraph 113 it says "After that time or since that time you've been subjected to further harassment, retaliation and discrimination," is that correct?

M. BOVELL                    7

A.    Yes, further harassment and
abuse from the department.

Q.    That harassment, retaliation
and discrimination you believe is based on
account of your race?

A.    Not just my race.  It's based
upon also me speaking out of identifying
what's happening in the police department so
the way it works is in Mount Vernon Police
Department you're supposed to keep your
mouth shut.  If you see something bad or you
don't like, you're supposed to keep your
mouth shut.  If you want to advance in your
career, you keep your mouth shut and keep it
moving or if you want to transfer which
approximately 50% of the department does,
you keep your mouth shut or, you know, keep
it moving.  There's been instances where
people speak up, people speak up and other
people have spoken up and are subject to
abuse, as well.

Q.    What other people were those
that were subjected to this --

A.    Sergeant Fegan, there's other

```
 1                      M. BOVELL                    8

 2        officers aside from me where another white

 3        officer where the jobs call up for

 4        references and spoken to Sergeant Fegan and

 5        he told them not to hire him, he's a piece

 6        of shit cop, you know, stuff like that

 7        happens.

 8             Q.    What officers have received

 9        that type of evaluation from or performance

10        opinion from Sergeant Fegan?

11                  THE WITNESS:   Retaliation or

12             evaluation?

13             Q.    Well, I think you just

14        mentioned a scenario where officers are

15        trying to, I assume transfer to a job

16        outside the Mount Vernon Police Department.

17             A.    Oh, yeah, they call up for

18        reference and Sergeant Fegan says don't hire

19        them, they're a piece of shit, literally.

20             Q.    What officers are you referring

21        to that received that type of reference from

22        Sergeant Fegan?

23                  THE WITNESS:   The names of the

24             officers?

25                  MR. SWEENEY:   Yes.
```

M. BOVELL                                9

1

2          A.    I don't remember the names

3    right now but I'll be able to recall some.

4          Q.    Is it more than one officer?

5          A.    Officers that are subject to

6    retaliation; yeah, there are officers that

7    have been taken off -- black officers have

8    been taken off the Con Ed list like Michael

9    Hutchings.  Michael Hutchings is a black

10   officer who's been subject to their

11   treatment in the department.  He's a very

12   active police officer.  He's, you know, he

13   was kicked out of the task force unit, you

14   know, and since then he's been retaliated

15   against.

16         Q.    I'm referring actually to the

17   officers or officer that received that

18   adverse reference from Sergeant Fegan when

19   they tried to get a job.

20         Which officer was that?

21         A.    I forgot their name.

22         Q.    Was it a male or a female?

23         A.    It was a male officer.

24         Q.    African-American officer?

25         A.    I'll not quite sure, but it's a

```
1                          M. BOVELL              10
2     non white officer.
3              Q.    What timeframe was this, what
4     year?
5              A.    I don't remember right now.
6              Q.    Is there anything that would
7     refresh your memory as to who this officer
8     is?
9              A.    I know who he is.  I just don't
10    remember his name.
11             Q.    Can you describe him for me?
12             A.    A male, 5'5", a non white.  I
13    don't remember his name.
14             Q.    Is he still with the police
15    department?
16             A.    Oh, yeah, he's still with the
17    Mount Vernon Police Department.
18             Q.    Do you know what division he
19    works in now?
20             A.    I'm not sure.  I'm not sure.
21             Q.    What division did he work in --
22    did you have --
23             A.    We worked in patrol together.
24    We spoke a lot about things, you know, we
25    worked patrol together at that time.
```

```
1                              M. BOVELL              11

2            Q.    Sergeant Fegan was his

3       supervisor at one time?

4            A.    I believe so.

5            Q.    In patrol or detective?

6            A.    In patrol prior to him going to

7       the narcotics unit.

8            Q.    With respect to Paragraph 113

9       after your injury to your knee your

10      Complaint says that you subjected further

11      harassment, retaliation and discrimination

12      and I asked you was that based on account of

13      your race and I think your response was

14      partly but also due to the fact that -- and

15      you went into this explanation about how you

16      had to keep quiet about misconduct in the

17      police department?

18           A.    If I speak up, which I did, I

19      spoke up about issues, identified issues in

20      the department.  The department in my

21      experience has the inability to govern

22      itself.  They cover stuff up.  They have

23      history of covering things up so if you

24      speak up, in my instance, you get retaliated

25      against with the powers that may be that
```

```
 1                          M. BOVELL              12
 2          being administration who has the power to do
 3          so.
 4                Q.    Last week I think during your
 5          deposition you mentioned one conversation
 6          you had with Sergeant Fegan where you
 7          reported to him alleged misconduct by I
 8          think Detective Antonini.
 9                Are there any other occasions where
10          you spoke up about misconduct in the Mount
11          Vernon Police Department?
12                      THE WITNESS:  Misconduct?
13                      MR. SWEENEY:  You said
14                      ██████████  I don't want to put
15                words in your mouth.
16                A.    Oh, yeah, misconduct,
17          harassment.  In the past before I came in
18          the narcotics unit there was a sergeant by
19          the name of ████  ████  He was known
20          to harass black people on the job.  He was
21          known as -- I believe he was German.  He was
22          racist.  The department knows he's racist
23          but somehow he's protected.  I complained of
24          him to our squad.  We had a problem with him
25          because he's known for speaking out in a
```

M. BOVELL                              13

1

2    condescending manner and being unfair.  He

3    once referred to a black person as an

4    eggplant in my presence.  I dead flagged

5    these issues.  I spoke up.  There were

6    instances where I spoke up.  I spoke up to

7    management.  I even complained to human

8    resources of what was happening.  At the

9    time I believe the mayor was Clinton Young.

10   I met with the mayor and we identified the

11   issues that he spoke to Chief Dunkin.  I

12   identified how he was a racist.  He made

13   racist comments and she had a meeting with

14   the squad.  He was eventually kicked out of

15   the unit but other members had a problem

16   with him, as well, you know, he was a

17   problem within the department itself but

18   somehow he was never penalized for it.

19            Q.    What timeframe was this?

20            A.    This timeframe was shortly

21   after I came on the job in 2007.

22            Q.    2007?

23            A.    Approximately.  This is around

24   2008, 2009 once I started working out of the

25   academy.

```
 1                           M. BOVELL              14
 2                 Q.    Other than talking to Sergeant
 3           Fegan about what Detective Antonini had done
 4           which you testified to at the deposition of
 5           last week and this other sergeant from 2008
 6           or 2009 timeframe, any other times when you
 7           spoke up about corruption or misconduct?
 8                 A.    Oh, yeah, Judy Williams before
 9           ████ ███ ██████████     I spoke with Ms. Judy
10           Williams.  She's human resource commission.
11           I went to her for intervention.  She said
12           she's going to speak with the mayor and
13           nothing happened.  Again, nothing happened.
14                 Q.    That's 2014 timeframe?
15                 A.    2014, right.
16                 Q.    Other than the time in 2008,
17           2009 when you spoke about this German
18           sergeant talking to Judy Williams in 2014
19           and Sergeant Fegan, that conversation you
20           had with him, have you spoken up any other
21           times?
22                      THE WITNESS:  To whom?
23                      MR. SWEENEY:  To a supervisor
24               or somebody in charge --
25                      THE WITNESS:  You mean someone
```

```
1                          M. BOVELL              15
2                 higher than a subordinate or to a
3                 supervisor?
4                 A.    I've spoken with other police
5           officers.  We've spoken together about
6           issues,  ███████  ██  ███  department.
7                 Q.    Other than a police officer.
8           I'm talking about supervisors --
9                 A.    Supervisors or police officers,
10          as well.
11                Q.    -- sergeants, lieutenants,
12          captains.
13                A.    I don't remember.  I don't
14          remember but we as officers have spoken
15          about these issues going on in the
16          department for awhile.  There was an
17          incident where  ████████  ███████  as I
18          mentioned earlier where he was working and
19          ████████████  ████████  ██████  █████
20          ████████  ██  █  ██  ██████  █████  ████
21          ████  ███  █████  ██  ██████  █████  █████
22          ████  ██  █████  █  ██  █████  ██████  ███
23          ████  ██  ██████  ███  ██████  I witnessed
24          that.  I was there for that.  Other officers
25          took, you know, so it's a matter of, you
```

```
 1                           M. BOVELL              16
 2        know, use of power and intimidation.
 3                 Q.    When was that incident?
 4                 A.    That was approximately around
 5        2008, 2009.  I don't remember exactly.
 6                 Q.    And you observed this?
 7                 A.    I observed the officer speaking
 8        about the incident.  I spoke with that -- I
 9        was present that night when that incident
10        occurred when the retired Police Officer
11        Leary ███ ██████ ██ ██████ ██████
12        After ██ ██ ██████ ██ ██ ██████   ██████
13        he told me what happened and other officers
14        spoke about the incident in my presence.
15        That's how ██████ ██████ ██████ ██ ██
16        ██ ██ ██ ██████ ██ ██ ██████ ██ ██
17        ██ ██ ██ ████ I witnessed ██████
18        ██████ supervisor that advised ██ ██
19        ██████ ██ ██████ ██████ ██████ in which
20        they did.  Apparently they didn't agree to
21        their liking.
22                 Q.    Did you make a complaint of
23        this to any superior?
24                 A.    Yes, I spoke to -- I went to
25        the mayor, Clinton Young.
```

M. BOVELL                          17

1

2          Q.     That's the one where you went

3     to the mayor's office?

4          A.     Subsequently because I guess

5     all this occurred in the same timeframe when

6     he was harassing officers, harassing me in

7     particular and making racist comments.  I

8     went to the mayor, Clinton Young, and I told

9     him about it.

10         Q.     There came a time when you were

11    advised that you had been awarded 207

12    benefits; is that correct?

13         A.     At some point, yes.

14         Q.     I'm going to show you and your

15    attorney what's marked as Exhibit DD.

16                (Handed)

17         Q.     I ask if you recall seeing that

18    document.

19         A.     It looks familiar.  I can't

20    really say but it looks familiar.  It has

21    the wording 207-c status on there.  It has

22    my name.

23         Q.     You do or don't recall seeing

24    that document before today?

25         A.     I recall seeing a similar

```
1                        M. BOVELL              18
2       document.
3                Q.    Then there came a time where
4       you were asked to provide Disability
5       Management Associates with certain
6       information regarding your 207-c claim; is
7       that correct?
8                THE WITNESS:  Disability -- say
9                that again, I'm sorry.
10               Q.    Disability Management
11      Associates, do you recall that name?
12               A.    Yes.
13               Q.    In your Complaint at Paragraphs
14      115 through 117 you allege that Disability
15      Management Associates was harassing you
16      because they were asking personal questions
17      unrelated to your injury.
18               THE WITNESS:  I'm sorry, when I
19               said yes just now I was referring to
20               I'm familiar with Disability
21               Management.  Could you repeat the
22               question before this one, please.
23               Q.    In Paragraphs 115 through 117
24      of your Complaint you allege that Disability
25      Management --
```

M. BOVELL                          19

1
2          THE WITNESS:  No, you said did
3      there came a time where --
4          MS. BELLANTONI:  The initial
5      question, maybe you can --
6          MR. SWEENEY:  Can you read it
7      back, please.
8          (Whereupon, the reporter read
9      back the requested material.)
10         A.    Yes, I'm familiar with
11     Disability Management.  There came a time
12     where I was told to sign some forms allowing
13     Disability Management to access my medical
14     records and for them to fill in my doctors
15     visits, speak with my doctor, for them to
16     access medical records for unrelated
17     injuries, unrelated work injuries.  I
18     remember that's what I do recall the
19     documentation, customized HIPAA release
20     forms, actually, because I was told in
21     January, sometime in January 2015 for the
22     first time when I was -- when the duty
23     doctor called me and I complied with
24     Lieutenant Nawrocki so that I can come down
25     while I was injured and when I came down he

```
1                    M. BOVELL              20
2        said I need to go see Lieutenant Nawrocki.
3        Lieutenant Nawrocki gave me a document
4        indicating I've been now assigned to
5        Disability Management.  I was told by
6        Lieutenant Nawrocki that I have no choice
7        that I have to comply with them and he gave
8        me a document.  I said I'm just signing
9        indicating that I acknowledged that I
10       received this document.  I asked him, "I've
11       never heard about this company before.  Is
12       this something new?"  Well, he said, you
13       know, for certain individuals that are being
14       assigned to this company.  So, I took the
15       document which just states that I've been
16       assigned to Disability Management.
17       Furthermore, he told me that later that
18       sometime in a week or two they will be
19       contacting me, which they did.  Jill Stein
20       from Disability Management contacted me.
21       She identified herself as the case manager
22       or nurse case manager.  She said that she
23       represents the company by the name of
24       Disability Management Associates and the
25       president is Steve Pearl and when she
```

```
1                    M. BOVELL              21
2       contacted me, I said, "Listen, I'm not
3       familiar with who you are" and I asked her
4       for more information and she told me that,
5       you know, she wanted to ask me some personal
6       questions.
7               Q.   I'm going to show you and your
8       attorney what's been marked as Exhibit EE
9       and ask if you recognize that.
10                   (Handed)
11              A.   It looks like the document that
12      Lieutenant Nawrocki handed me the day when
13      the duty doctor told me to meet with
14      Lieutenant Nawrocki so that he could give me
15      the document.  This looks like the document.
16              Q.   So, Exhibit EE is the
17      notification to you that Disability
18      Management Associates would be working on
19      your 207 claim; is that correct?
20              A.   This was the document that
21      Lieutenant Nawrocki handed to me that day.
22              Q.   That day meaning the
23      conversation you just went over with
24      Lieutenant Nawrocki?
25              A.   Yes.
```

M. BOVELL                        22

1
2          Q.    In your Complaint you allege
3     that "Disability Management representatives
4     are being used by the department to harass
5     and intimidate you by asking you personal
6     questions unrelated to your injury --
7              MS. BELLANTONI:  Can you just
8          tell me what paragraph, please.
9              MR. SWEENEY:  Paragraph 117.
10         Q.    -- calling your doctor to
11    obtain information about when you would
12    transfer your appointment and following you
13    to your doctors and physical therapy
14    appointments and trying to sit in on your
15    private doctor appointments with you."
16         A.    Yeah.
17         Q.    I think I fairly summarized
18    what Paragraph 117 says.
19         Do you think that Disability
20    Management Associates was harassing and
21    intimidating you on account of your race?
22         A.    No.  In the course of my EEOC
23    complaint to the Department of Justice or to
24    the EEOC I had a mediation session during
25    the course of when Sergeant Wuttke called --

```
 1                           M. BOVELL            23
 2          when I called him and he apologized to me.
 3          Mediation didn't work out so in January I
 4          took it out of mediation and to pursue an
 5          investigation about EEOC.  At that time I
 6          did not have counsel just yet during my
 7          mediation with the department.  Apparently
 8          the department was upset that I did this.
 9          The department was upset that I still had my
10          case in with a third-party entity, the
11          federal government, EEOC, and started their
12          investigation.  This is when the harassment
13          with Disability Management, the abuse, the
14          calls, the tedious phone calls from Jill
15          Stein on various visits and I forget her
16          name from Disability Management, but various
17          members of Disability Management team.  This
18          is when the abuse and the harassment started
19          to increase from the department.
20                    Q.    Do you know if you're the only
21          officer assigned to work with Disability
22          Management Associates that was on 207-c?
23                    A.    ████████  ████  was assigned with
24          them.  She complained about harassment from
25          them, as well.
```

```
 1                         M. BOVELL            24
 2               Q.    Any other officers that were
 3        assigned to work with Disability Management
 4        Associates?
 5               A.    Not that I know of.  I've
 6        spoken to          ██████.  She had confirmed
 7        that with me that she had resigned and that
 8        she had received unfair treatment and abuse
 9        from them and the department, as well.
10               Q.    Did ████████  file a claim
11        of racial discrimination before being
12        assigned to work Disability Management
13        Associates?
14               A.    I'm not sure.  I don't know.
15               Q.    Do you know of any white
16        officers that have been assigned to work
17        with Disability Management Associates?
18               A.    Not that I know of.
19               Q.    I'm going to show you what's
20        been marked as Exhibit FF with your
21        attorney.  I ask you to take a look at that.
22                         (Handed)
23                    THE WITNESS:  Yeah, this
24               doesn't make any sense because -- -
25               okay, all right.  I'm sorry, I read
```

M. BOVELL                          25

1
2          the date wrong because I saw the
3          date.  I thought this was the time of
4          the letter because I didn't start
5          getting communications with regards
6          to Disability Management until 2015
7          so that's the date of my injury.
8               What now pertaining to this?
9               MR. SWEENEY:  I'm just asking
10          if you recognize the exhibit, Exhibit
11          FF.
12          A.    I received so many letters from
13     Captain Goldman and Lieutenant Nawrocki
14     pertaining to my 207-c benefits.
15               THE WITNESS:  My 207-c benefits
16          are truly hard to keep up so I'm
17          trying to refresh my memory here.
18          A.    This seems like a letter after
19     I was forced to have a meeting with Jill
20     Stein of Disability Management.  Lieutenant
21     Nawrocki told me that they will be coming to
22     my home but then he further advised me that
23     it's too far for her to drive, this Jill
24     Stein, and I have to come down even though I
25     was the one who was injured, so I was

M. BOVELL                    26

1  ordered in prior.  I had spoken with her and

2  she wanted me to sign documentation and I

3  said, "Listen, I'm a police officer.  I

4  don't know who you are.  You're not a part

5  of our collective bargaining agreement.

6  There's nothing stipulated who you are as an

7  entity.  I'm only familiar with the duty

8  doctor, you know, which is in the rules and

9  regulations."  She was asking personal

10 questions and I said, "Listen, I'm a police

11 officer.  I have to be safe with my personal

12 information and these documents that you

13 need me to sign, could you please email them

14 to me so I could further it to my legal

15 counsel" and that never happened.  I

16 received a phone call from Lieutenant

17 Nawrocki that I was ordered to meet with her

18 regardless and that I should come and that

19 day I had physical therapy.  I was a bit

20 late.  I met with Jill Stein.  Lieutenant

21 Nawrocki was present and was supposed to be

22 there where they handed me six documents for

23 me to sign.  Jill also asked me questions

24 about unrelated injuries, unrelated

injuries.  She had records of them which she
said she received from the Mount Vernon
Police Department, Captain Goldman a day or
two prior.  So, she continued to ask me
questions.  These conversations that I had
with Jill Stein were actually recorded and
was given my counsel on the USB drive that
you have.  I then asked them for copies of
the documents which they refused to give me
copies that day.  Lieutenant Nawrocki came
in the room and asked me why I didn't want
to sign.  I said, "I don't want to sign
them.  I'm confused.  I don't know what I'm
signing and I need legal counsel."  They
refused to give me all the copies.  They
only gave me two.  I was told to write an
MV-5 as to why I was late which I was going
for physical therapy which is why I refused
to sign the documents because I wanted legal
counsel, and what else did he want, the MV-5
and I asked him if I could write the MV-5
later because I was in pain.  He said "No,
you have to do it now."  I was ordered to do
it while I was in pain.  I'm like, "I'm just

M. BOVELL                    28

coming from therapy, on the medication and

everything" so I was forced to meet with

this Jill Stein and I wasn't given an

opportunity to speak.  I had to speak to

legal counsel.

