# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MURASHEA "MIKE" BOVELL,

                Plaintiff,                          15 Civ. 08594 (CS)

   -against-                                  **DECLARATION OF**
                                                         **PATRICK JEAN-JEROME**

CITY OF MOUNT VERNON, New York, et al.,

                Defendants.
-----------------------------------------------------------x

      Police Officer Patrick Jean-Jerome, under the penalty of perjury, herein declares pursuant to 28 U.S.C. §1746, that:

      1.      I am a black male police officer employed by the City of Mount Vernon (the "City") as a Detective with the Mount Vernon Police Department.

      2.      I submit this Declaration in support of Police Officer Murashea Bovell's opposition to the defendants' Motion for Summary Judgment.

      3.      I have been employed with the City of Mount Vernon Police Department (the "Department") for approximately 19 years.

      4.      During that time period, I have personally observed and witnessed the culture of racial discrimination by the City and the Department against black police officers and black residents of Mount Vernon, which I have discussed with Officer Bovell on many occasions.

      5.      Over the years, the individuals in charge of the administration of the City have changed and the individuals in charge of the administration of the Department have changed, but the culture of racial discrimination against black police officers and black residents of Mount Vernon has continued to persist through the years and continues to this day.

1

6. The ongoing culture of racial discrimination has created a hostile work environment for black police officers in the Department that continues to exist today.

7. The Department's culture of racial discrimination has caused numerous officers to complain, bring court actions against the City and the Department. I have personally spoken out publicly regarding the discrimination and retaliation against black officers within the Department, including publicly addressing the Mount Vernon City Counsel.

8. The culture of racial discrimination has also caused black officers to refrain from speaking out for fear of being retaliated against.

9. Black officers and white officers are treated disparately by the Department regarding, 207-c benefits and disciplinary action.

10. For example, a black female officer (Jennifer Carpenter) fell in the stairway at the Department while on duty and tore her meniscus cartilage. Carpenter requested that an ambulance be contacted to render medical attention to her injuries, but her request was denied by Lt. Curzio (Caucasian). Sgt. Carpenter was then denied benefits under General Municipal Law §207-c by Defendant Goldman (white) for approximately 2 years because of her race.

11. In contrast, Lt. Hunce (white) was out of work and being paid under §207-c for 5 years before he was brought back to work.

12. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████    █████████████

[REDACTED]

13. When a black officer is subjected to disciplinary action, the Department administration publicly posts the Departmental Order violated and the punishment administered, however, when a white officer is disciplined, no Order is posted.

14. On one occasion, [REDACTED]

15. [REDACTED]

16. The Department retaliates against black officers who report abuse and discrimination in the Department and protects white officers who commit criminal acts and acts of violence against black members of the public. [REDACTED]

███████████████████████████████████████████████
████████████████████████████████ █████████████████
██████████████████████████████████████████ █
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████ ██████████████████████████████
██████████████████████████████████████████████
████████

17.     During the time that I was assigned to the Detective Division, Central Investigations Unit ("CIU"), my son was going into his senior year of high school. I asked Commissioner Bell for the ability to remain on a day schedule for my son's last year of high school because I am a single father and wanted to be home at night for my son.

18.     A white detective assigned to the day tour in the CIU made an unfounded complaint against me and I was reassigned out of the day tour because of my race despite the Commissioner's promise that I would remain assigned to the day shift.

19.     I have observed white lieutenants treat black crime victims with racial animus by intentionally denying the victims medical treatment. ████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████

20.     On another occasion, a black female had been the victim of an assault by a male.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

21.     With respect to the adverse action taken against Officer Bovell for the defendants' claim that he violated the "chronic sick" policy, such policy was never enforced until Michael Goldman (white) was reassigned out of the Intelligence Unit and took the initiative in disparately enforcing the policy against black officers.

22.     In and around April 2014, Defendant Goldman questioned my sergeant about my use of sick time.  When my sergeant informed Defendant Goldman that I did not fit the pattern of a sick time abuser, Defendant Goldman conducted his own "investigation" and, without a lawful basis, eliminated my ability to work Overtime, as Officer Bovell was also prevented from working Overtime.

23.     In fact, despite providing Defendant Goldman with a doctor's note, Defendant Goldman placed me on a "private" chronic sick list that was only disclosed to the white administrators in the Department.

24. I learned about the "private" chronic sick list from a lieutenant after inquiring as to why I was repeatedly denied the opportunity to work overtime based on Goldman's having placed me on the chronic sick list without notice or justification.

25. ███████████████████████████████████████████████████████████
███████████████████████

26. I was assigned to the Emergency Service Unit ("ESU"), where I performed well. I had regularly been assigned to attend every available training course. At some point, I discovered that I was not being sent to ESU training, and asked the white sergeants and captains to be placed back in training. I was never sent back to training and I was never given a reason from my white supervisors as to why I was no longer assigned to training. No charges or disciplinary action were ever filed against me, so there was no basis to deny my requests for training.