      Q.   In your response you indicated

that Jill Stein or whatever her name is from

Disability Management Associates was asking

you questions unrelated to your line of duty

injury.

      A.   Yes.

      Q.   In what way were they

unrelated?

      A.   They never occurred.  The

injuries that she was questioning me about

she had records of in her hand and she

attempted to question me about did not occur

on the job, unrelated in any way or form,

did not occur within the month of September

of 2014 or any time while my employment in

2007 until now with the Mount Vernon Police

Department, but she had those records.  I

never consented for her to have those

records but she had -- as a civilian she had

```
1                           M. BOVELL              29
2       those records in her hand with this company
3       Disability Management Associates.
4             Q.    Were the records pertaining to
5       a right knee injury that you sustained at
6       anytime?
7             A.    No.
8             Q.    What were the medical records
9       pertaining to?
10            A.    She began to ask me questions
11      about unrelated injuries that she had.
12            Q.    What unrelated injuries were
13      they?
14            A.    She stated dates, you know, she
15      mentioned injuries that I didn't even know I
16      had at one point in 2009.  I really don't
17      know.  She mentioned something in 2009, as
18      well.  I don't remember an injury in 2009
19      so, you know.
20            Q.    In terms of body parts, do you
21      recall what body parts she was referring to
22      which were not related to your line of duty
23      injury?
24            A.    I don't remember but I wish not
25      to discuss that further, anything unrelated
```

M. BOVELL                    30

1

2   to my on duty injury.

3           Q.    Have you ever injured your

4   right knee before September of 2014?

5           THE WITNESS:  Injured as on

6           duty or any time in my life?

7           MR. SWEENEY:  Anytime.

8           A.    Not that I remember, not prior

9   to being employed by the Mount Vernon Police

10  Department.

11          Q.    You indicated that there was

12  nothing in the collective bargaining

13  agreement regarding the authority of

14  Disability Management to work on your 207

15  claim; is that correct?

16          A.    I indicated I checked with -- I

17  confirmed with our -- the union president at

18  the time, I confirmed with the collective

19  bargaining agreement that we have and he

20  said that there was nothing indicated that

21  we have any type of agreement with

22  Disability Management.  We've consulted with

23  Captain Goldman -- Chief Goldman I believe

24  when he was promoted and he said to me --

25  his words are "Chief Goldman hasn't given

M. BOVELL                    31

1

2       him anything to indicate any type of

3       contractual contract or any type of

4       bargaining agreement with Disability

5       Management."

6              Q.    Did the union ever file a

7       grievance over Disability Management

8       Associates working with 207-c claims?

9              A.    I don't know.  I don't know.  I

10      made the union president aware.  He told me

11      that he has no idea and that basically

12      Captain Goldman was bullshiting and gave him

13      the run around every time he asked to see a

14      disagreement between the city and the Mount

15      Vernon Police Department or within a

16      department within.

17             Q.    Did you file a contract

18      grievance regarding the requirement to work

19      with Disability Management Associates?

20             A.    I identified the issues to my

21      union president.

22             Q.    But you didn't file your own

23      grievance?

24                   THE WITNESS:  I'm not familiar

25                   with that, what you're asking me.

M. BOVELL                    32

Q.   Well, if you had an individual
grievance, if you had a problem with how you
were being treated with respect to terms and
conditions of employment under the contract,
you can file your own grievance; is that
correct?

THE WITNESS:  Under the
contract -- with what contract, with
Disability Management?

MR. SWEENEY:  No, the
collective bargaining agreement that
you referred to.

THE WITNESS:  But there's no
contract that we have with Disability
Management.

MR. SWEENEY:  Right.

Q.   Did the union file an improper
practice charge?

A.   You know what, I don't know.
He has that authority.  I know he was
annoyed, you know, he has that authority.
He's fully aware of what's going on, my
issues with the department.  We've had
conversations about it, you know, and at

```
1                        M. BOVELL              33
2         some point he began misinforming me.  At
3         some point he began to lie to me about
4         what's going on, so I really don't know
5         what's going on.  It seems to be really
6         ambiguous from that point.
7                  Q.    In your Complaint at Paragraph
8         22 and I think other places you refer to
9         "The unlawfully brought authorizations to
10        obtain medical records."
11                 Why were the authorizations
12        unlawfully brought, if you know?
13                     MS. BELLANTONI:  I'm going to
14             object.  You can answer.
15                 A.    Sure.  Each and every time --
16        when I had the first meeting with Jill Stein
17        in February or January, I can't recall in
18        2015, she told me that these are customized
19        -- she gave me some forms and told me that
20        they're customized for me by her attorney.
21        I don't know what attorney she's referred
22        to, what attorney represents Disability
23        Management, perhaps you, I'm not sure, but
24        she informed me that these forms are
25        customized especially for me and the wording
```

1                          M. BOVELL                    34

2          basically expresses that in a nutshell that

3          any cat, dog or mice can access my medical

4          record.  It was very broad and very

5          customized, her words exactly.  From there

6          on out, communications that I received from

7          Captain Goldman, Lieutenant Nawrocki, each

8          time these customized HIPAA forms are

9          changed in different ways; the wording, from

10         who can access my medical records, every

11         cat, dog or mice, so it changed every time.

12              Q.    They were unlawful because they

13         changed from time to time?

14              MS. BELLANTONI:   Objection.

15         You can answer.

16              A.    They're unlawful in the sense

17         that it violated my -- who was allowed to

18         access my medical records, my personal

19         information; my Social Security Number and

20         my date of birth.  That was typed clearly on

21         these documents that was in the possession

22         of Jill Stein that day at the first meeting.

23         She had access to my date of birth, my

24         Social Security Number, my name and

25         everything.  These are confidential

M. BOVELL                          35

1
2    documents so that you have a civilian

3    walking around and asking me personal

4    information and trying to get access to my

5    information that we as a department, the PBA

6    is not aware of any -- at the time that I

7    was told any type of contract with this

8    company.

9         Q.    I'm going to hand you and your

10   attorney Exhibit GG.

11              (Handed)

12              THE WITNESS:   What about this

13        document exactly?

14        Q.    Do you recall receiving that?

15        A.    I recall Internal Affairs on

16   multiple occasions showing up at my house

17   banging on my door while me and my son was

18   home and my son being afraid, my neighbors

19   alerted, as well, accompanied by Francis who

20   is present right now, Lieutenant Olifiers.

21   I remember them giving me this letter and

22   banging hard -- prior to banging hard on my

23   door as if it was a jail style -- as if it

24   was a prison house, so I remember receiving

25   this letter but some details of this letter

```
1                          M. BOVELL                 36
2         is inaccurate.  It's very inaccurate so --
3         and I was never given ample time to respond
4         to this letter as requested.
5              Q.    Did you ever file -- did you or
6         anyone on your behalf file a grievance after
7         receiving that letter of counseling?
8              A.    File a grievance, I believe I
9         sent a response to --
10                   THE WITNESS:  One moment.  Let
11             me take a look again, please.
12             A.    I did send a rebuttal in
13        response to this in a time frame provided.
14             Q.    You sent a rebuttal.
15             Did you ever grieve that letter of
16        counseling?
17             A.    As indicated, I sent a
18        rebuttal.  I needed ten days to rebuttal
19        which I did within that ten days and
20        unfortunately I was never allowed these days
21        to provide a response.
22             Q.    Other than the rebuttal that
23        you submitted, did you grieve that letter of
24        counseling?
25             A.    I grieved the form.
```

```
1                          M. BOVELL                    37

2              Q.     To the union?

3              A.     The PBA president.

4              Q.     Do you know if a grievance --

5              A.     He never advised me of that

6       process of the grievance.  Again, I was

7       annoyed.  At some point he became very

8       misleading and, you know, wasn't of much

9       assistance to me which is why I have my own

10      counsel, so I wasn't given -- shown the best

11      interest by the PBA, Jose Colon, who is now

12      being promoted as sergeant and he came from

13      Sleepy Hollow.  I was given mis information

14      by Jose, I was misguided, I was misguided by

15      some of the PBA reps, as well.  So, they

16      didn't seem to have my best interest at all

17      but I did make my PBA, my leader -- our

18      leader as the union aware of what was

19      happening.  There were emails that were sent

20      by myself and my counsel to the PBA

21      concerning issues pertaining to the

22      harassment from the police department and

23      Disability Management Associates.

24              Q.     After receiving that letter of

25      counseling -- I'm going to show you what's
```

```
1                    M. BOVELL                   38
2        marked as Exhibit II and ask you to take a
3        look at that.
4                    (Handed)
5                    THE WITNESS:  This is April.
6             Again, I received 1,000,
7             approximately 1,000 -- a bit
8             exaggerating -- but this letter is
9             from Captain Goldman and Lieutenant
10            Nawrocki.  I remember this particular
11            one.  It seems to say that basically
12            my -- about my 207-C benefits.
13            Q.    That you were being awarded
14       207-c benefits; is that correct?
15            A.    I don't understand but I
16       already been awarded back in 2014.  I don't
17       remember this letter.
18            Q.    You don't remember receiving
19       that letter?
20            A.    I don't remember it.  I could
21       have but I don't really remember.
22            Q.    In your Complaint at Paragraph
23       128 you reference an incident "In and around
24       January of 2014 when Lieutenant Gallagher,
25       Christopher Gallagher, I guess, was involved
```

M. BOVELL                    39

1

2   in an altercation ████ █ ██████ ███

3   ██ █ ██ ████ █████ ██ ██

4   ███████ ██████ ██ do you recall that

5   allegation?

6          A.    Yes, I recall that that

7   information was given to me by another

8   officer, as well who witnessed, who did a

9   report who witnessed the incident, who

10  witnessed the racial display by Lieutenant

11  Gallagher around that timeframe.

12         Q.    What officer witnessed that?

13         A.    That was Gene Jerome.

14         Q.    Did Officer Gene Jerome make a

15  report of that?

16         A.    I'm not sure what he did, but

17  he witnessed the incident, he did a report.

18  He advised me that he did a report.

19         Q.    Do you know to whom did he

20  report?

21         A.    I'm not sure.

22         Q.    What racist remarks were made?

23         A.    I don't remember.  I know from

24  what I can recall he advised me that

25  Lieutenant Gallagher ████ █ █ ████ █

```
1                          M. BOVELL            40

2        ███████████, to my recollection right now.

3        I don't remember the details right now that

4        ██ ██████ ██ ██ ██████ ██ █ ████████

5        party while he was placed out of service ██

6        ███████ ██ █████   I can't recall the arrest

7        right now.

8              Q.    If I understand your response,

9        this incident took place in a place that

10       ██████ ████████ while on duty?

11             A.    I don't remember.  From what I

12       remember is that Lieutenant Gallagher

13       ███████ ████ ██████ ██ ███████ ██████

14       ███████ █████ █ █████ ████████.

15             Q.    But you don't remember what the

16       ██████ ██████ ███████

17             A.    I can't recall right now.

18             Q.    And ██ ████████ ██ may have

19       involved ████████

20             A.    Oh, it did involve ████████

21       ███████ ██ ███████████  That's what Gene

22       Jerome said to me.

23             Q.    When did Gene Jerome tell you

24       this?

25             A.    It was provided in a recording
```

```
1                           M. BOVELL              41
2          that was given to you.  Oh, he said he
3          witnessed it and they         █   █ █ .  He
4          said he witnessed it, he complained about it
5          but   ███   █████   █ ██ .  I remember him
6          saying that but it's in the recording.
7               Q.    Whatever knowledge you have
8          regarding an incident regarding Lieutenant
9          Gallagher would appear on the audio
10         recording?
11              A.    Yes, on the conversation
12         between myself and Gene Jerome.
13              Q.    Other than the audio recording,
14         have you and Gene Jerome discussed this
15         event?
16                   THE WITNESS:  Prior?
17                   MR. SWEENEY:  Either prior or
18              after.
19              A.    After, I can't recall but prior
20         to this, no, I don't remember.
21              Q.    How about after?
22              A.    After, I don't remember;
23         perhaps because we've had multiple -- we've
24         had multiple conversations about misuse of
25         black people in the department with
```

1                          M. BOVELL                    42

2          harassment, a lot of black people like

3          ███████  ███████  in the department, you

4          know, we've had multiple conversations about

5          things that happened, stuff that he's

6          witnessed, Jose Colon, PBA president, how he

7          signed an agreement not to -- when

8          Lieutenant Fisher -- when Sergeant Fisher

9          was illegally promoted to sergeant over

10         three black sergeants who also passed the

11         test, he was promoted on an expired list,

12         Jose Colon, PBA president signed an

13         agreement not to -- what should I say -- not

14         to -- what's the word I'm looking for -- not

15         to do anything.  Basically he signed an

16         agreement not to do anything about it with

17         management.

18              Q.    The agreement not to do

19         anything, that pertained to the promotion of

20         Lieutenant Fisher?

21              A.    The illegal promotion of

22         Lieutenant Fisher.

23              Q.    Why do you say it's illegal?

24              A.    He was promoted off an expired

25         list allegedly on the weekend when the mayor

wasn't around over three black other

officers who were at best on the current

list as a result.

Q.    Was Lieutenant Zadie promoted

off the same list?

A.    Lieutenant Zadie was --

actually, he scored, I believe number one on

the new list; either number one and

subsequently after that I believe Sergeant

McEachin, Sergeant Scott and then Sergeant

Sexton were on that list, as well.

Q.    You say that list, is that the

same list as Lieutenant Fisher or a

different list?

A.    Lieutenant Fisher failed the

test.  Once they realized he failed, they

promoted him off the expired list, so

members of the PBA, people were upset about

it but what I was advised he signed an

agreement with the administration not to

dispute the promotion, the illegal

promotion.

Q.    Are you scheduled for surgery

to your right knee, Officer Bovell?

M. BOVELL                    44

1

2          THE WITNESS:  Are you speaking

3      about now?

4          MR. SWEENEY:  Yes, now.

5          A.    Oh, yeah.  I suppose I should

6      have the surgery sometime like this month,

7      actually.

8          Q.    Have you been working with

9      Disability Management Associates regarding

10     your current treatment?

11         MS. BELLANTONI:  Objection to

12         the form.

13         Q.    Do you have interaction with

14     Disability Management regarding your current

15     medical treatment?

16         THE WITNESS:  When you say

17         current, you're saying injury?  I

18         don't get it.

19         MR. SWEENEY:  Yes, same injury

20         within the last 60 days.

21         A.    Within the last 60 days.  Well,

22     I used to get a lot of harassing phone calls

23     from Disability Management.  I really don't

24     understand -- it clearly states that they're

25     in the capacity of gathering medical records

1                            M. BOVELL                    45

2        but right after my second surgery or before

3        they would constantly call me and leave

4        messages, harass me.  I don't know what they

5        want.  I'm not under their personal care.  I

6        have my own doctor.  They used to call me a

7        lot and show up at my doctor's appointment.

8        I never signed an agreement for them to show

9        up at my doctor's appointment.  You know, it

10       was just too much.

11               Q.    I guess my question was:  Have

12       you had interaction with Disability

13       Management Associates within the last 60

14       days?

15                   THE WITNESS:  In the last 60

16               days, myself or my doctor's office?

17                   MR. SWEENEY:  Yourself.

18               A.    No.  Ever since I filed my

19       lawsuit then things got under the new mayor.

20       Things kind of calmed down.  I haven't

21       receive any phone calls lately, magically.

22               Q.    Do you know if Disability

23       Management Associates is speaking with your

24       doctors?

25               A.    Well, as of this year, I was

M. BOVELL                                    46

told by Cindy Luciano when I told her that

Steve Sperling called up and wanted to know

when my surgery was scheduled.  He said

Steve called Disability Management and they

wanted to know when my surgery's been

scheduled, you know, they've -- well, they

called and wanted to know my doctor's

appointment in the past.  Recently that's

what I was told by Cindy Luciano of my

doctor's office, Dr. Maddalo's office.  So,

they have been in contact with my doctor's

office for medical records.

       Q.    Have you objected to that

contact by Disability Management Associates?

           MS. BELLANTONI:  Object as to

       the form.

       A.    I have referred everything to

my attorney.  Once she advised me of that, I

said to her that she should refer to my

attorney for any type of legal matters.

       Q.    In your Complaint you allege

that your 207 benefits were terminated.

       Have your 207-c benefits been

terminated?

```
 1                    M. BOVELL              47
 2            MS. BELLANTONI:  In their
 3       entirety or any portions of them?
 4            MR. SWEENEY:  In their entirety
 5       or any portion thereof.
 6            A.    Yes, they were and luckily I
 7  have my legal counsel.  It wasn't in its
 8  entirety or it would have been if I didn't
 9  have my attorney.  After my second surgery,
10  I was told by my doctor I need about nine
11  months to 12 months of therapy.  I only
12  received one to two months of therapy and
13  then my benefits were partially discontinued
14  or terminated.
15            Q.    How were they partially
16  discontinued?
17            A.    Well, I was getting my pay but
18  I wasn't receiving my therapy.  It's a
19  Workers' Comp case.  I wasn't getting my
20  therapy.  I received a letter at some point
21  from Lieutenant Nawrocki or Chief Goldman at
22  the time that my benefits are terminated, my
23  207-c benefits are terminated so I stopped
24  receiving physical therapy, much needed
25  physical therapy for my recovery, so I went
```

M. BOVELL                    48

months, over perhaps six, seven months,

eight months without therapy.

     Q.    At some point in time, did

physical therapy resume?

     A.    Oh, yes, right after -- later

on after the old leadership and under the

new leadership of this new mayor, yes.

     Q.    Besides Gene Jerome, I guess

it's Detective Gene Jerome now, have you

spoke with any other officers about your

lawsuit?

          THE WITNESS:  About my lawsuit?

          MR. SWEENEY:  Yes.

          THE WITNESS:  You know what,

        when you say about my lawsuit, what

        exactly are you referring to?

          MR. SWEENEY:  You brought a

        lawsuit.  I'm asking if you spoke to

        officers besides Gene Jerome

        regarding your lawsuit.