27. Unexpectedly, I was reassigned/demoted from ESU to the Patrol Unit. When I asked why I had been demoted, I was informed that I was transferred from the ESU to Patrol because I had been decertified – for not attending the training that I had requested numerous times to attend.

28. Once back on patrol, I continued to utilize the drop holster that I had used while working in the ESU. I was the only officer in the Patrol Unit who utilized a drop holster. My white supervisors issued a Departmental Order that drop holsters were not allowed to be worn/used by officers in the Patrol Division. ███████████████████████████████████
███████████████████████████████████████████████████████████

29. Another example of racial discrimination is the Department's refusal to award a detective shield to black police officers who meet the statutory requirements under New York Civil

Service Law Article 58, i.e., have worked in a detective investigatory capacity for at least 18 months, yet the Department awards detective shields to white officers who have not met the statutory requirements.

30. The Department refused to award a detective shield to approximately 4-5 black Officers, despite the fact that they had worked in a detective capacity and were assigned to the detective division for between 22-30 months.

31. Detective Robinson (white) was awarded a detective shield within approximately 2 months of being assigned to the detective division.

32. Officer Marla Hunt (white) was assigned to the detective division for less than one year and received a detective shield.

33. I was listed #5 on the sergeant's list and "reachable" for promotion to a position as a sergeant in the Department. Because I brought a lawsuit against the Department due to its failure to award my detective shield though I met the statutory requirements, and because I threatened to sue the Department because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ I was passed over for promotion to a sergeant's position and the list was allowed to expire.

34. Officer Quinoy, at the time he was President of the PBA, informed the New York State Civil Service Department informing that, should any Department sergeant seek to challenge Sgt. Fischer's promotion to Lieutenant from an expired list, the PBA would not provide them with representation, the sergeants would have to pay the costs themselves.

35. Quinoy was promoted by the white supervisors to the position of sergeant soon thereafter.

36. Though there were four (4) sergeants in a position to be promoted from the new lieutenant's list, the three (3) black sergeants who were promoted to lieutenant were individuals who did not speak out against discrimination in the Department. These three (3) lieutenants informed me that they were too scared to speak out against the Department for fear of being retaliated against.

37. Like Officer Bovell, I filed a complaint regarding racial discrimination against blacks in the Department with Judy Williams in the City's Department of Human Resources and I spoke with Commissioner Raynor about the same issues as well.

38. As with Officer Bovell, Commissioner Raynor promised that he would "look into" the matter, however, nothing was done.

39. Ms. Williams also failed to take any steps in furtherance of investigating and/or addressing the Department's culture of racial discrimination. In fact, when I attempted to follow up on my complaints to the City's Department of Human Resources, I was directed to seek redress through the Department's chain of command – the very individuals who were engaging in racially discriminatory conduct.

40. Over the years, I have been suspended several times by the various white administrators and supervisors in retaliation for speaking out against the culture of years of racial discrimination, racial disparity and racial retaliation within the Department.

41. I am the First Vice President of the Mount Vernon PBA (the "PBA"). With respect to the defendants' position that it is a "requirement" that Mount Vernon police officers comply with the directives of Disability Management Associates in connection with their 207-c benefits, the Mount Vernon PBA has never voted to approve any requirement that Mount Vernon police

8

officers be subject to the direction and/or control of Disability Management Associates, nor were any such requirements bargained for by the PBA or its members.

42. The use of Disability Management Associates ("DMA") in connection with police officers' 207-c benefits was suggested by the Department administration (including defendant Goldman), and discussed with the Executive Board of the PBA (including myself), in order to facilitate treatment for, and help injured officers who were having trouble getting a timely response from the City's duty doctor, Dr. Ishkanian.

43. At no time was there any disclosure, discussion about, or approval of, any member of DMA obtaining an officer's entire medical record, and/or attending doctor's visits with the police officer, or delaying medical treatment for an officer and/or terminating of an officer's 207-c benefits if the officer did not comply with the suggestions of DMA.

44. The PBA Board could not have agreed, and did not agree, to subjugate the privacy interests of its police officer members to the control of DMA without a membership vote as a bargained-for term of the officers' conditions of employment.

45. The requirement that Department officers use and/or follow the directives of DMA or face adverse consequences related to their 207-c benefits and/or employment, was never voted on by the membership nor was it made a part of the officers' collective bargaining agreement.

46. There was no bargained for agreement that the Mount Vernon police officers are required to perform any act over and above that which is required under New York Civil Law §207-c, including, without limitation, abiding by any directive of DMA, allowing DMA agents to attend doctor's appointments, speaking with DMA about their medical conditions and medical history, and/or provide medical records to Disability Management Associates.

47. The information contained above is true and accurate to the best of my knowledge and where stated upon information and belief, I believe the same to be true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.

Dated: July 24, 2017

_____
Officer Patrick Jean-Jerome

10