     A.    Yeah, people have contacted.

People contacted me a few weeks ago.  They

were concerned that they -- they said they

got messages that they have to meet with the

                         M. BOVELL                    49

 1
 2       city's legal counsel because they were
 3       witnesses on my lawsuit and they called me.
 4       Some of them I haven't heard from in a long
 5       time, you know, and I will say years, so
 6       they called me up and they wanted to know
 7       what was going on.  I just said -- they
 8       asked.  I said, "Just tell the truth" and
 9       that's basically it.
10              Q.   Did you record those
11       conversations?
12              A.   I don't remember.
13              Q.   Why not?
14              MS. BELLANTONI:  He said he
15       doesn't remember.
16              Q.   You don't remember if you
17       recorded them?
18              A.   I don't remember.
19              Q.   Would there be something that
20       would refresh your memory as to whether or
21       not you recorded these people that called
22       you?
23              A.   Perhaps, but I will have to
24       see.
25              Q.   The audio recordings of Gene

M. BOVELL                    50

1

2      Jerome and others, were they done on your

3      personal cell phone?

4           A.    On my cell, yes.

5           Q.    Have you deleted any of those

6      recordings since this lawsuit began?

7           A.    No, I've transferred those

8      recordings on USB which I provided to you.

9           Q.    Are there any recordings of

10     individuals who have contacted you regarding

11     this lawsuit that you haven't transferred to

12     the thumb drive?

13          A.    Not that I remember.  I can't

14     remember.  I haven't checked.

15               MR. SWEENEY:  I'm going to ask

16          if you can search through your cell

17          phone and if there are any recordings

18          that have not been produced to your

19          attorney I'd like to get a copy of

20          those.

21          Q.    But you don't remember deleting

22     any recordings; do you?

23          A.    No.  If I had a recording about

24     an issue pertaining to this because of the

25     abuse that I received at the police

1                          M. BOVELL                51

2      department and Disability Management then,

3      you know, I would not have deleted anything.

4           Q.    What officers contacted you

5      besides Gene Jerome regarding this lawsuit

6      that you referred to?

7           A.    Officer Patterson called me two

8      weeks ago, approximately two weeks ago,

9      wanted to know what was going on.  I said --

10     he said he had a meeting.  He wasn't sure if

11     it was my attorney or city counsel,

12     something about the Attorney General and I

13     said, "Listen, tell the truth."  I said,

14     "Tell the truth."  I haven't spoken to him

15     since.  I spoke to Avian Lee.  She advised

16     me that she's having a meeting with them, as

17     well.  She received a voicemail from patrol

18     division that she has a meeting with the

19     Attorney General and city counsel; a

20     dispatcher.  I forgot her name -- it's

21     Dispatcher Richards.  She contacted me and

22     she wanted to know what, just as the others,

23     what was going on.  The same thing, I just

24     told her to tell the truth.

25          Q.    Any others besides Patterson,

1                    M. BOVELL                    52

2    Avian Lee and --

3          A.    I spoke to Gene Jerome, as I

4    mentioned.  I don't remember right now.

5          Q.    You reported Patterson;

6    correct?

7          A.    I'm not sure.

8          Q.    Mitchell, did Sergeant Mitchell

9    call you?

10               THE WITNESS:  Sergeant

11          Mitchell?

12               MR. SWEENEY:  Uh-huh.

13          A.    I haven't heard from Sergeant

14   Mitchell recently since he was promoted to

15   -- since he was promoted to honorary

16   commissioner.  I heard from him at some

17   point, yes, about the lawsuit a little bit

18   after or prior but I haven't spoken to him

19   recently.

20          Q.    So, you recorded Mitchell;

21   correct?

22          A.    Yes, I believe that was

23   provided to Briley.

24          Q.    You recorded Gene Jerome?

25          A.    Yes, I provided the

```
 1                       M. BOVELL                53
 2     information.
 3              Q.    You recorded Patterson?
 4              A.    Patterson, I don't remember --
 5     yes, in the past, not recently.  I don't
 6     remember recently but in the past I have
 7     because I haven't heard from Patterson in
 8     awhile.
 9              Q.    Did you record Avian Lee?
10              A.    I believe so.  I'm not sure.
11              Q.    Did you record Tiwana Richards?
12              A.    Yes, yes, I would think so.
13              Q.    In terms of your damages,
14     Officer Bovell, I understand you're making a
15     claim for compensation you would have earned
16     as a detective; is that correct?
17              A.    Yes, yes.
18              MR. SWEENEY:  And I believe
19              your attorney provided a calculation
20              of that.
21              Q.    You're claiming lost overtime
22     opportunities from the Con Ed detail; is
23     that correct?
24              A.    Oh, yes.
25              Q.    That would have been from the
```

M. BOVELL                          54

1    period of July 29th, 2014 until you were

2    injured on September 8th, 2014?

3         A.    Yes.

4         Q.    So, for about a month

5    and-a-half, six weeks or so?

6         A.    Approximately.

7         Q.    Then I think there's also a

8    claim for lost overtime since January of

9    2016; is that correct?

10        A.    I believe so.

11        Q.    What overtime do you think

12   you've lost since January 2016?

13        A.    Well, you know what, with

14   everything that's happening and all the

15   abuse, the harassment and the neglect of

16   medical treatment, if I had been given the

17   opportunity and all the medical attention

18   needed as a police officer, as an injured

19   police officer with the City of Mount

20   Vernon, a very busy City of Mount Vernon, I

21   believe that I would have been able to

22   recover in a more expeditious manner but as

23   a result of the neglect by the police

24   department in using my 207-c benefits

```
 1                    M. BOVELL                55
 2      against me and to harass and intimidate me,
 3      I have not had the opportunity to recover to
 4      the full potential that I could have.
 5            Q.    So, you believe that if you
 6      received medical treatment you believe you
 7      could have returned to duty on or about
 8      January of 2016?
 9            A.    I believe I could have been
10      back, but with all this abuse and neglect,
11      that didn't happen.
12            Q.    Are you claiming any emotional
13      damages, Officer Bovell?
14            A.    A lot of emotional damages,
15      yes.
16            Q.    Have you treated with any
17      professional regarding these emotional
18      damages?
19            A.    I have attempted to.
20            Q.    What does that mean?
21            A.    Meaning I reached out and I
22      tried to make appointments but it's very
23      hard, but at the same time, everything
24      that's going on has been damaging to my
25      personal life, to my wife, the abuse on the
```

M. BOVELL                              56

1

2   police department from my son, the

3   harassment.  Unfortunately my home, my wife,

4   my kids, they're not -- I'm the rock in my

5   family so unfortunately I can't appear to be

6   -- to them I appear to be weak and they

7   don't know what to do.  I tried to reach out

8   for therapy without them knowing but I was

9   unsuccessful and also it costs a lot of

10  money to do it.  So far I just been relying

11  on the power of God trying to keep sane and

12  try to hang on with everyday, you know,

13  abuse and the harassment and me being

14  ostracized, my career being objected and

15  everything else, so it's been really hard on

16  myself and my family.  There's times I

17  breakdown and I cry, I literally cry because

18  this is not where I want to be in my life.

19  It's not what I want to go through.  It's

20  been rough for myself and my family most of

21  all and I've been trying to protect them.

22          Q.    From your response, I take it

23  that you haven't sought any professional

24  counseling for these emotional issues that

25  you've been having?

```
 1                    M. BOVELL              57
 2             A.    I tried to.  It cost a lot of
 3       money.  I've tried to.  I haven't been able
 4       to get anyone and also it takes away, you
 5       know, I've been afraid to.  I've been afraid
 6       to because I don't want to look weak in
 7       front of my family.  I don't want to seem
 8       crazy.  I don't want to seem like a crazy
 9       person or something that needs help.
10             Q.    You said two different things.
11       You said that it cost a lot of money and
12       that you don't want to appear weak by your
13       getting counseling.
14             In terms of the expense, you have
15       major medical insurance through the City of
16       Mount Vernon; do you not?
17                   THE WITNESS:  Pardon me?
18             Q.    You have major medical
19       insurance -- you have health insurance?
20             A.    Major, it's not major, but I
21       have medical insurance, but, you know, when
22       I called these -- I've made a few phone
23       calls to therapists and some of them do not
24       accept my insurance.  Most of them want --
25       most of them want cash, you know, so you
```

M. BOVELL                    58

1

2      have to pay with cash and the way it works

3      you pay with cash and you get reimbursed by

4      your -- if they accept your medical

5      insurance, so most of the professionals that

6      I've contacted is either they do not have

7      any space, they're all booked up, they

8      accept cash and they're very expensive for

9      the hour and they -- the way it works is

10     also is that you pay them first and then you

11     attempt to get reimbursed from your

12     insurance company.

13          Q.     What providers that you've

14     tried to see but they only accept cash and

15     they're very expensive?

16          A.     I've called a few.

17          Q.     Do you have some names?

18          A.     I recorded the conversations.

19     I don't remember their names.

20          Q.     You recorded conversations?

21          A.     Yes, I recorded the

22     conversations.

23          Q.     Were those conversations

24     disclosed to your attorney?

25          A.     I don't remember.  I don't

```
1                    M. BOVELL                59
2       remember.  I don't remember and if I did, I
3       didn't see -- I don't remember.
4                    MS. BELLANTONI:  If they
5              haven't, I will ask my client to turn
6              them over to me and I will provide
7              you with a copy.
8                    MR. SWEENEY:  That will be
9              great.
10              Q.    You're being treated by an
11      orthopedic physician regarding -- for your
12      knee; is that correct?
13              A.    Yes.
14              Q.    Have you made any complaints to
15      your orthopedic surgeon about your emotional
16      issues?
17              A.    Well, my emotional -- yeah,
18      it's obvious.  My emotional status is
19      obvious when they see me.  They ask me if
20      everything is all right because it's obvious
21      based on what's happening and after,
22      especially after the Disability Management
23      representative showed up at my doctor's
24      appointment, they felt that, the doctor's
25      own words, that it's disgusting that the way
```

```
1                         M. BOVELL              60
2        I've been treated.  In their own words that
3        it's disgusting, this is something that is
4        too much abuse and that they've never seen
5        so much abuse in their life.
6               Q.    Can you describe for me what
7        emotional issues that you're currently
8        having?
9               A.    Stress, anxiety, headaches, I'm
10       worrying too much, I think about -- I was
11       just in the hospital two weeks ago because I
12       was worrying too much and I came down with a
13       serious headache and they had to admit me.
14              Q.    What date was that?
15              A.    I don't remember what date.  It
16       was the week of the first scheduled
17       deposition that I was unable to make it.  I
18       was just -- I had a nervous breakdown with
19       everything that was happening and I had to
20       go to the hospital because I was worrying so
21       much and my headache exacerbated and they
22       admitted me.  They had me in isolation for a
23       little bit.  They had to check to see if I
24       had any other type of disease which I didn't
25       and then they took me off isolation and they
```

M. BOVELL                    61

1

2       discharged me.

3                Q.    What hospital was this?

4                A.    This is Vassar Hospital.   I

5       think it's in Poughkeepsie.   I'm not sure.

6                Q.    You were treated by some mental

7       health professionals at Vassar?

8                A.    I don't know.   They were

9       doctors.   They couldn't understand why a

10      healthy young man came in with that type of

11      headaches and symptoms so they were checking

12      me for everything; meningitis, MRSA, they

13      were checking with needles in my spine so I

14      was on -- they, you know, they gave me

15      medication, antibiotics and I was on the IV.

16      So, until -- I did two days out there.   They

17      checked and everything came up negative and

18      they said -- once I started feeling better

19      they discharged me.

20               Q.    I take it from your response

21      you were there for two days?

22               A.    I don't remember;

23      approximately.   Once they were able to check

24      and saw that my results were negative and

25      that I was feeling better, I was discharged.

M. BOVELL                    62

Once they were able to check the results

that it wasn't anything major that I had, I

was taken off isolation.  People were coming

in my room with masks on because they felt

that -- they were asking me if I traveled

anywhere recently or if I -- the results

came out negative by the infectious disease

doctor, I believe.  They checked that, too,

and then I was cleared.

     Q.    The initial symptoms that

brought you to Vassar Hospital were stress,

anxiety and headaches?

     A.    Yes, I had little headaches

here and there but I started to --

everything was overwhelming and it just came

down and it hit me.  My diet, you know, it

was stressful.  I guess I was worrying about

this, all this happening.

     Q.    When you say all this

happening, you mean the lawsuit?

     A.    My predicament, me, me having

to stand up and expose the corruption and

the racism, the favoritism, all types of

ism's in the department, me standing up and

```
1                    M. BOVELL                63
2        the abuse that I'm subjected to, the
3        harassment, my career, you know, my career,
4        you know, me having to be here,
5        unfortunately.  I'd rather that this -- none
6        of this occurred, meaning the bad things
7        haven't occurred.  I wish they were all good
8        things that occurred.
9            Q.    In terms of other -- in terms
10       of headaches that you mentioned and stress
11       and anxiety, is that a frequent occurrence
12       for you or is that once in awhile?
13           A.    That's -- when I think about my
14       situation, when I think about what's
15       happened with the job, that's when this
16       occurs.  When I have to look out every time
17       to see Internal Affairs is coming to my
18       home, I have to send my son to his bed
19       because when they do come Lieutenant
20       Olifiers for some reason everybody in my
21       neighborhood was wondering why was that
22       person knocking on my door.  Lieutenant
23       Olifiers and Francis -- -Lieutenant Olifiers
24       is knocking on my door like it's a prison
25       house.  Whether it's Francis or someone else
```

```
 1                         M. BOVELL              64
 2          they ring the doorbell, so I really don't
 3          understand so I got to be looking out my
 4          window, you know, I'm home.  They're
 5          dropping off letters, they're checking on
 6          me, checking if I'm home, you know, it's all
 7          harassment, all intimidation, so my mental
 8          state is like what's next?  What's next?  I
 9          don't know what's next.  I live in cop land,
10          too.  Sergeant Wuttke lives across the
11          street from me.  I don't know what he's
12          going to do and what he's going to lie about
13          or say.  He's known for lying.  He's a liar,
14          you know, abuse of power.  This is what I
15          got to go through.  My son is looking at me
16          like "Daddy, who's at the door?  Why is he
17          banging on the door like that?"  I live in
18          Dutchess County.  No one bangs on the door.
19          They ring the doorbell.  It's a civilized
20          world I live in.  That's why it's there.
21          That's the type of stuff I have to go
22          through along with the phone calls, the
23          harassment from Disability Management, the
24          harassment from Lieutenant Nawrocki,
25          Goldman, you know, ever since ■ ■■ ▬▬▬▬
```

```
 1                              M. BOVELL              65
 2         since the new mayor, that stopped.
 3                   Q.    So, that would have been some
 4         time ago?
 5                   A.    The new mayor was inaugurated
 6         in January of this year.
 7                   Q.    We're in November now; right?
 8                   A.    Yes, we're in November.  It was
 9         January of this year.  Since the new mayor
10         came into office, things have calmed down.
11         Since Goldman ███ ████████, things calmed
12         down the way they used to be last year but,
13         you know, but I'm still nervous as hell.  I
14         don't know what to expect.  Anything is
15         possible in a person in my situation and
16         seeing what I've seen and the type of abuse
17         and power that these figures have, my
18         supervisors have, anything is possible, so I
19         worry everyday what's next.  I don't know
20         what's next.  Lies I've been told.  I've
21         been told lies and they have power.
22                   Q.    But the stressing phone calls
23         from Disability Management Associates, they
24         stopped as of January of this year; correct?
25                   A.    I believe so, approximately.  I
```

M. BOVELL                          66

1

2      have to check again but I'm still left with

3      my career, my health, you know, you know, I

4      expected to be at least a sergeant because

5      -- something right now, you know, doing

6      something positive.  I took the sergeants

7      test just a week or two after I did surgery,

8      you know, and that was rough and while being

9      stressed out by the job and Disability

10     Management, you know, it was rough.  I

11     couldn't study for the test so I wasn't even

12     prepared but I said hey, let me give it a

13     shot.  I like working for the City of Mount

14     Vernon, community of Mount Vernon.  Why

15     should I run?  Why do I got to run like

16     everybody else?  I want to be here, but it's

17     the administration that is corrupted and

18     full of racism, favoritism, abuse of power.

19     That's what I'm subjected.  Why should I

20     have to run?

21          Q.    I'm confused, so after change

22     of administration in January of 2016, the

23     city administration is still corrupt and

24     racist?

25               MS. BELLANTONI:  Was that --

M. BOVELL                    67

1

2          can you read the other question back?

3               (Whereupon, the reporter read

4          back the requested material.)

5          A.     Put it this way:  If I didn't

6     have my legal counsel, I'm pretty sure

7     things would be a lot worse and if I didn't

8     file this lawsuit, things would be a lot

9     worse than they are right now, so I put that

10    on the grace of God and that I have good

11    representation.  How can the city not be

12    corrupt and not be still racist?  The same

13    people work there.  The same people are

14    still there, the same players, the same

15    regime from years ago transitioning

16    Lieutenant Fisher, he's the head of major

17    case unit, incompetent case unit.  The word

18    is if you want to do a murder, come to Mount

19    Vernon, you know, nothing is being done.

20    Why do these people have this power and

21    nobody wants to work amongst that, you know,

22    he's a racist, you know, ask Dave Clark.

23    He's known to --  Marvin, he worked with

24    them.  Call him boy, you know, speak down to

25    them.  No black person wants to work in his

1                          M. BOVELL                    68

2     narcotics unit because he's a racist.  He is

3     a racist, you know, and he's been told by

4     Antonini he was.  Antonini told me the only

5     reason why Lieutenant Fisher likes him is

6     because he likes baseball and because

7     Antonini is dirty and is willing to do

8     anything for him.  So, you know, it's the

9     same players.  Ain't nothing changing, you

10    know, how is it going to change?

11           Q.    In terms of other damages such

12    as specials or I think you said you bought

13    an exercise bike, are there any other

14    damages you're claiming because of this

15    attributable to this lawsuit?

16           MS. BELLANTONI:  I'm going to

17              object just based on documentation

18              we've provided in interrogatories,

19              but you can go ahead and answer that.

20           A.    I don't know because this whole

21    experience has been overwhelming, you know,

22    it's been tough on myself and my family.  It

23    doesn't just affect me, it affects my family

24    as a person, as a police officer, as a

25    father, as a husband, as a human being, as a

M. BOVELL                         69

1
2      good person in my community when they see
3      people come to my home and knock on the door
4      and, you know, bang on the door like that,
5      all type of things that happened, it affects
6      me overall as an individual.  It's rough,
7      and I'll tell you this, now I understand why
8      cops, other police officers don't speak up.
9      I understand why other police officers take
10     the L and rather look the other way and go
11     somewhere else to transfer because nobodys
12     wants to be with this.  Who would want to go
13     through this?  You know, doing the right
14     thing does not mean you getting the right
15     results, you know, sometimes there's a
16     sacrificial lamb, unfortunately.  Sometimes
17     it takes something catastrophic to occur
18     before the good happens, you know, it's
19     unfortunate, so somebody has to be the
20     sacrificial lamb, who's willing to stand up?
21     Sometimes people don't want to stand up, you
22     know, because who wants to go through agony?
23     It's painful.  This what I'm going through
24     is painful.  Nobody in the world should have
25     to experience this.  Nobody in this great

M.  BOVELL                           70

1
2      country should have to experience this at
3      all especially as a police officer, a person
4      that puts their life on the line everyday,
5      especially a big city where people are dying
6      and getting shot in Mount Vernon.  You're a
7      real officer.  When you work here, you have
8      the credentials in other law enforcement
9      department.  You have the experience, you
10     are invaluable, you have the credentials
11     they know because working in the City of
12     Mount Vernon means that you're a cop, you
13     know, you've seen things, you know, you've
14     seen things so you should know how to go
15     about doing your job, but why would I have
16     to run if I like working here, you know, why
17     should I have to run?  I lived here.  Before
18     I moved to Dutchess I lived in the City of
19     Mount Vernon.  I have no problem with the
20     community, you know, it's a mixed community.
21     Unfortunately I had to move because taxes
22     were too high.  I can't afford it on my
23     salary.  I can't afford to pay 10,000,
24     $15,000 for taxes, you know, I can't afford
25     it.

M. BOVELL                    71

1

2          Q.    In terms of other damage you

3    may be claiming and it wasn't really clear

4    to me from what was provided to date, but

5    you're not claiming any physical injuries

6    arising out of this lawsuit; is that

7    correct?

8               MS. BELLANTONI:  No, that's not

9          correct.

10              MR. SWEENEY:  You are?

11              MS. BELLANTONI:  We are.  So as

12         we stated to court previously, the

13         retaliation -- want me to do this off

14         the record?

15              MR. SWEENEY:  On the record is

16         fine.

17              MS. BELLANTONI:  Based on

18         retaliation in connection with this

19         denial of his physical therapy, it

20         has exacerbated his injury and

21         prevented him from returning to work.

22         So, to the extent, and I know this is

23         a fine line, because 207-c is a

24         Workers' Comp issue but to the extent

25         it has delayed his return to work

M. BOVELL                                72

and/or exacerbated his injury, I
think that may take that outside of
the realm of the Workers'
Compensation.

          MR. SWEENEY:  Well, as I
understand --

          MS. BELLANTONI:  Which would
be, I guess, a question for the
court.

          MR. SWEENEY:  As I understand
the claims, this is why I want to
kind of narrow it down, because if
it's relevant I can ask him questions
about it.  If it's not relevant, I
won't but I understand there's an
economic claim based on his delay in
his return to work which I
understand, but in terms of whether
or not he's claiming his knee hurts
more or he's left with more of a limp
or something like that, is that part
of this claim?

          MS. BELLANTONI:  I don't know
that -- I don't know.  I don't know

M. BOVELL                    73

that he's going to be able to -- I

think that's more of a question for

his physician as far as his prognosis

initially and whether that caused a

for not having physical therapy.

        You can ask him about his

physical condition just because you

have him here, but I think that's

maybe more of a medical opinion based

on having physical therapy and what

was requested and not having it.

        MR. SWEENEY:  Also he's going

to have a new surgery soon?

        MS. BELLANTONI:  That's

correct.

        MR. SWEENEY:  I assume his

physical condition will be changed

somewhat perhaps after the additional

surgery.

        MS. BELLANTONI:  Right.

        MR. SWEENEY:  I just didn't

know for sure if there's a claim of

physical pain and suffering as a

result of this -- that's relating to

1                          M. BOVELL                    74

2              this lawsuit.  I guess that would be

3              part of the 207 Workers' Comp

4              statute.

5                  MS. BELLANTONI:  I just want

6              for the record there is a claim for

7              punitive damages, as well and

8              attorney fees as far as damages is

9              concerned.

10                 MR. SWEENEY:  I understand

11             that.

12             Q.    Have you filed a Notice of

13       Claim, Officer Bovell, in this matter?

14                 THE WITNESS:  Notice of Claim

15             to whom?

16                 MR. SWEENEY:  To the City of

17             Mount Vernon.

18                 THE WITNESS:  I'd have to check

19             with my attorney regarding that.

20                 MR. SWEENEY:  If you know or if

21             you don't know.

22             A.    I don't know.

23             Q.    In terms of your treating

24       physicians, Officer Bovell, who is your

25       current orthopedic surgeon that's treating

M. BOVELL                    75

1

2    you?

3               THE WITNESS:  Current, you mean

4          the one that's been since my 2014

5          injury?

6          Q.    It hasn't changed; right, so it

7    would be the same one.

8          A.    Same doctor, Anthony Maddalo.

9          Q.    Do you have a general practice

10   or family doctor that you see?

11         A.    Family doctor, I have a doctor

12   -- yeah, I do have a doctor.

13         Q.    What's your doctor's name?

14         A.    I forget -- Dr. Dave in New

15   Rochelle.

16               MS. BELLANTONI:  Do you know

17          how to spell that?

18               THE WITNESS:  I think it's

19          D-A-V-E.  I'm not sure.  I'd have to

20          look it up.

21         Q.    When was the last time that you

22   saw Dr. Dave?

23         A.    It's been a little while.  It's

24   been some time.

25         Q.    Have you treated with Dr. Dave

1                              M. BOVELL                76

2        regarding this injury, 207 claim or any of

3        the emotional that you've described?

4              A.    Emotional, no, I haven't

5        treated with Dr. Dave.  I think the last

6        time I saw him was perhaps last year.  I

7        don't remember.

8              Q.    Do you know the reason you saw

9        Dr. Dave last year?

10             A.    I don't remember, but I was

11       told by the hospital that I was -- when I

12       was admitted to Vassar that I should

13       follow-up with my doctor, personal doctor at

14       some point in time.

15             Q.    And you haven't done that?

16             A.    No, I've made an appointment to

17       follow-up with the health doctor there which

18       she told me to do and subsequently after

19       that I'll follow-up with my doctor, with my

20       personal doctor.

21             Q.    Other than your treating

22       orthopedic surgeon and Dr. Dave, your

23       primary care specialist, have you treated

24       with any other doctors since your injury of

25       2014?

```
 1                         M. BOVELL                77

 2              A.    I've been to -- I don't

 3         remember.  Pertaining to my injuries, I've

 4         seen other doctors, MRI's and stuff like

 5         that.

 6              Q.    I don't mean doctors that may

 7         have looked at you on behalf of the city,

 8         I'm talking about treating physicians and I

 9         don't mean physical therapists, I mean like

10         doctors with a medical degree.

11              A.    Not that I remember.

12              MR. SWEENEY:  Off the record.

13              (Whereupon, a discussion was

14         held off the record.)

15              Q.    Just to wrap up the doctor

16         issue, Officer Bovell, other than your

17         treating orthopedic physician, your surgeon

18         and Dr. Dave, you don't really recall any

19         other physicians, maybe other than

20         radiologist for the MRI?

21              A.    I don't remember.

22              MS. BELLANTONI:  You mean for

23              anything; flu shot, physical, stuff

24              he knows, just so we're clear?

25              Q.    The question is really relating
```

```
 1                              M. BOVELL                78
 2        to your line of duty injury or any emotional
 3        injuries that you've mentioned and that was
 4        my question and I'll make it more expansive
 5        after that.
 6              A.    Not that I remember.  I made
 7        attempts to see a therapist but I was
 8        unsuccessful.
 9              Q.    You said those maybe were
10        recorded phone calls?
11              A.    Yes.
12              Q.    In terms of seeing doctors for
13        any other reason, your attorney mentioned
14        for example a flu shot, would you have seen
15        your primary care specialist or some other
16        doctor for that reason?
17                  THE WITNESS:  For a flu shot?
18                  MR. SWEENEY:  Or any general
19              medical needs you may have.
20              A.    Other than two weeks ago I went
21        to the hospital.  I saw the doctors there
22        and they told me that I should follow-up
23        with them shortly and then I should see my
24        personal doctor so that's in the works right
25        now based on my breakdown.
```

```
 1                              M. BOVELL                    ■
 2                    MR. SWEENEY:  Let's take a two
 3               minute recess and we'll try and wrap
 4               this up.
 5                    (Whereupon, a recess was taken
 6               at 1:32 p.m., examination resumed at
 7               1:40 p.m.)
 8                    Q.   Officer Bovell, I'm just going
 9          to try and kind of go back to last week and
10          just ask you some questions where you may
11          have responded that you didn't know or you
12          didn't recall certain details and if that's
13          the case, that's okay, but I just figure if
14          you have any additional information for me.
15                    I'm just referencing a paragraph of
16          the Complaint because it makes for a better
17          record.
18                    Paragraph 34 of the Complaint you
19          indicated there was an occasion where
20          Detective Antonini ████████████   ██ ██
21          ████████ ██ ██ ████████ ██ █████
22          ██ ██ ██ ██ ██ ██ ██ ██ ██
23               ████     That's the allegation in Paragraph
24          34.
25                    If I recall correctly, I think you
```

```
1                           M. BOVELL              80
2          said that happened on more than one occasion
3          with Detective Antonini; is that correct?
4              A.    Yes, more than once.
5              Q.    Do you recall any specific
6          individuals?
7                   THE WITNESS:  Who were present?
8                   MR. SWEENEY:  Suspects or CI'S
9              that that happened to.
10             Q.    In other words --
11                  THE WITNESS:  Would you ask
12             that --
13                  MR. SWEENEY:  Let me rephrase
14             it.
15             Q.    ████ ████ ████ ████ ███ █
16        ██████   ██████  and Detective Antonini ████
17        ████ █████ ████ ██████
18                  MS. BELLANTONI:  I'm going to
19             rely on the prior testimony and if
20             there's more clarification, I don't
21             want him to be held down to what his
22             answer was if he doesn't have a copy
23             of the deposition transcript.  I
24             don't believe he was able to give
25             specific --
```

```
1                        M. BOVELL            81
2              MR. SWEENEY:  He wasn't.
3              MS. BELLANTONI:  -- locations
4         or arrests.  So, to that extent --
5              Q.   I'm hoping in the week since we
6         had the deposition that you may have looked
7         at whatever records you may have and have
8         some more information on exactly who --
9              A.   You mentioned person.  What I
10        stated I said when they were doing search
11        warrants of vehicles and along with
12        searching the car ███ ████ ███ ███ ████
13        ██ ██ ████ ██ █ ██ ██ ██ ██ ██ ███
14        ███ █ ██ ███ ██ █ ██ ███ ██ █ ██
15        ██ ██ █ ████ ███ ██ █ ██ ███ ██ ███
16        █ ██ ██ ██ ██ █ ██ ███ ██ ███ ███
17        ███ ██ ██ ██ █ █ ███ ██ ████ ███ ██ ███
18        ████ ████ ███ ███ ████ ████ ███ ██
19        ████ ████ ███ ████      the previous narcotics
20        unit.
21             Q.   I understand that, but all I'm
22        asking is when you say suspects' vehicles,
23        there's no identity of the suspect.
24             I'm asking if you have any
25        information on what suspect by name that
```

1                              M. BOVELL                    82

2          would have been, for example?

3                  A.    I don't remember right now in

4          detail, but I remember this one.

5                  Q.    Are there any records available

6          to you that would refresh your memory as to

7          what suspect it was?

8                  A.    In the narcotics office there's

9          a black book where that black book, I don't

10         know if they destroyed it, perhaps.  I don't

11         know.  It should still be there where we

12         keep all the arrests of Antonini and Fegan

13         and -- it's used as a competition amongst

14         ourselves by the supervisors to push us to

15         get arrests, so we put the arrests of whose

16         name, we cross out the name of the officer,

17         incident number, arrest location, who was

18         arrested and for what, you know, so we have

19         to put the names in that book.  So, that's

20         one thing, one particular item and also your

21         police reports.

22                 Q.    Are there any confidential

23         informants by name or by initials that would

24         correspond to these incidents where money is

25         taken out of a suspect's vehicle?

```
1                         M. BOVELL              83
2                    THE WITNESS:  Can you rephrase
3              that?  I didn't get that.
4              Q.    Are there any confidential
5       informants and I'm hesitant to using a name
6       on a confidential informant or by initials
7       that you can recall that would correspond to
8       these incidents where money was taken out of
9       a suspect's vehicle?
10                   MS. BELLANTONI:  I'm going to
11             object to the form.  Do you mean that
12             money was taken as a result of a
13             search, information from a CI or
14             money was taken from the personal
15             property of the CI?
16                   MR. SWEENEY:  Well, I think it
17             would be the informant or meaning --
18             Q.    Paragraph 34 says "On numerous
19       occasions while conducting search warrants
20       on suspect vehicles and homes, Officer
21       Bovell would observe Detective Antonini
22       ███████ ████ ███ ███ ████ █████ ███ ██████
23       ██ ████ ███ ████ ██ ██ ████████
24                   THE WITNESS:  Why would a
25             confidential informant be present for
```

```
1                    M. BOVELL                84
2         that?
3         Q.    Does a confidential informant
4    give you information that lead to that
5    suspect vehicle being subject to a search
6    warrant?
7                    THE WITNESS:  Are you asking
8              what particular incident where an
9              incident number or incident report --
10                   MR. SWEENEY:  Right.
11        A.    Oh, yeah, that information
12   would definitely be in that black book that
13   we have in the narcotics office that we
14   record all the arrests.  That would be
15   helpful.  It has arrests in there from years
16   ago.  There are arrests in that book from
17   Sergeant Fegan as I stated that when we went
18   -- when I had that discussion with Sergeant
19   Fegan when he told me to, you know, pick the
20   fucking bag up and I initially asked out of
21   the unit and we had that discussion.  He was
22   pushing us to get -- he was telling us that
23   we have to get 60 arrests, that we have a
24   quota that we have to get 60 arrests a month
25   and I looked in the book and I said to him,
```

M. BOVELL                                85

1

2    "You ain't even making 60 arrests a month so

3    why do we assume that we're gonna get

4    written up if we don't make 60 arrests?"

5    So, we have to go out and lock people up so

6    that was one of my -- the reason that I

7    refer back to that book, it has arrests from

8    Sergeant Fegan days when he was working in

9    narcotics as a detective.

10        Q.    But regarding your current

11   knowledge of any names of suspects or even

12   CI's or street names regarding these

13   incidents where the vehicle was pulled over

14   for the search warrant, you can't remember

15   any of those details?

16             THE WITNESS:  Right now?  Right

17        now?

18             MR. SWEENEY:  Right now.

19        A.    Right now, not right now.  In

20   reference to the case where ████████ ██

1                           M. BOVELL                    86
2        ████████ ▌ ████ ████ ██████   ███ ███
3                      MR. SWEENEY:   Off the record.
4                      (Whereupon, a discussion was
5               held off the record.)
6                      MR. SWEENEY:   In an off the
7               record conversation, Officer Bovell
8               provided some information regarding
9               the CI that was involved in an
10              incident as alleged in Paragraph 54
11              through 59 of the Complaint, I
12              believe.
13                     THE WITNESS:   May I say
14              something?   Detective Griffin
15              personally reached out to him to let
16              him know that.   He knows the
17              relevance of that particular CI so he
18              wanted to let me know that, so we
19              were discussing that -- previously he
20              had passed away, as well so I was
21              asking why the CI died and what was
22              going on.
23                     MS. BELLANTONI:   Are you done?
24                     THE WITNESS:   Sure.
25                     MS. BELLANTONI:   In an off the



```
 1                    M. BOVELL                87

 2         record discussion, Officer Bovell

 3         gave counsel the name of the CI who

 4         was referenced in Paragraph --

 5         ████████ ████████ ██ ██ ██ ██ ███

 6         ███████ █ ██████ ██ ██ ██

 7         ███████ ███ ██████ ██ ██

 8         ██████ ██ █ █ █████ █████

 9         █████ ██ █ ████ ████ █ █ ███

10         ██████ ██ █ ████ -- ██████

11         █████ ████ █████ ███ ██ ██

12         ████ ████ ██ █ ██ ██ █████ ██.

13                    THE WITNESS:  Sometime this

14         year.

15         Q.   ██ ███ ██ ███████,

16    █████ █████ ████ ██ ██ ██ ██ ██ ██

17    █ ████ ████

18         A.   1 ██ ██ ████ █ ███

19    ████ ████ ████ ████ ████ █ █ ████ ███

20    █████ ██ █ ██ ████ █ █ ██ ██

21    ███ █ ███ ███

22         Q.   ██ ██ ████ █ █████

23    ███ ████

24         Do you believe that ██ ███ ████

25    █████ ████ ██ ██ █ ██ ███
```

1               M. BOVELL                88

2

3          A.

4

5

6

7

8               THE WITNESS:  Can we go off the

9          record for that one?

10              MS. BELLANTONI:  You're going

11         to give a name?

12              THE WITNESS:  Yeah, I'll give a

13         name for that one.

14              MR. SWEENEY:  Off the record.

15              (Whereupon, a discussion was

16         held off the record.)

17         Q.

18

19

20

21         Q.     Is that a dangerous business in

22    your experience?

23              THE WITNESS:  Dangerous

24         business selling drugs?

25              MR. SWEENEY:  Yes.

```
 1                          M. BOVELL          89
 2                A.    Dealing drugs, working in the
 3          police department as a police officer is
 4          dangerous business.
 5                Q.    My question was:  Is selling
 6          drugs a dangerous business in your
 7          experience?
 8                A.    Yeah, of course.
 9                Q.    Did you make an official report
10          of the misconduct that you've outlined in
11          Paragraphs 55 through 59 of the Complaint
12          and that's regarding ██ ██ ███ ████
13          ██ ███ ██ ███ ██ ████ █ ███
14          █ ███ █████ ██ ████
15                      THE WITNESS:  Other than
16                Sergeant Fegan?
17                Q.    So, you reported this
18          misconduct to ████ ██ that he was
19          involved in?
20                A.    What happened to me with
21          ████ ██, we discussed that -- no, I
22          don't think so.  I'm not sure.  I don't
23          remember.
24                Q.    You don't remember reporting
25          this misconduct about ████ ██ and
```

1                             M. BOVELL              90

2            ████████████

3                   A.     I reported this conduct to Judy

4         Williams of human resources.

5                   THE WITNESS:  Did I?

6                   A.     Yes, to Judy Williams of human

7         resources.  That was in 2014.  I was in the

8         narcotics unit in 2013.  I left the

9         narcotics unit in January of 2014.  As the

10        harassment and the abuse escalated I

11        reported it to Judy Williams of the human

12        resources.  We had a conversation and we

13        discussed about ████ ██████████ in Mount

14        Vernon Police Department.  She wanted me to

15        draft something on paper so we can open up

16        an investigation.  I did.  No investigation

17        was done.

18                   Q.     As I understand your response

19        to the question the misconduct about

20        ██████████ ████ and ████████████ ██████

21        supposedly ████████████ ████████ ██████ ██

22        ████████████ ██ ████████ ██ ██ ██ ██████ ████

23        ██ ██████ ████████ ██████ ████████ ██ ██████ ██

24        ██████ ████████

25                   A.     That occurred sometime in mid

```
 1                              M. BOVELL            91
 2       August to late -- I'm sorry, mid 2013 to
 3       late 2013.  I don't remember the exact date.
 4            Q.    And you made a report of that
 5       misconduct sometime in 2014 to Judy
 6       Williams; is that correct?
 7            A.    In 2014 when I was no longer in
 8       the narcotics unit I made a report to Judy
 9       Williams, yes.
10            Q.    And ███ ██████████ that you
11       described, that was set forth in this
12       written report to Judy Williams; correct?
13            A.    We had a conversation about it
14       and she said to me that I shouldn't put too
15       much details, just draft something so we can
16       open up an investigation.  She's going to
17       set up a meeting with the mayor and we're
18       going to take it from there.  Nothing had
19       happened.
20            Q.    Judy Williams told you not to
21       put down too many details?
22            A.    She told me to draft it, I
23       don't have to go into too much details.  We
24       were discussing this verbally and she told
25       me about ███ ██████████ in the department
```

```
1                          M. BOVELL                92

2      and Internal Affairs.  We discussed that

3      with Lieutenant Olifiers, we discussed that

4      with Commissioner Burke and other things

5      that have occurred and she said I should

6      just draft -- put something -- document

7      something so she could work with it and

8      allow her to open up an investigation and

9      we're going to have some meetings and that

10     never occurred.

11              Q.    I'm handing you back Exhibit H

12     that you identified at the last deposition.

13                     (Handed)

14              A.    This seems to be some of the

15     documentation that I gave Ms. Williams.

16              Q.    I show you Defendant's I for

17     Identification which is a human resources

18     form.

19                     (Handed)

20              A.    Okay.

21              Q.    H and I are documents that you

22     gave to Judy Williams; correct?

23              A.    Some of the documents.

24              Q.    What other documents did you

25     give her?
```

```
1                          M. BOVELL                  93
2              A.    I'm not sure.  I don't
3        remember.  I'd have to see.  I don't recall.
4              Q.    Is there any other ████████
5        that you believe exists with respect to
6        Mount Vernon Police Department that is not
7        set forth in your report to Judy Williams?
8              A.    Well, this happened after.
9        There are instances where -- see, the way it
10       works in Mount Vernon Police Department even
11       though there's racism, there's abuse of
12       power, as well.  The way I've been told I
13       cannot effect change if I'm not a
14       supervisor.  I was told by another
15       supervisor I cannot effect change if I'm not
16       a supervisor.  So, unfortunately sometimes
17       -- well, supervisors do get away with
18       things, you know, get to get their way and
19       do what they want to do.  Initially when I
20       called in I wasn't approved for my second
21       surgery and I waited for my second surgery.
22       I called the desk.  I was speaking to Tommy
23       Gallagher who is Lieutenant Chris
24       Gallagher's brother and he asked me "What's
25       going on?"  I said, "I'm waiting for my
```

```
 1                            M. BOVELL                    94
 2        second surgery."  He said to me that "Well,
 3        you got to be like my brother.  You got to
 4        call up City Hall and talk to someone,
 5        scream at somebody and then you get approved
 6        right then?"  He said to me, "You're not a
 7        supervisor, you can't do that."  That's to
 8        say, you know, you won't get the privilege
 9        as a supervisor unless you are a supervisor.
10             Q.    In terms ██  ████████████, you
11        give a story about how you had to be a boss
12        in order to get surgery approved.
13             A.
```



M. BOVELL                    95

[REDACTED]

        Q.    When did this happen?

        A.    This happened sometime in 2014,
'15, I believe.  I'm not sure.

        Q.    Did you observe this or --

        A.    No, this was told to me by
another police officer.

        Q.    What police officer was that?

        A.    I think it's a few police
officers told me this.  I believe one of
which I can remember now is Gene Jerome.
Gene Jerome told me he saw the complaint
form, you know, and nothing is being done
[REDACTED].

        Q.    Who is the supervisor?

        A.    I don't remember.  I don't

```
 1                          M. BOVELL            96
 2        remember.
 3                 Q.    You don't remember the name of
 4        the supervisor.
 5                 Who is the spouse or wife that was
 6        involved?
 7                 A.    I'm not sure.  I'd have to
 8        gather more information from my recollection
 9        from Gene Jerome, but Gene Jerome is the one
10        that gave me specific details.  He saw the
11        complaint, that he saw the complaint form
12        that the spouse filled out for the incident
13        and nothing was done.  ███ ██████████  ███
14        ██ ██ ██ ██ ████████████  ██████
15        ███████ ██ ████████
16                 Q.    Are there any other examples of
17        ████████████ that you haven't mentioned?
18                 A.    Right now, I don't remember
19        right now.  I'll try to get it as much as
20        possible at this point in time.  I don't
21        remember.
22                       MR. SWEENEY:  I have no further
23             questions at this time.  Thank you.
24                       (Whereupon this examination
25             concluded at 2:02 p.m.)
```

1                    M. BOVELL                    97

2

3

4                              _____

5                              MURASHEA BOVELL

6

7     Subscribed and sworn to

8     before me this_____day

9     of_____, 2016.

10

11    _____

12        Notary Public

13

14

15

16

17

18

19

20

21

22

23

24

25

98

# C E R T I F I C A T E

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF WESTCHESTER)

I, LISA DOBBO, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That MURASHEA BOVELL, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of November, 2016.

————————————————————

LISA DOBBO
SHORTHAND REPORTER

99

## EXHIBIT PAGE

| Defendant's Exhibit | Description | Page Number |
|---|---|---|
| DD | Letter dated 10-27-14 | 04 |
| EE | Letter dated 1-29-15 | 04 |
| FF | Letter dated 2-26-15 | 04 |
| GG | Letter dated 3-6-15 | 04 |
| HH | Letter dated 3-13-15 | 04 |
| II | Letter dated 4-13-15 | 04 |

\* \* \*

## REQUEST

Page 50   Production of any cell phone
recordings that have not been
produced to your attorney

100

ERRATA SHEET

The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter held on 11/1/16:

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

Page____Line____SHOULD READ:_____

REASON FOR CHANGE:_____

_____
MURASHEA BOVELL

Subscribed and sworn to before me this_____day of_____, 2016.

_____
Notary Public

**$**

$15,000 - 70:24

**'**

'15 - 95:13

**0**

0 - 99:7

04 - 99:7

**1**

1 - 1:16; 4:3
1,000 - 38:6
1-29-15 - 4:13; 99:8
10,000 - 70:23
10-27-14 - 4:10; 99:7
1000 - 1:24
10550 - 1:15; 4:5
10583 - 2:8
10606 - 1:24
11/1/16 - 100:4
113 - 6:22; 11:8
115 - 18:14, 23
117 - 18:14, 23; 22:9, 18
12 - 47:11
128 - 38:23
12:00 - 1:16
13904 - 2:13
13th - 98:17
1:32 - 79:6
1:40 - 79:7

**2**

2 - 1:15; 2:7
2-26-15 - 4:16; 99:9
2007 - 13:21; 28:22
2008 - 13:24; 14:5, 16; 16:5
2009 - 13:24; 14:6, 17; 16:5;
   29:16
2013 - 87:11; 90:8, 24; 91:2
2014 - 6:17; 14:14, 18; 28:21;
   30:4; 38:16, 24; 54:2; 75:4,
   76:25; 90:7, 9; 91:5, 7; 95:12
2015 - 19:21; 25:6; 33:18; 88:6
2016 - 1:16; 54:10, 13; 55:8;
   66:22; 97:9; 98:17; 100:23
207 - 17:11, 21; 30:14;
   46:23; 74:3; 76:2
207-c - 17:21; 18:6; 23:22;
   25:14; 31:8; 38:14; 46:24;
   47:23; 54:25; 71:23
207-C - 38:12
22 - 33:8
29th - 54:2
2:02 - 96:25

**3**

3-13-15 - 4:22; 99:11
3-6-15 - 4:19; 99:10
34 - 79:18, 24; 83:18

**4**

4-13-15 - 4:25; 99:12
400 - 2:7

**5**

5'5 - 10:12

50 - 1:24; 99:17
50% - 7:17
54 - 86:10; 87:5
55 - 89:11
59 - 86:11; 87:5; 89:11

**6**

60 - 44:20; 45:13, 15; 84:23;
   85:2, 4
682-1888 - 1:25

**7**

7:15-CV-08594-CS - 1:6

**8**

8th - 54:3

**9**

914 - 1:25
99 - 2:12
9th - 6:17

**A**

able - 9:3; 54:22; 57:3; 61:23;
   62:2; 73:2; 80:24
above-captioned - 100:4
abuse - 7:3, 22; 23:13, 18;
   24:8; 50:25; 54:16; 55:10, 25;
   56:13; 60:4; 63:2; 64:14;
   65:16; 66:18; 90:10; 93:11
academy - 13:9
accept - 57:24; 58:4, 8, 14
access - 19:13, 16; 34:3, 10,
   18, 23; 35:4
accompanied - 35:19
account - 7:6; 11:12; 22:21
acknowledged - 20:9
Action - 1:5
action - 96:14; 98:13
active - 9:12
additional - 37:19; 79:14
additions - 100:2
address - 4:3
Address - 2:7, 12
administer - 3:12
administration - 12:2; 43:21;
   66:17, 22
admit - 60:13
admitted - 60:22; 76:12
advance - 7:14
adverse - 9:18
advised - 16:18; 17:11; 25:22;
   37:5; 39:18, 24; 43:20; 46:19;
   51:15
affair - 94:15; 95:5
Affairs - 35:15; 63:17; 92:2;
   95:2
affect - 68:23
affects - 68:23; 69:5
afford - 70:22
afraid - 35:18; 57:5
African - 9:24
African-American - 9:24
ago - 48:23; 51:8; 60:11; 65:4;
   67:15; 78:20; 84:16
agony - 69:22
agree - 16:20; 81:16
AGREED - 3:7, 18
agreement - 26:6; 30:13, 19,
   21; 31:4; 32:12; 42:7, 13, 16,
   18; 43:21; 45:8

ahead - 68:19
ain't - 68:9; 85:2
alcohol - 40:6, 10
Alec - 2:18
alerted - 35:19
allegation - 39:5; 79:23; 87:7,
   15
allege - 18:14, 24; 22:2; 46:22
alleged - 12:7; 86:10
allegedly - 42:25
allow - 92:8
allowed - 34:17; 36:20; 87:8;
   89:12
allowing - 19:12; 90:22
altercation - 39:2; 94:19
ambiguous - 33:6
American - 9:24
ample - 36:3
AMY - 2:8
AND - 1:8-12; 3:6, 17
and-a-half - 54:6
annoyed - 32:22; 37:7
answer - 5:11, 21; 33:14;
   34:15; 68:19; 80:22
Anthony - 75:8
antibiotics - 61:15
Antonini - 12:8; 14:3; 68:4, 7;
   79:20; 80:3, 16; 82:12; 83:21;
   85:20; 87:7; 90:2, 20
antonini - 68:4
anxiety - 60:9; 62:13; 63:11
anytime - 29:6; 30:7
apologized - 23:2
appear - 41:9; 56:5; 57:12
apply - 5:10
appointment - 22:12; 45:7, 9;
   46:9; 59:24; 76:16
appointments - 22:14; 55:22
approved - 93:20; 94:5, 12
April - 38:5
area - 6:15; 88:19
arising - 71:6
arrest - 40:6; 62:17
arrested - 14:9; 16:11, 15;
   82:18; 85:24
arrests - 81:4; 82:12, 15;
   84:14-16, 23-24; 85:2, 4, 7, 22
aside - 8:2
assigned - 20:4, 14, 16; 23:21,
   23; 24:3, 12, 16
assistance - 37:9
Associates - 18:5, 11, 15;
   20:24; 21:18; 22:20; 23:22;
   24:4, 13, 17; 28:9; 29:3; 31:8,
   19; 37:23; 44:9; 45:13, 23;
   46:15; 65:23
assume - 5:9, 22; 8:15; 73:17;
   85:3
assumption - 5:13, 24
AT - 1:14
attempt - 58:11; 61:14
attempted - 28:18; 55:19
attempts - 78:7
attention - 54:18
Attorney - 51:12, 19
attorney - 17:15; 21:8; 24:21;
   33:20-22; 35:10; 46:19, 21;
   47:9; 50:19; 51:11; 53:19;
   58:24; 74:8, 19; 78:13; 99:18
Attorneys - 2:6, 11
attorneys - 3:7
attributable - 68:15
audio - 41:9, 13; 49:25
August - 90:23; 91:2
authority - 30:13; 32:21
authorizations - 33:9, 11
authorized - 3:11

available - 82:5
Avian - 51:15; 52:2; 53:9
awarded - 17:11; 38:13, 16
aware - 31:10; 32:23; 35:6;
   37:18
awhile - 15:16; 53:6; 63:12

**B**

bad - 7:12; 63:6
bag - 84:20
bang - 69:4
banging - 35:17, 22; 64:17
bangs - 64:18
bargaining - 26:6; 30:12, 19;
   31:4; 32:12
baseball - 68:6
based - 7:5, 7; 11:12; 59:21;
   68:17; 71:17; 72:17; 73:10;
   78:25; 81:16
beat - 15:19; 16:16
beaten - 16:12
became - 37:7
bed - 63:18
began - 29:10; 33:2; 50:6
behalf - 36:6; 77:7
BELLANTONI - 2:6, 8; 19:4;
   22:7; 33:13; 34:14; 44:11;
   46:16; 47:2; 49:14; 59:4;
   66:25; 68:16; 71:8, 11, 17;
   72:8, 24; 73:15, 21; 74:5;
   75:16; 77:22; 80:18; 81:3;
   83:10; 86:23, 25; 68:10
benefits - 17:12; 25:14; 38:12,
   14; 46:23; 47:13, 22-23; 54:25
best - 37:10, 16; 43:3
better - 61:18, 25; 79:16
between - 3:7; 31:14; 41:12
big - 70:5
bike - 68:13
Binghamton - 2:13
birth - 34:20, 23
bit - 26:20; 38:7; 52:17; 60:23
black - 31:7, 9; 12:20; 13:3;
   39:2; 40:2, 4, 14; 41:25; 42:2,
   10; 43:2; 67:25; 82:9; 84:12
blood - 98:14
body - 29:20
book - 82:9, 19; 84:12, 16, 25;
   85:7
booked - 58:7
boss - 94:11
bought - 68:12
BOVELL - 1:4, 19; 4:2; 97:5;
   98:9; 100:21
Bovell - 5:3; 6:14; 43:25; 53:14;
   55:13; 74:13, 24; 77:16; 79:8;
   83:21; 86:7; 87:2, 16; 88:18
boy - 67:24
break - 6:8, 11
breakdown - 56:17; 60:18;
   78:25
Briley - 52:23
broad - 34:4
broke - 6:13
brother - 93:24; 94:3
brought - 5:8; 33:9, 12; 48:18;
   62:12
bullshiting - 31:12
BURKE - 1:9
Burke - 92:4
business - 4:3; 88:21, 24; 89:4,
   6
busy - 54:21
BY - 2:8, 13

**C**

calculation - 53:19
calmed - 45:20; 65:10
cannot - 93:13, 15
capacity - 44:25
CAPACITY - 1:8-10, 12
Captain - 25:13; 27:4; 30:23;
   31:12; 34:7; 38:9
CAPTAIN - 1:10
captains - 15:12
captioned - 100:4
car - 81:12
care - 45:5; 76:23; 78:15
career - 7:15; 56:14; 63:3; 66:3
   [ ] - 42:3
case - 20:21; 23:10; 47:19;
   67:17; 79:13; 85:20
cash - 57:25; 58:2, 8, 14
cat - 34:3, 11
catastrophic - 69:17
caused - 73:5; 87:19
causes - 87:17
cell - 50:3, 16; 99:17
certain - 18:5; 20:13; 79:12
certainly - 5:17
certify - 98:8, 13
CHANGE - 100:7, 9, 11, 13,
   15, 17, 19
change - 15:23; 16:19; 66:21;
   68:10; 93:13, 15
changed - 34:9, 11, 13; 73:16;
   75:6
changing - 68:9
charge - 14:24; 32:19
check - 60:23; 61:23; 62:2;
   66:2; 74:18
checked - 30:16; 50:14; 61:17;
   62:9
checking - 61:11, 13; 64:5
Chief - 13:11; 30:23, 25; 47:21
choice - 20:6
choked - 39:25; 40:4, 13
choking - 40:19
Chris - 93:23
Christopher - 38:25
CI - 83:13, 15; 85:21, 23; 86:9,
   17, 21; 87:3, 8, 12, 19-20;
   90:22
CI's - 85:12, 25; 86:2; 87:16;
   88:2, 6, 18; 89:12
Cindy - 46:2, 10
city - 1:7; 5:7; 31:14; 51:11, 19;
   66:23; 67:11; 70:5; 77:7
City - 54:20; 57:15; 66:13;
   70:11, 18; 74:16; 94:4
city's - 49:2
Civil - 1:5
civilian - 28:25; 35:2
civilized - 64:19
Claim - 74:13
claim - 18:6; 21:19; 24:10;
   30:15; 53:15; 54:9; 72:17, 23;
   73:23; 74:6; 76:2
claiming - 53:21; 55:12; 68:14;
   71:3, 5; 72:20
claims - 31:8; 72:12
clarification - 60:20
Clark - 67:22
clear - 71:3; 77:24
cleared - 62:10
clearly - 34:20; 44:24
client - 59:5
Clinton - 13:9; 16:25; 17:8
coincidence - 88:5
collective - 26:5; 30:12, 18;

32:12
Colon - 37:11; 42:6, 12
coming - 25:21; 28:2; 62:4; 63:17
comments - 13:13; 17:7
commission - 14:10
COMMISSIONER - 1:7
Commissioner - 92:4
commissioner - 52:16
communications - 25:5; 34:6
community - 66:14; 69:2; 70:20
Comp - 47:19; 71:24; 74:3
company - 20:11, 14, 23; 29:2; 35:8; 58:12
compensation - 53:15
Compensation - 72:5
competition - 82:13
complained - 12:23; 13:7; 23:24; 41:4
complaint - 16:22; 22:23; 94:25; 95:4, 21; 96:11
Complaint - 6:21; 11:10; 18:13, 24; 22:2; 33:7; 38:22; 46:22; 79:16, 18; 86:11; 87:6; 89:11
complaints - 59:14
complied - 19:23
comply - 20:7
Con - 9:8; 53:22
conceal - 83:23
concerned - 48:24; 74:9
concerning - 37:21
concluded - 96:25
condescending - 13:2
condition - 73:8, 18
conditions - 32:5
condoning - 90:21
conduct - 90:3
conducting - 83:19
confidential - 34:25; 82:22; 83:4, 6, 25; 84:3
confirmed - 24:6; 30:17
confused - 27:14; 66:21
connection - 71:18; 87:6
consented - 28:24
constantly - 45:3
consulted - 30:22
contact - 46:12, 15
contacted - 20:20; 21:2; 48:22; 50:10; 51:4, 21; 58:6
contacting - 20:19
continue - 87:8
continued - 27:5
contract - 31:3, 17; 32:5, 9, 15; 35:7
contractual - 31:3
conversation - 12:5; 14:19; 21:23; 41:11; 86:7; 90:12; 91:13
conversations - 27:6; 32:25; 41:24; 42:4; 49:11; 58:18, 20, 22
cop - 8:6; 64:9; 70:12
copies - 27:9, 11, 16
cops - 69:8
copy - 50:19; 59:7; 80:22
Corporate - 2:12
Corporation - 1:14
correct - 6:19, 25; 17:12; 18:7; 21:19; 30:15; 32:7; 38:14; 52:6, 21; 53:16, 23; 54:10; 59:12; 65:24; 71:7, 9; 73:16, 80:3; 90:24; 91:6, 12; 92:22
corrections - 100:2
correctly - 79:25
correspond - 82:24; 83:7
█████ - 66:23; 67:12

█████ - 66:17
█████ - 12:14; 14:7; 15:6; 62:23; 90:13; 91:10, 25; 93:4; 94:10; 96:17
cost - 57:2, 11
costs - 56:9
Coughlin - 5:6
COUGHLIN - 2:11
counsel - 23:6; 26:16; 27:8, 15, 21; 28:6; 37:10, 20; 47:7; 49:2; 51:11, 19; 67:6; 87:3
Counsel - 1:14
counseling - 36:7, 16, 24; 37:25; 56:24; 57:13
counter - 6:5
country - 70:2
COUNTY - 98:5
County - 64:18
course - 22:22, 25; 89:8
COURT - 1:2
court - 71:12; 72:10
Court - 1:19
cover - 11:22
covered - 41:3, 5; 95:8
covering - 11:23
crazy - 57:8
credentials - 70:8, 10
cross - 82:16
cry - 56:17
current - 43:3; 44:10, 14, 17; 74:25; 75:3; 85:10
customized - 19:19; 33:18, 20, 25; 34:5, 8

D

D-A-V-E - 75:19
Daddy - 64:16
damage - 71:2
damages - 53:13; 55:13, 18; 68:11, 14; 74:7
damaging - 55:24
dangerous - 88:21, 23; 89:4, 6
date - 25:2, 7; 34:20, 23; 60:14; 71:4; 91:3
dated - 99:7
dates - 29:14
Dave - 67:22; 75:14, 22, 25; 76:5, 9, 22; 77:18
days - 36:18-20; 44:20; 45:14, 16; 61:16, 21; 85:8
DD - 4:10; 17:15; 99:7
dead - 13:4
dealing - 89:2
death - 87:16, 25
December - 88:6
Defendant's - 4:9, 12, 15, 18, 21, 24; 92:16; 99:5
Defendants - 1:13; 2:11
defendants - 5:7
definitely - 84:12
degree - 77:10
delay - 72:17
delayed - 71:25
deleted - 50:5; 51:3
deleting - 50:21
deletions - 100:3
demoted - 64:25; 65:11
denial - 71:19
department - 7:3, 9, 17; 9:11; 10:15; 11:17, 20; 12:22; 13:17; 15:6, 16; 22:4; 23:7-9; 19, 24:9; 31:16; 32:24; 35:5; 37:22; 41:25; 42:3; 51:2; 54:25; 56:2; 62:25; 70:9; 89:3; 91:25
Department - 7:11; 8:16; 10:17; 12:11; 22:23; 27:4;

28:23; 30:10; 31:15; 87:25; 90:14; 93:6, 10
deposition - 3:9, 14; 5:4; 12:5; 14:4; 60:17; 80:23; 81:6; 92:12; 98:10
DEPUTY - 1:8
describe - 10:11; 60:6
described - 76:3; 91:11
Description - 99:5
desk - 93:22
destroyed - 82:10
detail - 53:22; 82:4
details - 35:25; 40:3; 79:12; 85:15; 91:15, 21, 23; 96:10
detective - 11:5; 53:16; 85:9; 86:14
Detective - 12:8; 14:3; 48:10; 79:20; 80:3, 16; 83:21; 87:10; 88:4; 90:20
died - 88:21
diet - 62:17
different - 34:9; 43:15; 57:10
dirty - 68:7; 81:19
Disability - 18:4, 8, 10, 14, 20, 24; 19:11, 13; 20:5, 16, 20, 24; 21:17; 22:3, 19; 23:13, 16-17, 21; 24:3, 12, 17; 25:6, 20; 28:9; 29:3; 30:14, 22; 31:4, 7, 19; 32:10, 15; 33:22; 37:23; 44:9, 14, 23; 45:12, 22; 46:5, 15; 51:2; 59:22; 64:23; 65:23; 66:9
disagreement - 31:14
discharged - 61:2, 19, 25
disciplinary - 96:14
disclosed - 58:24
discontinued - 47:13, 16
discrimination - 6:24; 7:5; 11:11; 24:11
discuss - 29:25
discussed - 41:14; 88:5; 89:21; 90:13; 92:2
discussing - 86:19; 91:24
discussion - 77:13; 84:18, 21; 86:4; 87:2; 88:15
disease - 60:24; 62:8
disgusting - 59:25; 60:3
dispatcher - 51:20
Dispatcher - 51:21
display - 39:10
dispute - 43:22
DISTRICT - 1:2
division - 10:18, 21; 51:18
Dobbo - 1:25; 4:6
DOBBO - 98:7, 21
doctor - 19:15, 23; 21:13; 22:10, 15; 26:9; 45:8; 47:10; 62:9; 75:8, 10-12; 76:13, 17, 19-20; 77:15; 78:15, 24
doctor's - 45:7, 9, 16; 46:8, 11-12; 59:23; 75:13
doctors - 19:14; 22:13; 45:24; 61:9; 76:24; 77:4, 6, 10; 78:12, 21
document - 17:18, 24; 18:2; 20:3, 8, 10, 15; 21:11, 15, 20; 35:13; 92:6
documentation - 19:19; 26:3; 68:17; 92:15
documents - 26:13, 23; 27:10, 20; 34:21; 35:2; 92:21, 23
dog - 34:3, 11
done - 14:3; 50:2; 67:19; 76:15; 86:23; 90:17; 95:22; 96:13
door - 35:17, 23; 63:22, 24; 64:16-18; 69:3
doorbell - 64:2, 19
down - 19:24; 25:24; 45:20; 60:12; 62:17; 65:10, 12; 67:24; 72:13; 80:21; 91:21

Dr - 46:11; 75:14, 22, 25; 76:5, 9, 22; 77:18
draft - 90:15; 91:15, 22; 92:6
drive - 25:23; 27:8; 50:12
Drive - 2:12
dropping - 64:5
drug - 88:18; 90:22
drugs - 85:23; 86:2; 87:9; 88:24; 89:2, 6, 13
due - 11:14
duly - 4:5; 96:10
Dunkin - 13:11
during - 12:4; 22:24; 23:6
Dutchess - 64:18; 70:18
duty - 6:15, 17; 19:22; 21:13; 26:8; 28:10; 29:22; 30:2, 6; 40:6, 10; 55:7; 78:2
dying - 70:5

E

earned - 53:15
economic - 72:17
Ed - 9:8; 53:22
EE - 4:13; 21:8, 16; 99:8
EEOC - 22:22, 24; 23:5, 11
effect - 3:13; 93:13, 15
eggplant - 13:4
eight - 48:3
either - 41:17; 43:9; 58:6
email - 28:14
emails - 37:19
emotional - 55:12, 14, 17; 56:24; 59:15, 17-18; 60:7; 76:3; 78:2
Emotional - 76:4
employed - 30:9
employment - 28:21; 32:5
enforcement - 70:8
entirety - 47:3, 8
entity - 23:10; 26:8
entrapment - 85:22
ERRATA - 100:2
escalated - 90:10
especially - 33:25; 59:22; 70:3, 5
ESQUIRE - 2:8, 13
evaluation - 8:9, 12
event - 41:15
eventually - 13:14
everyday - 56:12; 65:19; 70:4
exacerbated - 60:21; 71:20; 72:2
exact - 91:3
exactly - 16:5; 34:5; 35:13; 48:17; 81:8
exaggerating - 38:8
examination - 79:6; 96:24
Examination - 1:18
example - 79:14; 82:2
examples - 96:16
except - 3:18
exercise - 68:13
exhibit - 25:10
EXHIBIT - 99:3
Exhibit - 4:9, 12, 15, 18, 21, 24; 17:15; 21:8, 16; 24:20; 25:10; 35:10; 38:2; 92:11; 99:5
exists - 93:5
expansive - 78:4
expect - 65:14
expected - 66:4
expeditious - 54:23
expense - 57:14
expensive - 58:8, 15
experience - 11:21; 68:21; 69:25; 70:2, 9; 88:22; 89:7

expired - 42:11, 24; 43:18
explanation - 11:15
expose - 62:23
expresses - 34:2
extent - 71:22, 24; 81:4

F

F'ing - 94:22
fact - 11:14
failed - 43:16
fair - 5:12, 24; 88:17
fairly - 22:17
familiar - 17:19; 18:20; 19:10; 21:3; 26:8; 31:24
family - 56:5, 16, 20; 57:7; 68:22; 75:10
far - 25:23; 56:10; 73:4; 74:8
father - 68:25
favoritism - 62:24; 66:18
February - 33:17
federal - 23:11
fees - 74:8
Fegan - 7:25; 8:4, 10, 18, 22; 9:18; 11:2; 12:6; 14:3, 19; 82:12; 84:17, 19; 85:8, 21; 87:7; 89:16, 18, 21, 25; 90:20
felt - 59:24; 62:5
female - 9:22
few - 48:23; 57:22; 58:16; 95:18
FF - 4:16; 24:20; 25:11; 99:9
figure - 79:13
figures - 65:17
file - 24:10; 31:6, 17, 22; 32:6, 18; 36:5, 8; 67:8
filed - 45:18; 74:12
filing - 3:9
fill - 19:14
filled - 96:12
fine - 71:16, 23
FIRM - 2:6
firm - 5:6
first - 19:22; 33:16; 34:22; 58:10; 60:16
Fisher - 42:8, 20, 22; 43:14, 16; 67:16; 68:5
flagged - 13:4
flu - 77:23; 78:14, 17
follow - 76:13, 17, 19; 78:22
follow-up - 76:13, 17, 19; 78:22
following - 22:12; 100:2
follows - 4:7
FOR - 100:7, 9, 11, 13, 15, 17, 19
force - 3:12; 9:13
forced - 25:19; 28:3
forget - 23:15; 75:14
forgot - 9:21; 51:20; 86:2
form - 3:19; 28:19; 36:25; 44:12; 46:17; 83:11; 92:18; 95:22; 96:11
forms - 19:12, 20; 33:19, 24; 34:8
forth - 91:11; 93:7; 98:10
frame - 36:13
Francis - 2:18; 35:19; 63:23, 25
free - 6:10
frequent - 63:11
front - 15:20; 57:7
fucking - 84:20
full - 55:4; 66:18
fully - 32:23
FURTHER - 3:17
furthermore - 20:17

**G**

Gallagher - 38:24; 39:11, 25; 40:12; 41:9; 93:23
Gallagher's - 93:24
Garcia - 87:11
gather - 96:8
gathering - 44:25
Gene - 39:13; 40:21, 23; 41:12, 14; 48:9, 20; 49:25; 51:5; 52:3, 24; 95:20; 96:9
General - 51:12, 19
general - 75:9; 78:18
Gerhart - 5:6
GERHART - 2:11
German - 12:21; 14:17
gG - 99:10
GG - 4:19; 35:10
given - 27:8; 28:4; 30:25; 36:3; 37:10, 13; 39:7; 41:2; 54:17; 98:11
God - 56:11; 67:10
Goldman - 25:13; 27:4; 30:23, 25; 31:12; 34:7; 38:9; 47:21; 64:25; 65:11
GOLDMAN - 1:10
gonna - 85:3
govern - 11:21
government - 23:11
grace - 67:10
great - 59:9; 69:25
grievance - 31:7, 18, 23; 32:3, 6; 36:6, 8; 37:4, 6
grieve - 36:15, 23
grieved - 36:25
Griffin - 86:14; 88:4
ground - 5:10; 16:16
guess - 17:4; 38:25; 45:11; 48:9; 62:18; 72:9; 74:2
gun - 94:21
guy - 94:21

**H**

half - 54:6
Hall - 94:4
hand - 28:17; 29:2; 35:9; 98:17
Handed - 92:13
handed - 17:16; 21:10, 12, 21; 24:22; 26:23; 35:11; 38:4; 92:19
handicapped - 15:19
handing - 92:11
hang - 56:12
harass - 12:20; 22:4; 45:4; 55:2
harassing - 17:6; 18:15; 22:20; 44:22
harassment - 6:24; 7:2, 4; 11:11, 12:17; 23:12, 18, 24; 37:22; 42:2; 54:16; 56:3, 13; 63:3; 64:7, 23-24; 90:10
hard - 25:16; 35:22; 55:23; 56:15
head - 67:16
headache - 60:13, 21
headaches - 60:9; 61:11; 62:13; 63:10
health - 57:19; 61:7; 66:3; 76:17
healthy - 61:10
heard - 20:11; 49:4; 52:13, 16; 53:7
HELD - 1:14
held - 1:19; 77:14; 80:21; 86:5; 88:16; 100:4
hell - 65:13
help - 57:9
helpful - 84 15

HEREBY - 3:6
hereby - 98:8
herein - 3:8
hereinbefore - 98:10
hereunto - 98:17
herself - 20:21
hesitant - 83:5
HH - 4:22; 99:11
high - 70:22
higher - 15:2
HIPAA - 19:19; 34:8
hire - 8:5, 18
HIS - 1:8-10, 12
history - 11:23
hit - 62:17
Hollow - 37:13
home - 25:22; 35:18; 56:3; 63:18; 64:4, 6; 69:3
homes - 83:20
honorary - 52:15
hoping - 81:5
hospital - 60:11, 20; 61:3; 76:11; 78:21
Hospital - 61:4; 62:12
hour - 58:9
house - 35:16, 24; 63:25
human - 13:7; 14:10; 68:25; 90:4, 6, 11; 92:17
hurts - 72:20
husband - 68:25; 94:17, 20
Hutchings - 9:9

**I**

idea - 31:11
Identification - 4:11, 14, 17, 20, 23; 5:2; 92:17
identified - 11:19; 13:10, 12; 20:21; 31:20; 92:12
identifying - 7:8
identity - 81:23
II - 4:25; 38:2; 99:12
illegal - 42:21, 23; 43:22; 90:21
illegally - 42:9
improper - 32:18
IN - 1:8-10, 12; 98:16
inability - 11:21
inaccurate - 36:2
inaugurated - 65:5
Inc - 1:23
incident - 15:17; 16:3, 8-9, 14; 38:23; 39:9, 17; 40:9; 41:8; 82:17; 84:8; 86:10; 96:12
incidents - 82:24; 83:8; 85:13
incompetent - 67:17
increase - 23:19
indicate - 31:2; 88:3
indicated - 28:7; 30:11, 16, 20; 36:17; 79:19
indicating - 20:4, 9
individual - 32:2; 40:14, 21; 69:6; 94:15
INDIVIDUALLY - 1:8
individuals - 20:13; 50:10; 80:6; 85:25
infectious - 62:8
informant - 83:6, 17, 25; 84:3
informants - 82:23; 83:5
information - 18:6; 21:4; 22:11; 26:13; 34:19; 35:4; 37:13; 39:7; 53:2; 79:14; 81:8, 25; 83:13; 84:4, 11; 86:8; 96:8
informed - 33:24
initial - 19:4; 62:11
initials - 82:23; 83:6
injured - 6:18; 19:25; 25:25; 30:3, 5; 54:3, 19

injuries - 19:17; 26:25; 27:2; 28:16; 29:11, 15; 71:5; 77:3; 78:3
injury - 6:15, 17; 11:9; 18:17; 22:6; 25:7; 28:11; 29:5, 18, 23; 30:2; 44:17, 19; 71:20; 72:2; 75:5; 76:2, 24; 78:2
instance - 11:24
instances - 7:19; 13:6; 93:9
insurance - 57:15, 19, 21, 24; 58:5, 12
interaction - 44:13; 45:12
interest - 37:11, 16
interested - 98:14
Internal - 35:15; 63:17; 92:2; 95:2
interrogatories - 68:18
intervention - 14:11
intimidate - 22:5; 55:2
intimidating - 22:21
intimidation - 16:2; 64:7
invaluable - 70:10
investigation - 23:5, 12; 90:16; 91:16; 92:8
involve - 40:20
involved - 38:25; 40:19; 86:9; 87:25; 88:18; 89:19; 96:6
IS - 3:6, 17
ism's - 62:25
isolation - 60:22, 25; 62:4
issue - 50:24; 71:24; 77:16
issues - 11:19; 13:5, 11; 15:6, 15; 31:20; 32:24; 37:21; 58:24; 59:16; 60:7
IT - 3:6, 17
item - 82:20
itself - 11:22; 13:17
IV - 61:15

**J**

jail - 35:23
January - 19:21; 23:3; 33:17; 38:24; 54:9, 13; 55:8; 65:6, 9, 24; 66:22; 90:9
[ ] - 42:3
Jerome - 39:13; 40:22; 41:12, 14; 48:9, 20; 50:2; 51:5; 52:3, 24; 95:20; 96:9
Jill - 20:19; 23:14; 25:19, 23; 26:21, 24; 27:7; 28:4, 8; 33:16; 34:22
job - 8:15; 9:19; 12:20; 13:21; 28:19; 63:15; 66:9; 70:15
jobs - 8:3
[ ] - 23:23; 24:6, 10
Jose - 37:11, 14; 42:6, 12
Judy - 14:8, 18; 90:3, 6, 11; 91:5, 8, 12, 20; 92:22; 93:7
July - 54:2
Justice - 22:23

**K**

keep - 7:11, 13, 15, 18; 11:16; 25:16; 56:11; 82:12
kicked - 9:13; 13:14
kids - 58:4
kind - 45:20; 72:13; 79:9
knee - 6:18; 11:9; 29:5; 30:4; 43:25; 59:12; 72:20
knock - 69:3
knocking - 63:22, 24
knowing - 56:8
knowledge - 41:7; 85:11
known - 12:19, 21, 25; 64:13; 67:23
knows - 12:22; 77:24; 86:16

**L**

lady - 94:17, 24
lady's - 94:19
lamb - 69:16, 20
land - 64:9
last - 5:4; 6:13; 12:4; 14:5; 44:20; 45:13, 15; 65:12; 75:21; 76:5, 9; 79:9; 92:12
late - 26:21; 27:18; 87:11; 91:2
lately - 45:21
LAW - 2:6
law - 5:6; 70:8
lawsuit - 5:8; 45:19; 48:12, 16, 19, 21; 49:3; 50:6, 11; 51:5; 52:17; 62:21; 67:8; 68:15; 71:6; 74:2
lead - 84:4
leader - 37:17
leadership - 48:7; 95:9
Leary - 16:11
least - 66:4
leave - 45:3
Lee - 51:15; 52:2; 53:9
left - 66:2; 72:21; 90:8
legal - 26:15; 27:15, 20; 28:6; 46:21; 47:7; 49:2; 67:6
Letter - 4:10, 13, 16, 19, 22, 25; 99:7
letter - 25:4, 18; 35:21, 25; 36:4, 7, 15, 23; 37:24; 38:8, 17, 19; 47:20
letters - 25:12; 64:5
liar - 64:13
lie - 33:3; 64:12
lies - 65:20
LIEUTENANT - 1:11
Lieutenant - 19:24; 20:2, 6; 21:12, 14, 21, 24; 25:13, 20; 26:17, 21; 27:11; 34:7; 35:20; 38:9, 24; 39:10, 25; 40:12; 41:8; 42:8, 20, 22; 43:5, 14; 47:21; 63:19, 22-23; 64:24; 67:16; 68:5; 92:3; 93:23; 95:9
lieutenant - 43:7, 16
lieutenants - 15:11
life - 30:6; 55:25; 56:18; 60:5; 70:4
limp - 72:21
line - 6:15, 17, 28:10; 29:22; 70:4; 71:23; 78:2
Lisa - 1:25; 4:6
LISA - 98:7, 21
list - 9:8; 42:11, 25; 43:4, 6, 9, 12-15, 18
Listen - 21:2; 26:4, 11; 51:13
literally - 8:19; 56:17
live - 64:9, 17, 20
lived - 70:17
lives - 64:10
LLP - 2:11
location - 82:17
locations - 81:3
lock - 85:5
look - 24:21; 36:11; 38:3; 57:6; 63:16; 69:10; 75:20; 81:13, 16
looked - 77:7; 81:6; 84:25
looking - 42:14; 64:3, 15
looks - 17:19; 21:11, 15
lost - 52:21; 54:9, 13
Luciano - 46:2, 10
luckily - 47:6
lying - 64:13

**M**

Maddalo - 75:8
Maddalo's - 46:11

magically - 45:21
Main - 1:24
major - 57:15, 18, 20; 62:3; 67:16
male - 9:22; 10:12; 39:2; 40:2, 4
man - 61:10
Management - 18:5, 10, 15, 21, 25, 19:11, 13; 20:5, 16, 20, 24; 21:18; 22:3, 20; 23:13, 16-17, 22; 24:3, 12, 17; 25:6, 20; 28:9; 29:3; 30:14, 22; 31:5, 7, 19; 32:10, 16; 33:23; 37:23; 44:9, 14, 23; 45:13, 23; 46:5, 15; 51:2; 59:22; 64:23; 65:23; 66:10
management - 13:7; 42:17
manager - 20:21
manner - 13:2; 54:23
mark - 4:8
marked - 4:10, 13, 16, 19, 22, 25; 17:15; 21:8; 24:20; 38:2
marriage - 98:14
Marvin - 67:23
masks - 62:5
material - 19:9; 67:4
matter - 15:25; 74:13; 98:15; 100:4
matters - 46:21
mayor - 13:9; 14:12; 16:25; 17:8; 42:25; 45:19; 48:8; 65:2, 5, 9; 91:17
mayor's - 17:3
McEachin - 43:11
mean - 14:25; 55:20; 62:21; 69:14; 75:3; 77:6, 9, 22; 83:11
meaning - 21:22; 55:21; 63:6; 83:17
means - 70:12
mediation - 22:24; 23:3, 7
medical - 19:13, 16; 29:8; 33:10; 34:3, 10, 18; 44:15, 25; 46:13; 54:17; 55:6; 57:15, 18, 21; 58:4; 73:10; 77:10; 78:19
medication - 28:2; 61:15
medications - 6:2
meet - 21:13; 26:18; 28:3; 48:25
meeting - 13:13; 25:19; 33:16; 34:22; 51:10, 16, 18; 91:17
meetings - 92:9
members - 13:15; 23:17; 43:19
memory - 10:7; 25:17; 49:20; 82:6
meningitis - 61:12
mental - 61:6; 64:7
mentioned - 8:14; 12:5; 15:18; 29:15, 17; 52:4; 63:10; 78:3, 13; 81:9; 96:17
messages - 45:4; 48:25
met - 13:10; 26:21
mice - 34:3, 11
MICHAEL - 1:10
Michael - 9:8
mid - 90:25; 91:2
MIKE - 1:4
minute - 79:3
mis - 37:13
misconduct - 11:16; 12:7, 10, 12, 16; 14:7; 89:10, 14, 18, 25; 90:19; 91:5
misguided - 37:14
misinforming - 33:2
misleading - 37:8
misuse - 41:24
Mitchell - 52:8, 11, 14, 20
mixed - 70:20
modification - 95:8
modified - 95:6; 96:15

moment - 36:10
money - 56:10; 57:3, 11; 79:20, 22; 80:15; 81:12, 14; 82:24; 83:8, 12, 14, 22
month - 28:20; 44:6; 54:5; 84:24; 85:2
months - 47:11; 48:2
⬛ 23:33
⬛ 24:6, 10
most - 56:20; 57:24; 58:5
MOUNT - 1:7
Mount - 1:15; 4:4; 7:10; 8:16; 10:17; 12:10, 27:3; 28:22; 30:9; 31:14; 54:20; 57:16; 66:13; 67:18; 70:6, 12, 19; 74:17; 87:24; 88:19; 90:13; 93:6, 10
mouth - 7:12, 14-15, 18; 12:15
move - 70:21
moved - 70:18
moving - 7:16, 19
MR - 4:8; 5:17; 8:25; 12:13; 14:23; 19:6; 25:9; 32:11; 41:17; 44:4, 19; 47:4; 48:18; 50:15; 52:12; 53:18; 59:8; 71:10, 15; 72:6, 11; 73:13, 17, 22; 74:10, 16; 77:12; 78:18; 79:2; 80:8, 13; 81:2; 83:16; 84:10; 85:18; 86:3, 6; 88:14; 96:22
MRI - 77:20
MRI's - 77:4
MRSA - 61:12
MS - 19:4; 22:7; 33:13; 34:14; 44:11; 46:16; 47:2; 49:14; 59:4; 66:25; 68:16; 71:8, 11, 17; 72:8, 24; 73:15, 21; 74:5; 75:16; 77:22; 80:18; 81:3; 83:10; 86:23, 25; 88:10
multiple - 35:16; 41:23; 42:4; 85:22
MURASHEA - 1:4, 19; 4:2; 97:5; 98:9; 100:21
murder - 67:18
MV-5 - 27:18, 21

## N

name - 9:21; 10:10, 13; 12:19; 17:22; 18:11; 20:23; 23:16; 28:8; 34:24; 51:20; 75:13; 81:25; 82:16, 23; 83:5; 86:2; 87:3; 88:11, 13; 96:3
names - 8:23; 9:2; 58:17, 19; 82:19; 85:11
narcotics - 11:7; 12:18; 68:2; 81:19; 82:8; 84:13; 85:9; 90:8, 22; 91:8
narrow - 72:13
natural - 87:17
Nawrocki - 19:24; 20:2, 6; 21:12, 14, 21, 24; 25:13, 21; 26:18, 22; 27:11; 34:7; 38:10; 47:21; 64:24
NAWROCKI - 1:11
necessary - 5:20
need - 6:8; 20:2; 26:14; 27:15; 47:10
needed - 36:18; 47:24; 54:19
needles - 61:13
needs - 57:9; 78:19
negative - 61:17, 24; 62:8
neglect - 54:16, 24; 55:10
neighborhood - 63:21
neighbors - 35:18
nervous - 60:18; 65:13
never - 13:18; 20:11; 25:16; 28:15, 24; 36:3, 20; 37:5; 45:8; 60:4; 92:19; 95:7; 96:13
new - 20:12; 43:9; 45:19; 48:8; 65:2, 5, 9; 73:14

NEW - 1:2, 7; 98:4
New - 1:15, 20, 24; 2:8, 13; 4:4; 75:14; 98:8
next - 64:8; 65:19
night - 16:9
nine - 47:10
nobody - 87:21; 69:24
Nobody - 69:25
nobodys - 69:11
non - 10:2, 12
none - 63:5
normally - 95:2
Notary - 1:20; 4:6; 97:12; 98:7; 100:24
nothing - 14:13; 26:7; 30:12, 20; 67:19; 68:9; 91:18; 95:22; 96:13
Notice - 74:12, 14
notification - 21:17
November - 1:16; 65:7; 98:17
Number - 34:19, 24; 99:5
number - 43:8; 82:17; 84:9
numerous - 83:18
nurse - 20:22
nutshell - 34:2

## O

oath - 3:12
obituary - 87:18
object - 33:14; 46:16; 68:17; 83:11
objected - 46:14; 56:14
objection - 34:14; 44:11
objections - 3:18
observe - 83:21; 95:14
observed - 16:6
obtain - 22:11; 33:10
obvious - 59:18
occasion - 79:19; 80:2
occasions - 12:9; 35:16; 83:19
occur - 28:18, 20; 69:17
occurred - 16:10; 17:5; 28:15; 63:6-8; 87:11; 90:23, 25; 92:5, 10
occurrence - 63:11
occurs - 63:16
OF - 1:2, 7; 98:4
office - 17:3; 45:16; 46:11, 13; 65:10; 82:8; 84:13
Office - 1:14; 2:7, 12
officer - 3:11, 14; 8:3; 9:4, 10, 12, 17, 20, 23:24; 10:2, 7; 15:7, 20; 16:7, 19; 23:21; 26:4, 12; 39:8, 12; 51:7; 54:19; 68:24; 70:3, 7; 82:16; 89:3; 95:16
Officer - 5:3; 6:14; 16:10; 39:14; 43:25; 53:14; 55:13; 74:13, 24; 77:16; 79:8; 83:20; 86:7; 87:2, 10, 16; 88:17
officers - 8:2, 8, 14, 20, 24; 9:5-7, 17; 15:5, 9, 14, 20, 24; 16:13; 17:6; 24:2, 16; 43:3; 48:11, 20; 51:4; 69:8; 95:19
official - 89:9
OFFICIAL - 1:8-10, 12
old - 48:7
Olifiers - 35:20; 63:20, 23; 92:3; 95:9
once - 13:3, 24; 43:17; 46:19; 61:18, 23; 62:2; 63:12; 80:4
one - 9:4; 11:3; 12:5; 17:2; 18:22; 25:25, 20; 16; 38:11; 43:8; 47:12; 64:18; 75:4, 7; 80:2; 82:4, 20; 85:6; 88:6, 9; 13; 95:19; 96:9
One - 36:10

open - 90:15; 91:16; 92:8
openly - 89:13
opinion - 8:10; 73:10
opportunities - 53:22
opportunity - 5:15; 26:5; 54:18; 55:3
order - 94:12
Order - 1:19
ordered - 26:2, 18; 27:24
orthopedic - 59:11, 15; 74:25; 76:22; 77:17
ostracized - 58:14
otherwise - 5:22
ourselves - 82:14
outcome - 98:14
outlined - 89:10
outside - 8:16; 72:3
over-the-counter - 6:5
overall - 69:6
Overhill - 2:7
overtime - 53:21; 54:9, 12
overwhelming - 62:16; 68:21
own - 31:22; 32:6; 37:9; 45:6; 59:25; 60:2

## P

p.m - 1:16; 79:6; 96:25
Page - 99:5
PAGE - 99:3
page - 99:17
Page____Line____
SHOULD - 100:6, 8, 10, 12, 14, 16, 18
pain - 27:23, 25; 73:24
painful - 69:23
painkillers - 6:5
paper - 90:15
paragraph - 22:8; 79:15; 83:18
Paragraph - 6:21; 11:8; 22:18; 33:7, 38:22; 79:18, 23; 86:10; 87:4
Paragraphs - 18:13, 23; 89:11
pardon - 57:17
part - 26:5; 72:22; 74:3
partially - 47:13, 15
particular - 17:7; 38:10; 82:20; 84:8; 86:2, 17
partly - 1:14
parts - 29:20
party - 23:10; 40:5
pass - 87:19
passed - 42:10; 86:20; 67:12, 20; 88:6
past - 12:17; 46:9; 53:5
patrol - 10:23, 25; 11:5; 51:17
Patterson - 51:7, 25; 52:5; 53:3, 7
PAUL - 1:11, 2:13
Paul - 5:5
pay - 47:17; 58:2, 10; 70:23
PBA - 35:5; 37:3, 11, 15, 17, 20; 42:6, 12; 43:19
Pearl - 20:25
penalized - 13:18
pending - 6:10
People - 48:23
people - 7:20, 23; 12:20; 41:25; 42:2; 43:19; 48:22; 49:21; 62:4; 67:13, 20; 69:3, 21; 70:5; 85:5
performance - 8:9
perhaps - 33:23; 41:23; 48:2; 49:23; 73:19; 76:6; 82:10
period - 54:2
person - 13:3; 57:9; 63:22;

65:15; 67:25; 68:24; 69:2; 70:3; 80:16; 81:9, 14
personal - 18:16; 21:5; 22:5; 26:10, 12; 34:18; 35:3; 45:5; 50:3; 55:25; 76:13, 20; 78:24; 83:14
personally - 86:15
pertained - 42:19
pertaining - 25:8, 14; 29:4, 9; 37:21; 50:24; 77:3
phone - 23:14; 26:17; 44:22; 45:21; 50:3, 17; 57:22; 64:22; 65:22; 78:10; 99:17
physical - 22:13; 26:20; 27:19; 47:24; 48:5; 71:5, 19; 73:6, 8, 11, 18, 24; 77:9, 23
physically - 39:4
physician - 59:11; 73:4; 77:17
physicians - 74:24; 77:8, 19
pick - 84:19
piece - 8:5, 19
place - 1:20; 40:9
placed - 40:5; 95:7
places - 33:8
Plains - 1:24
Plaintiff - 1:5, 19; 2:6
players - 67:14; 68:9
PLLC - 2:6
pocket - 79:23; 83:23
Podges - 12:19; 15:17; 16:11, 15
Podges' - 16:18
point - 17:13; 29:16; 33:2, 6; 37:7; 47:20; 48:4; 52:17; 76:14; 96:20
police - 7:9; 9:12; 10:14; 11:17; 15:4, 7, 9, 19; 16:18; 26:4, 11; 37:22; 50:25; 54:19, 24; 56:2; 68:24; 69:8; 70:3; 82:21; 89:3; 95:16
Police - 7:10; 8:16; 10:17; 12:11; 16:10; 27:4; 28:22; 30:9; 31:15; 87:25; 90:14; 93:6, 10
portion - 47:5
portions - 47:3
positive - 66:6
possession - 34:21
possible - 65:15, 18; 96:20
Post - 2:7, 12
potential - 55:4
Poughkeepsie - 61:5
power - 12:2; 16:2; 56:11; 64:14; 65:17, 21; 66:18; 67:20; 93:12
powers - 11:25
practice - 32:19; 75:9
predicament - 62:22
prepared - 66:12
presence - 13:4; 16:14
present - 16:9; 26:22; 35:20; 80:7; 83:25
president - 20:25; 30:17; 31:10, 21; 37:3; 42:6, 12
pretty - 67:6
prevent - 6:3
prevented - 71:21
previous - 81:19
previously - 71:12; 86:19
primary - 76:23; 78:15
prison - 35:24; 63:24
private - 22:15
privilege - 94:8
problem - 12:24; 13:15, 17; 32:3, 70:19
procedure - 95:3
proceeds - 90:23
process - 37:6
produced - 50:18; 99:18

Production - 99:17
professional - 55:17; 56:23
professionals - 58:5; 61:7
prognosis - 73:4
promoted - 30:24; 37:12; 42:9, 11, 24; 43:5, 18; 52:14
promotion - 42:19, 21; 43:22
property - 83:15
protect - 56:21
protected - 12:23; 95:23
provide - 18:4; 36:21; 59:6
provided - 36:13; 40:25; 50:8; 52:23, 25; 53:19; 68:18; 71:4; 86:8
providers - 18:5
Public - 1:20; 4:6; 97:12; 98:7; 100:24
pulled - 85:13
punitive - 74:7
pursuant - 1:19
pursue - 23:4
push - 82:14
pushing - 84:22
put - 12:14; 67:5, 9; 79:22; 81:13, 17; 82:15, 19; 91:14, 21; 92:6
puts - 70:4

## Q

questioning - 28:16
questions - 18:16; 21:6; 22:6; 26:11, 24; 27:6; 28:10; 29:10; 72:14; 79:10; 96:23
quiet - 11:16
quite - 9:25
quota - 84:24

## R

race - 7:6; 11:13; 22:21
racial - 24:11; 39:10
racism - 62:24; 66:18; 93:11
racist - 12:22; 13:12; 17:7; 39:3, 22; 40:13, 16; 66:24; 67:12, 22; 68:2
radiologist - 77:20
rather - 63:5; 69:10
RAYNOR - 1:7
reach - 56:7
reached - 55:21; 86:15
READ - 100:6, 8, 10, 12, 14, 16, 18
read - 16:9, 8; 24:25; 67:2
real - 70:7
realized - 43:17; 81:15, 17
really - 17:20; 29:16; 33:4; 38:21; 44:23; 56:15; 64:2; 71:3; 77:18, 25; 87:18
realm - 72:4
reason - 63:20; 68:5; 76:8; 78:13, 16; 85:6
REASON - 100:7, 9, 11, 13, 15, 17, 19
rebuttal - 36:12, 14, 18, 22
receive - 45:21
received - 8:8, 21; 9:17; 20:10, 24:8; 25:12; 26:17; 27:3, 34:6; 38:6; 47:12, 20; 50:25; 51:17; 55:6
receiving - 35:14, 24; 36:7, 37:24; 38:18; 47:18, 24
recently - 46:9; 52:14, 19; 53:5; 62:7
recess - 79:3, 5
recognize - 21:9; 25:10
recollection - 40:2; 96:8
record - 34:4; 49:10; 53:9, 11;

71:14; 74:6; 77:12, 14; 79:17; 84:14; 86:3, 5, 7; 87:2; 88:9, 14, 16; 98:11
recorded - 27:7; 49:17, 21; 52:20, 24; 53:3; 58:18, 20-21; 78:10
recording - 40:25; 41:6, 10, 13; 50:23
recordings - 49:25; 50:6, 8-9, 17, 22; 99:17
records - 19:14, 16; 27:2; 28:17, 23, 25; 29:2, 4, 8; 33:10; 34:10, 18; 44:25; 46:13; 81:7; 82:5
recover - 54:23; 55:3; 83:22
recovery - 47:25
refer - 33:8; 46:20; 85:7
reference - 8:18, 21; 9:18; 38:23; 85:20
referenced - 87:4
references - 8:4
referencing - 79:15
referred - 13:3; 32:13; 33:21; 46:18; 51:6
referring - 8:20; 9:16; 18:19; 29:21; 48:17
refresh - 10:7; 25:17; 49:20; 82:6
refused - 27:10, 16, 19
regarding - 18:6; 30:13; 31:18; 41:8; 44:9, 14; 48:21; 50:10; 51:5; 55:17; 59:11; 74:19; 76:2; 85:10, 12; 86:8; 89:12
regardless - 26:19
regards - 25:5
regime - 67:15
registered - 87:10
regulations - 26:10
reimbursed - 58:3, 11
related - 29:22; 98:13
relating - 73:25; 77:25
release - 19:19
relevance - 86:17
relevant - 72:14
rely - 80:19
relying - 56:10
remarks - 39:3, 22; 40:14, 16
remember - 9:2; 10:5, 10, 13; 15:13; 16:5; 19:18; 29:18, 24; 30:8; 35:21, 24; 38:10, 17-18, 20-21; 39:23; 40:3, 11-12, 15; 41:5, 20, 22; 49:12, 15-16, 18; 50:13, 21; 52:4; 53:4, 6; 58:19, 25; 59:2; 60:15; 61:22; 76:7, 10; 77:3, 11, 21; 78:6; 82:3; 85:14; 89:23; 91:3; 93:3; 95:20, 25; 96:2, 18, 21
repeat - 18:21
rephrase - 5:19, 22; 80:13; 83:2
report - 15:23; 39:9, 15, 17-18, 20; 84:9; 89:9, 13; 91:4, 8, 12; 93:7; 94:25
reported - 12:7; 52:5; 89:17; 90:3, 11; 94:16
Reporter - 1:25; 98:7
REPORTER - 98:22
reporter - 19:8; 67:3
reporting - 89:24
REPORTING - 1:23
reports - 15:21; 16:19; 82:21
represent - 5:7
representation - 67:11
representative - 59:23
representatives - 22:3
represents - 20:23; 33:22
reps - 37:15
REQUEST - 99:15
requested - 19:9; 36:4, 67:4, 73:12

requirement - 31:18
reserved - 3:19
resigned - 24:7
resource - 14:10
resources - 13:8; 90:4, 7, 12; 92:17
respect - 11:8; 32:4; 93:5
respective - 3:8
respond - 36:3
responded - 79:11
response - 11:13; 28:7; 36:9, 13, 21; 40:8; 56:22; 61:20; 87:23; 90:18
result - 43:4; 54:24; 73:25; 83:12
results - 61:24; 62:2, 7; 69:15
resume - 48:5
resumed - 79:6
resumption - 5:4
retain - 90:22
retaliated - 9:14; 11:24
retaliation - 6:24; 7:4; 8:11; 9:6; 11:11; 71:13, 18
retired - 15:19; 16:10
return - 71:25; 72:18
returned - 55:7
returning - 71:21
RICHARD - 1:9
Richards - 51:21; 53:11
ring - 64:2, 19
Road - 2:7
ROBERT - 1:11
Rochelle - 75:15
rock - 58:4
room - 27:12; 62:5
Roosevelt - 1:15; 4:3
rough - 56:20; 66:8, 10; 69:6
roughed - 39:4, 25; 40:4, 13
roughing - 40:18
rules - 5:10; 26:9
run - 31:13; 66:15, 20; 70:16

S

sacrificial - 69:16, 20
safe - 26:12
salary - 70:23
sale - 90:23
sales - 90:21
sane - 56:11
saw - 25:2; 61:24; 75:22; 76:6, 8; 78:21; 87:18; 95:21; 96:10
Scarsdale - 2:8
scenario - 8:14
scheduled - 43:24; 46:4, 7; 60:16
scored - 43:8
Scott - 43:11
scream - 94:5
sealing - 3:8
search - 50:16; 81:10; 83:13, 19; 84:5; 85:14
searching - 81:12
second - 45:2; 47:9; 93:20; 94:2
Security - 34:19, 24
see - 7:12; 20:2; 31:13; 49:24; 58:14; 59:3, 19; 60:23; 63:17; 69:2; 75:10; 78:7, 23; 79:21; 80:17; 83:22; 93:3, 9
seeing - 17:17, 23, 25; 65:16; 78:12
seem - 37:16, 57:7
sell - 85:25; 89:13
selling - 87:8; 88:24; 89:5
send - 36:12; 63:18
sense - 24:24; 34:16

sent - 36:9, 14, 17; 37:19
September - 6:17; 28:20; 30:4; 54:3
sergeant - 12:18; 14:5, 18; 37:12; 42:9; 52:10; 66:4
Sergeant - 7:25; 8:4, 10, 16, 22; 9:18; 11:2; 12:5, 19; 14:2, 19; 15:17; 16:11, 15, 17; 22:25; 42:8; 43:10; 52:8, 13; 64:10; 84:17; 85:8, 21; 89:16, 18, 21, 25; 90:20
SERGEANT - 1:11
sergeants - 15:11; 42:10; 66:6
serious - 60:13
serves - 40:10
SERVICE - 1:23
service - 40:5
session - 22:24
set - 91:11, 17; 93:7; 98:10, 17
seven - 48:2
Sexton - 43:12
SHEET - 100:2
shit - 8:6, 19
shoot - 94:20; 95:4
Shorthand - 98:7
SHORTHAND - 98:22
shortly - 13:20; 78:23
shot - 66:13; 70:6; 77:23; 78:14, 17
show - 17:14; 21:7; 24:19; 37:25; 45:7; 92:16
showed - 59:23
showing - 35:16
shown - 37:10
shut - 7:12, 14-15, 18
sign - 19:12; 26:3, 14, 24; 27:13, 20
signed - 3:10, 13; 42:7, 12, 15; 43:20; 45:8
signing - 20:8; 27:15
similar - 17:25
sit - 22:14
situation - 63:14; 65:15
six - 26:23; 48:2; 54:6
Sleepy - 37:13
Social - 34:19, 24
sold - 85:23
someone - 14:25; 63:25; 94:4; 95:3
sometime - 19:21; 20:18; 44:6; 87:13; 90:25; 91:5; 95:12
sometimes - 69:15, 21; 93:16
somewhat - 73:19
somewhere - 69:11
son - 35:17; 56:2; 63:18; 64:15
soon - 73:14
sorry - 18:9, 18; 24:25; 91:2
sought - 56:23
SOUTHERN - 1:2
space - 58:7
speaking - 7:8; 12:25. 16:7; 44:2; 45:23; 63:22
specialist - 76:23; 78:15
specials - 68:12
specific - 80:5, 25; 96:10
spell - 75:17
Sperling - 45:3
spine - 61:13
spoken - 7:21; 8:4; 14:20, 15:4, 14; 24:6; 26:2; 51:14. 52:18
spouse - 54:20, 24; 95:5, 12
squad - 12:24; 13:14
Square - 1:15; 4:4
ss - 98:4
stand - 62:23; 69:20
standing - 62:25
start - 25:4
started - 13:24; 23:11, 18;

61:18; 62:15
state - 5:15, 18; 64:8
STATE - 98:4
State - 1:20; 98:8
STATES - 1:2
states - 20:15; 44:24
stating - 4:2
status - 17:21; 59:18
statute - 74:4
Stein - 20:16; 23:15; 25:20, 24; 26:21; 27:7; 28:4, 8; 33:16; 34:22
Steve - 20:25; 46:3, 5
still - 10:14, 16; 23:9; 65:13; 66:2, 23; 67:12, 14; 82:11
STIPULATED - 3:6, 17
stipulated - 26:7
stop - 94:13
stopped - 47:23; 65:2, 24
story - 94:11
Street - 1:24
street - 64:11; 85:12; 87:9
stress - 60:9; 62:12; 63:10
stressed - 60:9
stressful - 62:18
stressing - 65:22
study - 66:11
stuff - 8:6; 11:22; 42:5; 64:21; 77:4, 23
style - 35:23
subject - 7:21; 9:5, 10; 84:5
subjected - 6:23; 7:24; 11:10; 63:2; 66:19
submitted - 36:23
subordinate - 15:2
Subscribed - 97:7; 100:22
subsequently - 17:4; 43:10; 76:18
suffering - 73:24
Suite - 1:24; 2:7
summarized - 22:17
superior - 16:23
supervisor - 11:3; 14:23; 15:3; 16:18; 93:14-16; 94:7, 9, 14; 95:6, 23-24; 96:4, 13
supervisors - 15:8; 65:18; 82:14; 93:17
suppose - 44:5
supposed - 7:11, 13; 26:22
supposedly - 90:21
surgeon - 59:15; 74:25; 76:22; 77:17
surgery - 43:24; 44:6; 45:2; 46:4; 47:9; 66:7; 73:14, 20; 93:21; 94:2, 12
surgery's - 46:8
suspect - 81:23, 25; 82:7; 83:20; 84:5
suspect's - 82:25; 83:9
suspects - 80:8; 85:11
suspects' - 81:22
sustained - 6:16; 29:5
Sweeney - 5:5
SWEENEY - 2:13; 4:8; 5:17; 8:25; 12:13; 14:23; 19:6; 22:9; 25:9; 30:7; 32:11, 17; 41:17; 44:4, 19; 45:17; 47:4; 48:14, 18; 50:15; 52:12; 53:18; 59:8; 71:10, 15; 72:6, 11; 73:13, 17, 22; 74:16, 19, 20; 77:12, 78:18; 79:2; 80:8, 13; 81:2; 83:16; 84:10; 85:18; 86:3, 6; 88:14, 25; 96:22
sworn - 3:11, 13; 4:5; 97:7; 98:10; 100:22
symptoms - 61:11; 62:11

T

task - 9:13
taxes - 70:21, 24
team - 23:17
tedious - 23:14
ten - 36:18
terminated - 46:23, 25; 47:14, 22
terms - 29:20; 32:4; 53:13; 57:14; 63:9; 68:11; 71:2; 72:19; 74:23; 78:12; 94:10
TERRANCE - 1:7
test - 42:11; 43:17; 66:7, 11
testified - 4:7; 14:4
testifying - 6:3
testimony - 80:19; 98:11; 100:3
THE - 5:14; 8:11, 23; 12:12; 14:22, 25; 18:8, 18; 19:2; 24:23; 25:15; 30:5; 31:24; 32:8, 14; 35:12; 36:10; 38:5; 41:16; 44:2, 16; 45:15; 48:13, 15; 52:10; 57:17; 74:14, 18; 75:3, 18; 78:17; 80:7, 11; 83:2, 24; 84:7; 85:16; 86:13; 87:13; 88:8, 12, 23; 89:15; 90:5
therapist - 78:7
therapists - 57:23; 77:9
therapy - 22:13; 26:20; 27:19; 28:2; 47:11, 18, 20, 24-25; 48:3, 5; 56:8; 71:19; 73:6, 11
thereof - 47:5
they've - 46:7; 60:4
third - 23:10
third-party - 23:10
this_____day - 97:8; 100:22
threaten - 95:4
threatened - 94:20
three - 42:10; 43:2
thumb - 50:12
timeframe - 10:3; 13:19; 14:6, 14; 17:5; 39:11
Tiwana - 53:11
today - 6:3; 17:24
together - 10:23, 25; 15:5
Tommy - 93:22
took - 6:4; 15:25; 16:16, 20:14; 23:4; 40:9; 60:25; 66:6; 79:20
tough - 68:22
trade - 88:19
transcript - 80:23; 100:3
transfer - 7:16; 8:15; 22:12; 69:11
transferred - 50:7, 11
transitioning - 67:15
traveled - 62:6
treated - 32:4; 55:16; 59:10; 60:2; 61:6; 75:25; 76:5, 23
treating - 74:23, 25; 76:21; 77:8, 17
treatment - 9:11; 24:8; 44:10, 15; 54:17; 55:6
Trial - 1:18
trial - 3:19
tried - 9:19; 55:22; 56:7; 57:2; 58:14
true - 98:11
truly - 25:16
truth - 49:8; 51:13, 24
try - 54:10; 72:3, 9; 96:19
trying - 8:15; 22:14; 25:17; 35:4; 56:11, 21; 87:22
turn - 59:5
two - 20:16; 27:5, 17; 47:12. 51:7; 57:10; 60:11; 61:16, 21; 66:7; 78:20; 79:2
type - 8:9, 21; 30:21; 31:2;

35:7; 48:21; 60:24; 61:10;
64:21; 65:16; 69:5; 95:7;
96:14
typed - 34:20
types - 62:24

## U

unable - 60:17
under - 32:5, 8; 45:5, 19; 48:7;
95:8
understood - 5:12, 23
unfair - 13:2; 24:8
unfortunate - 69:19
unfortunately - 36:20; 56:3, 5;
63:5; 60:16; 70:21; 63:16
union - 30:17; 31:6, 10, 21;
32:18; 37:2, 18
unit - 9:13; 11:7; 12:18; 13:15;
67:17; 68:2; 81:19; 84:21;
90:8; 91:8
UNITED - 1:2
unlawful - 34:12, 18
unlawfully - 33:9, 12
unless - 94:9
unrelated - 18:17; 19:16; 22:6;
26:25; 28:10, 14, 19; 29:11,
25
unsuccessful - 56:9; 78:8
up - 7:20; 8:3, 17; 11:18, 22-24;
12:10, 13:5; 14:7, 20; 15:19,
16:12, 16; 25:16; 35:16; 39:4,
25; 40:4, 13, 18; 41:3, 5; 45:7,
9; 46:3; 49:6; 58:7; 59:23;
61:17; 62:23, 25; 69:8, 20-21;
75:20; 76:13, 17, 19; 77:15;
78:22; 79:4; 84:20; 85:4;
90:15; 91:16; 92:8; 94:4; 95:8
upset - 23:8; 43:19
USB - 27:8; 50:8

## V

various - 23:15
Vassar - 61:4, 7; 62:12; 76:12
vehicle - 82:25; 83:9; 84:5;
85:13
vehicles - 81:11, 22; 83:20
verbally - 91:24
VERNON - 1:7
Vernon - 1:15; 4:4; 7:10; 8:16;
10:17; 12:11; 27:3; 28:22;
30:9; 31:15; 54:21; 57:16;
66:14; 67:19; 70:6, 12, 19;
74:17; 87:24; 88:19; 90:14;
93:6, 10
violated - 34:17
visits - 19:15; 23:15
voicemail - 51:17

## W

waited - 93:21
waiting - 93:25
waived - 3:10
walking - 35:3
wants - 67:21, 25; 69:12, 22
warrant - 84:6; 85:14
warrants - 81:11; 83:19
ways - 34:9
weak - 56:6, 57:6, 12
week - 5:5; 12:4; 14:5; 20:18;
60:16; 66:7; 79:9; 81:5
weekend - 42:25
weeks - 48:23; 51:8; 54:6;
60:11; 78:20
WESTCHESTER - 98:5
Westchester - 1:23

WHEREOF - 98:16
white - 8:2; 10:2, 12; 24:15
White - 1:24
whole - 68:20
wife - 55:25; 56:3; 84:22; 95:6;
96:5
Williams - 14:8, 10, 18; 90:4,
6, 11; 91:6, 9, 12, 20; 92:15,
22; 93:7
willing - 68:7; 69:20
window - 64:4
wish - 29:24; 63:7
WITNESS - 5:14; 8:11, 23;
12:12; 14:22, 25; 18:8, 16;
19:2; 24:23; 25:15; 30:5;
31:24; 32:8, 14; 35:12; 36:10;
38:5; 41:16; 44:2, 16; 45:15;
48:13, 15; 52:10; 57:17;
74:14, 18; 75:3, 18; 78:17;
80:7, 11; 83:2, 24; 84:7;
85:16; 86:13, 24; 87:13; 88:8,
12, 23; 89:15; 90:5; 98:16
witness - 98:10
witnessed - 15:23; 16:17;
39:8-10, 12, 17; 41:3; 42:6
witnesses - 49:3
wondering - 63:21
word - 42:14; 67:17
wording - 17:21; 33:25; 34:9
words - 12:15; 30:25; 34:5;
59:25; 60:2; 80:10
Workers' - 47:19; 71:24; 72:4;
74:3
works - 7:10; 10:19; 58:2, 9;
78:24; 93:10
world - 64:20; 69:24
worry - 65:19
worrying - 60:10, 12, 20; 62:18
worse - 67:7, 9
wrap - 77:15; 79:3
write - 27:17, 22
written - 85:4; 91:12
WUTTKE - 1:11
Wuttke - 22:25; 64:10

## Y

year - 10:4; 45:25; 65:6, 9, 12,
24; 76:6, 9; 87:14
years - 49:5; 67:15; 84:15
YORK - 1:2, 7; 98:4
York - 1:15, 20, 24; 2:8, 13; 4:4;
98:8
young - 61:10; 94:17, 24
Young - 13:9; 16:25; 17:8
yourself - 45:17

## Z

Zadie - 43:5, 7