**EXHIBIT 17**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -X
MURASHEA "MIKE" BOVELL,
                              Plaintiff,
         -against-                          Case No.:

                                            15 Civ. 8594

CITY OF MOUNT VERNON, New York,
Commissioner TERRANCE RAYNOR,
Individually and in his Official
Capacity, Deputy Commissioner
RICHARD BURKE, Individually and
in his Official Capacity,
Captain MICHAEL GOLDMAN, Individually
and in his Official Capacity,
Sergeant ROBERT WUTTKE, and Lieutenant
PAUL NAWROCKI, Individually and in his
Official Capacity,
                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -X

PORTIONS OF THIS TRANSCRIPT ARE DEEMED CONFIDENTIAL

                November 4, 2016
                1:40 p.m.


DEPOSITION of SERGEANT ROBERT WUTTKE, a Defendant herein,

taken pursuant to Notice, and held at Mount Vernon

City Hall, 1 Roosevelt Square, Mount Vernon, New

York, before Gabriel Alicea, a Court Reporter and

Notary Public of the State of New York.



2

```
1    A P P E A R A N C E S:

2

3        THE BELLANTONI LAW FIRM

4            Attorneys for Plaintiff

5            2 Overhill Road, Suite 400

6            Scarsdale, New York 10583

7    BY:  AMY L. BELLANTONI, ESQ.

8

9        COUGHLIN & GERHART, LLP

10           Attorneys for Defendants

11           99 Corporate Drive

12           Binghamton, New York 13904

13   BY:  PAUL J. SWEENEY, ESQ.

14

15

16

17

18

19

20   ALSO PRESENT:

21       Police Officer Murashea Bovell

22       Det. Alec Francis

23

24
```



800.DAL.8779
dalcoreporting.com
DALCO

1        IT IS HEREBY STIPULATED AND AGREED by and

2   between the attorneys for the respective parties

3   herein, that filing and sealing be and the same are

4   hereby waived.

5        IT IS FURTHER STIPULATED AND AGREED that all

6   objections, except as to the form of the question,

7   shall be reserved to the time of the trial.

8        IT IS FURTHER STIPULATED AND AGREED that the

9   within deposition may be signed and sworn to before

10  any officer authorized to administer an oath, with

11  the same force and effect as if signed and sworn to

12  before the Court.

13

14

15

16

17

18

19

20

21

22

23

24



1            (Plaintiff's Exhibit 13, PHOTOCOPY OF

2       PERSONNEL ORDER, was marked for

3       identification.)

4

5            (Plaintiff's Exhibit 14, COMPENSATORY TIME

6       REQUEST, was marked for identification.)

7

8            (Plaintiff's Exhibit 15, SUPERVISOR'S

9       REPORT, was marked for identification.)

10

11           (Plaintiff's Exhibit 16, LIST OF DAYS OFF,

12      was marked for identification.)

13

14           (Plaintiff's Exhibit 17, 3/31/14 EMAIL,

15      was marked for identification.)

16

17           (Plaintiff's Exhibit 18, ADMINISTRATIVE

18      GUIDE, was marked for identification.)

19

20           (Plaintiff's Exhibit 19, 3/27/14 EMAIL,

21      was marked for identification.)

22

23

24



1            (Plaintiff's Exhibit 20, OFFICE OF THE
2       POLICE COMMISSIONER DOCUMENT, was marked
3       for identification.)

4

5            (Plaintiff's Exhibit 21, TYPEWRITTEN
6       LETTER, was marked for identification.)

7

8            (Plaintiff's Exhibit 22, PERFORMANCE
9       EVALUATION FORM, was marked for
10      identification.)

11

12           (Plaintiff's Exhibit 23, PRINTOUT OF
13      COMPUTER SCREEN, was marked for
14      identification.)

15

16           (Plaintiff's Exhibit 24, PRINTOUT OF
17      COMPUTER SCREEN, was marked for
18      identification.)

19

20           (Plaintiff's Exhibit 25, PRINTOUT OF
21      COMPUTER SCREEN, was marked for
22      identification.)

23

24



 1              (Plaintiff's Exhibit 26, HANDWRITTEN

 2              NOTES, were marked for identification.)

 3

 4              (Plaintiff's Exhibit 27, PERFORMANCE

 5              EVALUATION, was marked for

 6              identification.)

 7

 8              (Plaintiff's Exhibit 28, AMENDED

 9              EVALUATION, was marked for

10              identification.)

11

12              (Plaintiff's Exhibit 29, PERFORMANCE

13              EVALUATION, was marked for

14              identification.)

15

16              (Plaintiff's Exhibit 30, CODE OF CONDUCT

17              DOCUMENT, was marked for identification.)

18

19              (Plaintiff's Exhibit 31, HARASSMENT

20              COMPLAINT FORM, was marked for

21              identification.)

22

23

24


800.DAL.8779
dalcoreporting.com   DALCO

```
 1              (Plaintiff's Exhibit 32, PRINTOUT OF TEXT
 2              MESSAGES, was marked for identification.)
 3
 4              (Plaintiff's Exhibit 33, CHARGE OF
 5              DISCRIMINATION DOCUMENT, was marked for
 6              identification.)
 7
 8   SERGEANT ROBERT WUTTKE,
 9   having been first duly sworn by the Notary Public
10   (Gabriel Alicea), was examined and testified as
11   follows:
12
13   EXAMINATION
14   BY MS. BELLANTONI:
15       Q.    Good afternoon.
16       A.    Good afternoon.
17       Q.    My name is Amy Bellantoni.  I represent
18   Officer Bovell and his lawsuit against the city and
19   yourself and certain other individuals employed with
20   the Mount Vernon Police Department and the city or
21   formerly employed there.  Have you ever been deposed
22   before?
23       A.    No, I haven't.
24       Q.    I'm just going to ask you questions.  And
```



## SERGEANT ROBERT WUTTKE

```
 1   I'm just looking for your best answers.  I don't
 2   want you to speculate or guess.  If you're not sure
 3   of something, just say, I don't recall, or, I don't
 4   know.  And I will assume that, if you answer my
 5   question, that you understood what I was asking you
 6   and were responding to my question.
 7          If you don't understand a question --
 8   sometimes, my questions are long.  I'm sure you will
 9   agree.  Just let me know, and I will try to rephrase
10   it or shorten it so that you understand what I'm
11   trying to ask you.  Okay?
12       A.   Okay.
13       Q.   The court reporter is taking down
14   everything that we're saying.  So at some point,
15   there may come a time that you are anticipating what
16   the rest of my question is going to be and you start
17   answering before I'm done like a regular, casual
18   conversation, but that's going to make it difficult
19   for him to get down everything that we're saying if
20   we are talking over each other.  So I will try to
21   wait until you are done giving your answer before I
22   give a follow-up question.  And I will just ask that
23   you wait until I'm finished asking my question
24   before you start to answer.  Is that fair?
```



1        A.    Fair enough.

2        Q.    All right.  Are you taking any medication

3   today that would interfere with your ability to

4   understand my questions?

5        A.    No.

6        Q.    Have you forgotten to take or did not take

7   any medication that you should have taken?

8        A.    No.

9        Q.    Where are you currently employed?

10       A.    City of Mount Vernon Police Department.

11       Q.    And just for the record, I can see you,

12   but can you state what your race is?

13       A.    White.

14       Q.    When were you first hired to work in the

15   City of Mount Vernon Police Department?

16       A.    August of 2003.

17       Q.    And what did you do before that?

18       A.    I worked as a recreational therapist at an

19   acute care psychiatric facility.

20       Q.    Where?

21       A.    Ossining.

22       Q.    What was the name of the facility?

23       A.    Stony Lodge Hospital.

24       Q.    What were you -- what was your position



**SERGEANT ROBERT WUTTKE**

1   there?

2          A.    Recreational therapist.

3          Q.    You did say that.  And what were your

4    duties and responsibilities in that regard?

5          A.    I dealt predominantly with adolescents

6    with acute psychiatric illness, and my ultimate

7    goals were to give them positive ways to express

8    themselves and/or vent their frustration or anger

9    without going into a range, a fit, a tantrum.

10         Q.    What was the age range of the kids in the

11   facility?

12         A.    The youngest child I dealt with was six

13   years old, and it went all the way up to 18.

14         Q.    And this was a residential facility?

15         A.    An acute care hospital.

16         Q.    And forgive me, but I'm not familiar with

17   this type of facility.  So were the individuals who

18   were in the hospital -- were there times that they

19   would leave the hospital and be discharged, or was

20   this a residential-type setting where they would

21   remain because they couldn't be placed back into the

22   community?

23         A.    It was a facility for the -- the patients

24   resided there, but it was acute care.  It was only



```
 1   until we can stabilize the patient enough to go back
 2   to a less secure facility or back to a group home or
 3   back to their families.
 4        Q.    And how long did you work there?
 5        A.    Just shy of a year.
 6        Q.    Where did you work before that?
 7        A.    I was in college.
 8        Q.    Okay.  Where did you graduate from?
 9        A.    University of Buffalo.
10        Q.    And what was your major?
11        A.    Psychology.
12        Q.    What made you take -- did you take the
13   police exam to get into the department?
14        A.    Yes, ma'am.
15        Q.    And what made you decide to go into a
16   different direction?
17        A.    I didn't want to sit in an office all day
18   doing paperwork.
19        Q.    So when you were hired in August of 2003
20   after attending the academy, you were assigned to
21   patrol; is that fair to say?
22        A.    Yes.
23        Q.    And how long were you in patrol?
24        A.    Just over two years.
```



1         Q.    Did you apply at any other police
2    departments other than Mount Vernon?
3         A.    Yes, ma'am.
4         Q.    Where did you apply?
5         A.    New York City Police Department, the
6    United States Capital Police.  Those are the only
7    two that I can remember for sure, off the top of my
8    head.
9         Q.    Are you from Westchester, originally?
10        A.    Yes, ma'am.
11        Q.    You didn't apply to any other police
12   departments other than Mount Vernon in Westchester
13   County?
14        A.    At the time I was taking the exams, the
15   Westchester County -- other village test wasn't
16   available.
17        Q.    And after you finished your assignment and
18   patrol, what was your next assignment?
19        A.    I was assigned to the TRACI unit.
20        Q.    Can you spell that?
21        A.    T-R-A-C-I.
22        Q.    Do you remember, approximately, when you
23   were assigned to that unit?
24        A.    Early spring of 2006.



```
 1        Q.    And what is that?
 2        A.    TRACI unit was a uniformed conditions unit
 3   that worked in conjunction with the New York State
 4   Police and the Mount Vernon Police street crimes
 5   unit.
 6        Q.    What crimes?
 7        A.    Street crimes.
 8        Q.    Street crimes.  And what were your
 9   responsibilities there?
10        A.    They varied day-to-day.  Three days a
11   week, we were assigned with a New York State Trooper
12   to do high-presence, high-visibility patrol, traffic
13   enforcement, quality of life enforcement.  Other
14   days, we were assigned with the members of the
15   street crimes unit to do street crimes work.
16        Q.    Did the members of the street crimes unit
17   have a different rank?  In other words, were they
18   detectives and you were a patrolman or -- I don't
19   understand what you mean when you say you were
20   assigned to the other officers with the street
21   crimes unit.
22        A.    They were police officers that were
23   assigned to a different unit than I was.
24        Q.    Does TRACI stand for something?  Is it
```



1   TRACI -- does it stand for --

2          A.    I don't want to interrupt you if you are

3   not --

4          Q.    That's fine.  Does it stand for --

5          A.    Targeted response anti-crime initiative.

6          Q.    And when you were assigned to the state

7   trooper, were you in a marked state trooper vehicle

8   or a Mount Vernon police car?

9          A.    New York State Trooper.

10         Q.    And is being in -- assigned to the TRACI

11  unit, is that something you were -- applied for or

12  approached to work in that unit?

13         A.    I was approached to work in that unit.

14         Q.    Who were you approached by?

15         A.    Then, Captain Kelly.

16         Q.    And in 2006, were there any

17  African-American officers assigned to the TRACI

18  unit?

19         A.    Yes.

20         Q.    And who was assigned there?  Well,

21  withdrawn.

22              Approximately, how many officers were

23  assigned to the TRACI unit in spring 2006?

24         A.    Five.



**SERGEANT ROBERT WUTTKE**                    15

1      Q.    And who were the African-American officers
2  assigned to that unit?
3      A.    Police Officer Leonard Cooper, Police
4  Officer Alan Patterson, and Police Officer
5  Latheia -- pardon me.  I'm trying to figure out what
6  her last name was at that time.  It was either
7  Latheia Daniels or Latheia Smith.  I don't remember
8  when she got married.
9      Q.    Okay.  At some point, you left the TRACI
10 unit and went on to another assignment?
11     A.    Yes.
12     Q.    And what was that assignment?
13     A.    Back to patrol division.
14     Q.    Okay.  And under what circumstances did
15 you leave the TRACI unit to return to the patrol
16 division?
17
18
19
20
21
22
23
24





1   *****************START CONFIDENTIAL*****************





800.DAL.8779
dalcoreporting.com



18                                  **SERGEANT ROBERT WUTTKE**











```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   *****************END CONFIDENTIAL******************
```



800.DAL.8779
dalcoreporting.com

DALCO

1          Q.    And when you had first begun your career

2     in --

3               MS. BELLANTONI:  And this can be not

4          confidential any longer.

5          Q.    When you had started your career in the

6     Mount Vernon Police Department, for the first year

7     or two, did you have any supervisor or someone in a

8     higher rank than yourself that you considered a

9     mentor or that, you know, assisted you or maybe your

10    field training officer, anyone of that type of

11    relationship?

12         A.    Yes.

13         Q.    And who would that have been?

14         A.    I had my field training officer, which is

15    Police Officer Kenny Rella.

16         Q.    Is he still on the job?

17         A.    No, ma'am.

18         Q.    Anyone else?

19         A.    The first sergeant that I worked for.  I

20    worked for him for almost my whole first two years

21    of patrolling.  That was -- at the time, he was

22    sergeant Kevin Mandell.

23         Q.    Is he still with the department?

24         A.    No, ma'am.



1          MS. BELLANTONI:   Okay.   So this is

2     confidential.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24


800.DAL.8779
dalcoreporting.com



1    ******************START CONFIDENTIAL******************



24                    **SERGEANT ROBERT WUTTKE**



```
 1
 2
 3
 4
 5
 6
 7
 8            MS. BELLANTONI:   So now we're back on
 9       nonconfidential.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24       *******************END CONFIDENTIAL*******************
```



800.DAL.8779
dalcoreporting.com
DALCO

1        Q.    For how long did you remain in that

2    capacity?

3        A.    Several months.

4        Q.    So that would have been in 2007?  At some

5    point, that came to an answered in 2007?

6        A.    Came to an end in the beginning of 2007.

7        Q.    Okay.  And then where were you assigned?

8        A.    After reassignment to patrol, I was

9    assigned to the operations division and/or patrol

10   clerk.

11       Q.    And how was that assignment different from

12   what you had been doing before?

13       A.    I was assigned inside the patrol division

14   office.  I worked only day tours Monday through

15   Friday.

16       Q.    Were you pleased with that assignment?

17       A.    No.

18       Q.    Some people like to be out.  Yeah.  So you

19   weren't -- okay.  What circumstances existed that

20   caused your assignment inside?

21       A.    The person who was the clerk at the time

22   was going out on maternity leave.  I was asked if I

23   would accept the assignment, and I did.

24       Q.    Were you given a time frame as to how long



1    you would be doing that?

2         A.    No, ma'am.

3         Q.    Who asked you to accept the assignment?

4         A.    I don't recall exactly -- the exact

5    circumstances.  The clerk that was going out on

6    maternity leave asked me if I would be willing to

7    take the position.  I said, I guess.  And I don't

8    know if it was the deputy chief or the captain who

9    ultimately said, will you take the position.

10        Q.    And what was the name of the patrol clerk?

11        A.    Laura -- again, you will have to excuse

12   me.  She got married at some point during my career.

13   Either Sakouski or Hurley.  I don't remember which

14   it was at that point in time.

15        Q.    What were your responsibilities as the

16   patrol clerk?

17        A.    Scheduling overtime, entering days off,

18   entering vacations, planning for the following

19   year's scheduling, planning for special events as in

20   hiring and reassigning people for, you know, that

21   particular event.

22        Q.    Who did you report to?

23        A.    Captain Robert Kelly and Deputy Chief John

24   Roland.



1       Q.    Roland?

2       A.    Roland.

3       Q.    And Kelly's first name?

4       A.    Robert.

5       Q.    Was there any pay differential in your

6    position in the operations division versus your

7    prior position at patrol?

8       A.    No.

9       Q.    Were you allowed to do overtime in the new

10   position?

11      A.    If the overtime was available on my time

12   off.

13      Q.    Between the time that you were with the

14   patrol squad and the time that you had completed

15   your assignments in the operations division, were

16   you subjected to any disciplinary proceedings?

17      A.    No, ma'am.

18      Q.    And so after you were -- how long were you

19   in the operations division?

20      A.    A few months.

21      Q.    Okay.  So, at some point then in 2007, you

22   were reassigned somewhere else?

23      A.    The end of 2007, December, I was

24   reassigned to the patrol task force.



1          Q.    Was that an open position that you applied

2     for, or were you approached for that?

3          A.    I was approached.

4          Q.    By who?

5          A.    Captain Robert Kelly.

6          Q.    And what were your responsibilities in

7     that position?

8          A.    I was plain-clothes street crime work.

9          Q.    And you talked about the street crime unit

10    you worked in before, with the TRACI unit.  Was that

11    what the patrol task force was?

12         A.    Yes.  Same idea, different name.

13         Q.    Same people?

14         A.    No.

15         Q.    Did street crime unit still exist at the

16    time that you were in the patrol task force?

17         A.    Patrol task force became the street crime

18    unit.  I think they thought it was a more

19    politically correct name.

20         Q.    So what were your responsibilities in that

21    position?

22         A.    Plain-clothes street crime work.

23         Q.    Undercover work, or were you developing

24    CIs?  Did you work with a partner?  Did you have



1    specific assignments?  What were your objectives,

2    you know, as part of that group?

3         A.    I was undercover.  I was in plain clothes.

4    I did work with a partner until he was injured.  We

5    did develop CIs on occasion.  It wasn't our primary

6    task.  Our primary task was to be out in the

7    high-crime areas or out where we were experiencing

8    some type of pattern crime to try and quell that and

9    move on to the next task.

10        Q.    Were -- did you, as a group, utilize

11   undercovers as part of your objectives?

12        A.    No, ma'am.

13        Q.    So neither you -- you didn't do undercover

14   work in that connection, and you didn't use

15   undercovers as part of any operations while you were

16   in that division; correct?

17        A.    No, ma'am.

18        Q.    And when did you leave that unit?

19        A.    Summer of 2008.

20        Q.    And where did you go?

21        A.    Narcotics.  Excuse me.  I misspoke.  I had

22   a brief assignment in between to the intelligence

23   unit.

24        Q.    How long were you in the intelligence



**SERGEANT ROBERT WUTTKE**

```
 1   unit?
 2        A.    Just a few weeks.
 3        Q.    When you were assigned to the patrol task
 4   force, approximately how many months were you there?
 5        A.    Seven-and-a-half.
 6        Q.    And you were still -- had the rank of
 7   police officer?
 8        A.    Yes, ma'am.
 9        Q.    Did you do any investigative work while
10   you were in that position?  In other words, did you
11   develop your own investigations, or were you
12   basically working at the direction of possibly a
13   supervisor or other detectives in that unit?
14        A.    I was working under the direction of a
15   supervisor.  We executed search warrants.  However,
16   we didn't do long-term investigations.
17        Q.    And who was your supervisor?
18        A.    Sergeant John Mangieri.
19        Q.    And were there individuals in that unit
20   that had the title of detective?
21        A.    Yes.
22        Q.    So how many detectives -- I'm just going
23   to call it the street crime unit.  How many
24   detectives were there at the time?  And how many
```



1   police officers?

2       A.    There was one detective, five police

3   officers.

4       Q.    And John Mangieri, what was his title?

5       A.    Sergeant.

6       Q.    What were the circumstances under which

7   you were assigned to the intelligence unit?

8       A.    I was moving up to the detective division.

9   I was familiar with the work intelligence did,

10  because when I was the operations clerk, the

11  intelligence unit operated out of the office that I

12  worked out of, and they needed help for a couple of

13  weeks.

14      Q.    So you helped them out when you were in

15  the operations division?

16      A.    On occasion.

17      Q.    And what did you do at that time for them?

18      A.    If one of the members of the intelligence

19  units were out, I would assist in prisoner

20  debriefings in the morning.

21      Q.    Alone or with someone else?

22      A.    No.  With someone else, ma'am.

23      Q.    Did you receive any training before you

24  were assigned to the street crime unit?



32                    SERGEANT ROBERT WUTTKE

1        A.      In what regards?

2        Q.      In -- other than the training that you

3   received in the academy with respect to recognizing,

4   you know, drug activity or protocol for executing

5   search warrants, in those general basic types of

6   instruction, did you receive any additional

7   instruction at all before going into the street

8   crime unit or while you were in the street crime

9   unit?

10       A.      Formalized instruction, no.  I learned

11  from the sergeant.

12       Q.      You didn't attend any seminars or any

13  outside or in-house training?

14       A.      No, ma'am.

15       Q.      Does the department have any in-house

16  training programs?

17       A.      Yes.

18       Q.      Okay.  And from the point in time you were

19  hired until you were in the intelligence unit, did

20  you take advantage of any of the in-house training

21  that they provided?

22       A.      I attended the five mandatory yearly

23  trainings every year.

24       Q.      Are they the same topics every year?



1      A.    Just about.

2      Q.    Okay.  And what are those topics?

3      A.    First aid CPR, firearms and article 35,

4  defensive tactics, legal updates, and then the other

5  one varies, I guess.  I can't think of anything else

6  off the top of my head that we do every year.

7      Q.    And who is responsible for providing the

8  training?

9      A.    The training unit.

10      Q.    Who is currently the head of the training

11  unit?

12      A.    I don't know.

13      Q.    Okay.  So when you were assigned to the

14  intelligence unit, who did you report to?

15      A.    Lieutenant Marcel Olifiers.

16      Q.    And had you been supervised by lieutenant

17  Olifiers prior to that time?

18      A.    I'm sure, at some point or another, there

19  was a time where he supervised me.

20      Q.    Were you approached to go into the

21  intelligence unit, or did you request to be

22  transferred there?

23      A.    I was approached.

24      Q.    By whom?



1        A.    Lieutenant Olifiers.

2        Q.    And you had mentioned you were moving up

3   to the detective division.   Under what circumstances

4   were you moving up to the detective division and to

5   what unit?

6        A.    I was told I was moving up to the

7   detective division.

8        Q.    Did they tell you what unit?

9        A.    When I went up there, I was told I was

10  going to intelligence or asked if I would go to

11  intelligence.

12       Q.    And you responded --

13       A.    Yes.

14       Q.    And that's when you spent a few weeks in

15  the intelligence unit?

16       A.    Yes, ma'am.

17       Q.    So you -- is it fair to say, at some

18  point, you left the intelligence unit and were

19  assigned to the narcotics unit?

20       A.    Yes, ma'am.

21       Q.    Did you request to be assigned to the

22  narcotics unit, or did someone approach you?

23       A.    I was request -- I'm sorry.  I actually

24  asked not to be assigned to the narcotics unit.



```
1          Q.    Who was -- who was the head of the
2     narcotics unit at that time?
3          A.    Sergeant Daniel Fisher.
4          Q.    And what time frame are we talking about?
5          A.    Summer of 2008.
6          Q.    Who else was in that unit at that time?
7          A.    Detective Fegan, Detective Dimase --
8          Q.    D-I-M-A-C-E?
9          A.    D-I-M-A-S-E.
10         Q.    Okay.
11         A.    I don't know if -- Medina was there.   I
12    don't know if he was a detective or a patrolman at
13    that time.   I think he was a detective.   And there
14    was two, I believe, detectives leaving the unit as I
15    was being assigned in.
16         Q.    Any other patrolmen being assigned into
17    the narcotics unit?
18         A.    The day I was assigned or the timeframe I
19    was assigned, another patrolman was assigned there
20    as well.
21         Q.    And who was that?
22         A.    Robert Burke.
23         Q.    Had you worked with Officer Burke before?
24         A.    Yes, ma'am.
```



1      Q.     Okay.  So in summer of 2008 -- withdrawn.

2             Sergeant Fisher is Caucasian?

3      A.     Yes.

4      Q.     Detective Fegan is Caucasian?

5      A.     Yes.

6      Q.     Officer Burke is Caucasian?

7      A.     Yes.

8      Q.     Detective Dimase is Caucasian?

9      A.     Yes.

10     Q.     Officer Medina or Detective Medina is

11  Caucasian or Hispanic?

12     A.     Hispanic.

13     Q.     And who was leaving?  Who were the

14  detectives that were leaving?

15     A.     Detective Stella and Detective

16  Mastrogiorgio.

17     Q.     Were they leaving the department?

18     A.     No.

19     Q.     Where were they going?

20     A.     General investigations.

21     Q.     Are they both Caucasians?

22     A.     Yes.

23     Q.     Is it your understanding that they

24  requested to leave the unit?



```
 1        A.    I have no idea.
 2        Q.    Do you know the circumstances under which
 3    they left Sergeant Fisher's unit?
 4        A.    No, ma'am.
 5        Q.    Why did you ask not to be assigned to
 6    narcotics?
 7        A.    I was in a relationship.  I had just moved
 8    in with my then fiancée.  Working day tours in the
 9    intelligence unit made it available to actually have
10    a life.
11        Q.    And who did you request -- who did you
12    make that request to?
13        A.    Lieutenant Olifiers.
14        Q.    And what did he say?
15        A.    Somebody else is being assigned to
16    intelligence.  We don't have a spot for you.
17        Q.    Who was being assigned to intelligence?
18        A.    Krista Mann.
19        Q.    These positions in these various units,
20    are they openings that are posted?  In other words,
21    do you have knowledge before they are filled that
22    they are going to be open, such that you have time
23    to apply or approach someone about going into that
24    position?
```



**SERGEANT ROBERT WUTTKE**

```
 1        A.    Depends on the position.  Depends on who
 2   is in charge at the time.
 3        Q.    So once you were assigned to the narcotics
 4   unit -- how long were you assigned there?
 5        A.    Just under two years.
 6        Q.    And what were your duties and
 7   responsibilities?
 8        A.    Narcotics investigations, executing search
 9   warrants, surveillance.  I had arrest warrants and
10   bench warrants that were assigned to me that I
11   needed to follow up on.
12        Q.    And when you say "investigations," were
13   you assisting the detectives in their
14   investigations, or were you actually conducting your
15   own investigations?
16        A.    Both.
17        Q.    And what investigations did you conduct on
18   your own?
19        A.    Off the top of my head, I can't remember
20   which ones were --
21        Q.    Not names.  Just generally, if you can
22   recall, what types of investigations you initiated
23   or --
24        A.    Narcotics investigations.
```



## SERGEANT ROBERT WUTTKE 39

```
 1        Q.    More specifically --
 2        A.    Sale of illegal narcotics, possession of
 3   illegal narcotics.
 4        Q.    Talking long-term --
 5        A.    My investigations were all relatively
 6   short-term.
 7        Q.    Okay.  We're talking about just street
 8   sales that you see, you know, buy and bust
 9   operations, or are we talking about targeting homes
10   where people are going in and buying narcotics?
11   Just trying to get a feel for it.
12        A.    Targeting homes, cars, businesses.
13        Q.    Was that based on CIs or any information
14   that was supplied to you in the unit, or was that
15   based on just being out there and observing possible
16   drug activity?
17        A.    Every situation was different.  Some of it
18   was complaints that were received through -- I
19   received through Sergeant Fisher that he received
20   through other channels.  Some of it was information
21   from CIs.  Some of it was based off of observations.
22        Q.    Okay.  And while you were in the narcotics
23   unit, did you have an opportunity to develop your
24   own CIs?
```



1      A.    Yes, ma'am.

2      Q.    What was the policy and procedure with

3   respect to identifying a confidential informant and

4   registering them with the department?  And how is

5   that information memorialized with the department,

6   procedurally?

7      A.    There is a packet, six pages, I believe,

8   of information needed to be filled out.  A criminal

9   history had to be attached to it.  The potential

10  informant would have to be interviewed by the

11  supervisor.  He would make a recommendation as to

12  whether that informant was -- he considered that

13  informant reliable and whether the informant should

14  be registered.  At that point, the packet went off

15  to his supervisor.

16     Q.    And so when you say the supervisor would

17  make a recommendation and interview the CI, at that

18  point in time, that was Sergeant Fisher?

19     A.    Yes, ma'am.

20     Q.    Did -- during the two years that were in

21  that unit, did you have a supervisor other than

22  Sergeant Fisher?  In other words, did he leave at

23  any point in time?  Was he replaced during those two

24  years?



1       A.   He left for vacations.

2       Q.   Was he reassigned from his position --

3       A.   I'm sorry.  I wasn't trying to be

4  contrite.  When he went on vacation, we would have

5  another supervisor in the office.

6       Q.   Okay.  But he generally permanently held

7  that title during the two years that you were in the

8  narcotics unit?

9       A.   Almost the whole two years.

10      Q.   When did -- he didn't hold that title?

11      A.   A couple months before I left, he was

12  reassigned back to patrol.

13      Q.   And his title was Fisher -- his title was

14  sergeant at that time; correct?

15      A.   Detective sergeant.

16      Q.   And what was -- if you know, what was his

17  position when he was reassigned back to patrol?

18      A.   Patrol supervisor.

19      Q.   Was he still the title of detective

20  sergeant?

21      A.   I don't remember.

22      Q.   Or would the title just have been sergeant

23  at that time, patrol supervisor?

24      A.   It could have been either.


800.DAL.8779
dalcoreporting.com
DALCO

1     Q.    Is it lieutenant?

2     A.    Now, it's lieutenant.

3     Q.    Was it then?

4     A.    No.

5     Q.    During the time that you were in the

6   narcotics unit, did you have an opportunity to

7   engage in any buy and bust scenarios?

8     A.    I'm sorry.  Did I have an opportunity to

9   what?

10    Q.    Be in any buy and bust scenarios or

11  operations.

12    A.    Can you be a little bit more specific what

13  you mean, "Buy and bust"?

14    Q.    Okay.  So, for instance, you have a

15  registered CI, and -- well, let me ask you this:

16  What was the policy and procedure of the department

17  at that time with respect to -- and I apologize.  I

18  thought it was -- when I was in the DA's office, it

19  was a pretty known term.  But -- so if you have

20  someone who is going to be out there selling or

21  buying, approaching someone to buy from them, you

22  would have, in some divisions or some departments,

23  pre-marks or recorded buy money, and they would

24  approach someone.  And later on, that person would



1   be arrested for selling.  So in those types of

2   circumstances, were you involved in any

3   investigations in that respect?

4       A.   I had instructed informants of mine to buy

5   from certain people, if they had the ability to.  I

6   was involved for a very short period of time,

7   because the investigation didn't pan out, when we

8   were using an undercover Westchester County officer

9   to buy drugs.  When using informants, the policy,

10  whether it was written or not, we weren't going to

11  use our informants to buy off the street and then

12  immediately go grab the dealer for fear of risking

13  the safety of the informant.  That's why I asked you

14  to be more specific on buy and bust.  Because when

15  we use an undercover, we get to make arrests

16  relatively quickly.  But when we used CIs, we

17  didn't.

18      Q.   So those would be a longer-term process,

19  where you would hide the identity of the person they

20  had purchased from, and maybe not even effect an

21  arrest until months later so there was no connection

22  to the CI?

23      A.   Normally not months later.

24      Q.   Weeks?

800.DAL.8779
dalcoreporting.com


1       A.    Weeks.

2       Q.    Days?

3       A.    Not if it was a street-level buy, no.  If

4   they bought from a house, it could be within a day.

5       Q.    While you were in the narcotics unit,

6   aside from using either an undercover or a CI to buy

7   from an individual from a home or what have you, did

8   you also -- were you also involved in investigations

9   or operations where your CI was a seller, and you

10  were -- your unit was targeting the purchaser of the

11  narcotics?

12      A.    Not that I can remember.

13      Q.    Is there any reason why there wouldn't be

14  that type of reverse operation or investigation?

15      A.    I've never -- I've never heard of it being

16  done.  I was never -- like I said, I can't remember

17  ever having given an informant the okay to sell

18  drugs.

19      Q.    From your understanding of the policies

20  and procedures of the department, would that have

21  been a violation of any policy or procedure, to use

22  a CI to sell narcotics in the community for purposes

23  of making arrests of the purchasers?

24      A.    I don't know if that's a violation of



```
 1   department rules and regs.
 2        Q.   Would it be a violation of the penal law?
 3        A.   I don't know.  Morally, I don't think it's
 4   right.  I think it's counterproductive getting drugs
 5   off the street by allowing drugs to be put out
 6   there.
 7        Q.   In your connection with your understanding
 8   of the policies and procedures of the department,
 9   would that type of situation rise to the level of
10   violating any -- or subjecting that individual,
11   narcotic officer, to disciplinary action?  In other
12   words, would there be a violation of any -- would
13   there be misconduct or a violation of any
14   disciplinary rules, to your knowledge?
15        A.   I don't know, because I don't know that
16   that's -- I'm not aware of that circumstance ever
17   happening.  That would depend on the -- was that
18   sanctioned by some other -- sanctioned by a
19   supervisor?  Was there a reason why they were
20   allowing it to happen?  I think that would be
21   something that would have to be evaluated on a
22   case-by-case basis.
23        Q.   But in your two years in the narcotics
24   unit, you never heard of anything like that?
```


800.DAL.8779
dalcoreporting.com
DALCO

1       A.    No, ma'am.

2       Q.    Are you familiar with what's been referred

3   to as the black book within the narcotics unit that

4   records arrests or the number of arrests that are

5   made from the officers or detectives within that

6   unit?

7       A.    I never heard of it referred to as the

8   black book, but I am familiar with the arrest book

9   that was kept.

10      Q.    Okay.  What color is it?

11      A.    At the time, I think it was a blackish,

12  brownish, with a red binder.

13      Q.    And to your knowledge, is it still

14  maintained within the narcotics unit?

15      A.    Yes.

16      Q.    And what type of information is contained

17  within that book?

18      A.    Date of the arrest, person arrested,

19  incident number, crime, and the detective or officer

20  that made the arrest.

21      Q.    And what was your understanding of the

22  purpose of having that book in the unit?

23      A.    Make it easier to keep stats.

24      Q.    Did you -- was there a feeling of healthy



```
 1    competition among the officers there to have higher
 2    stats than other officers in the unit?
 3         A.    Yes.
 4         Q.    Were you ever, either formally or
 5    informally, or given the impression or told
 6    specifically to have any certain number of arrests
 7    or quota, to fill a quota within a certain time
 8    period?
 9         A.    No, ma'am.
10         Q.    And while you were in the narcotics unit,
11    was Sergeant Fegan in that unit with you for the
12    entire two years?
13         A.    He wasn't a sergeant.
14         Q.    He was a detective; correct?
15         A.    Yes.
16         Q.    And he was a detective, yes?
17         A.    Yes.
18         Q.    And was he with you for the entire two
19    years?
20         A.    He may have been reassigned at the very
21    end of my tenure there up to the DEA task force.
22         Q.    Did you ever work with Detective Fegan on
23    any -- any operations or investigations while you
24    were in the narcotics unit?
```



1      A.    Yes.

2      Q.    And did you have an opportunity to observe

3   him make any disparaging or racial comments in

4   connection with either other black officers or the

5   black citizens within the City of Mount Vernon?

6      A.    No.

7      Q.    You have never heard him say anything that

8   was disparaging about minorities or the citizens of

9   Mount Vernon, generally?

10     A.    No.

11     Q.    Have you ever heard him say anything that

12  was disparaging about the City of Mount Vernon?

13          MR. SWEENEY:    Objection to form, but you

14     can answer, if you know.

15     Q.    The citizenry of Mount Vernon.

16     A.    No.

17     Q.    And likewise, have you ever heard or had

18  conversations with Detective Sergeant Fisher that

19  indicated or he made racial -- discriminatory racial

20  remarks, disparaging remarks, about either black or

21  non-Caucasian officers, detectives, or citizens of

22  Mount Vernon?

23     A.    No, ma'am.

24     Q.    From the time you worked in the narcotics



```
 1    unit to the present day, are you aware of whether

 2    other officers within the department have expressed

 3    concern or displeasure with either detective, now

 4    sergeant, Fegan or Lieutenant Fisher in connection

 5    with disparaging remarks or discriminatory treatment

 6    toward African-Americans within the department or

 7    the citizens of Mount Vernon?

 8            MR. SWEENEY:  Object to the form of the

 9        question, but you can answer it.

10        A.   Are you asking if I ever heard somebody

11    say that one or both of them are racist?

12        Q.   To that extent.

13        A.   Yes, I have heard that.

14        Q.   And who, generally, have you heard that

15    from?

16        A.   I've heard it as a -- a run-of-the-mill

17    grapevine, I've heard this, I've heard that.

18        Q.   Have police officers ever mentioned in a

19    conversation with you or in your presence wherein

20    they expressed their opinion or belief that either

21    of those two officers were disparaging towards

22    non-Caucasians, whether in the department or within

23    the City of Mount Vernon?

24        A.   No.  People don't have those conversations
```



1    with me.

2         Q.    You had mentioned which officers and

3    detectives were in the narcotics unit when you first

4    arrived.  Did any of them change?  In other words,

5    at the end of the two years, was it still yourself,

6    Officer Burke, Detective Fegan, Detective Dimase,

7    Detective Medina?

8         A.    No.

9         Q.    Okay.  And who came in; and who left?  Let

10   me put this way, who did you have the opportunity to

11   work with other than those people?

12        A.    Police Officer Antinini, Detective Latheia

13   Smith, Police Officer Greg Addison, Detective

14   Courtney Besley, Detective Chris Hutchins, Police

15   Officer Danny Ibanez.

16        Q.    Can you spell that?

17        A.    I-B-A-N-E-Z.

18        Q.    And did you have an opportunity to work

19   with -- is it Officer Antinini at the time, or --

20        A.    Yes, ma'am.  Officer.

21        Q.    Did you have an opportunity to work with

22   him on any assignments?

23        A.    Yes, ma'am.

24        Q.    And approximately how many?



1        A.    When I worked in narcotics, if there was a

2   search warrant to be executed, we all did it

3   together.  Each individual officer or each

4   individual team worked on their own investigations.

5   But when it came to the culmination, we all worked

6   together.  So a lot.

7        Q.    So is it fair to say you worked with

8   Officer Antinini and Detective Fegan in the

9   execution of search warrants?

10       A.    Yes, ma'am.

11       Q.    And how about in the execution of making

12  arrests?

13       A.    It would depend on the circumstances.

14       Q.    Have you ever been present or involved in

15  any arrest that officer Antinini has made?

16       A.    Yes.

17       Q.    And at any of those times, have you

18  observed Officer Antinini use force that was more --

19  more force than was reasonably necessary under the

20  circumstances?

21       A.    No, ma'am.

22       Q.    Are you aware of whether other people have

23  complained of Officer Antinini's use of force?

24       A.    By "other people" --



1      Q.    Other officers.   I apologize.

2      A.    No, ma'am.

3      Q.    And have you observed Officer Antinini

4  make any racial, disparaging comments?

5      A.    No, ma'am.

6      Q.    Are you aware of whether anyone else has

7  complained within the department about Officer

8  Antinini making any disparaging comments?

9      A.    No, ma'am.

10  ████      ██████████████████████████████████

    █████████████████████████████████████████████

    ███████████████████████████████████████

    █████████████████████

    ████    ██████    ██████

    ████    ████████████████████████

        ██████    ████████    ██████████████

    ████

    ████         (Discussion held off the record.)

19

20         MS. BELLANTONI:   All right.   So this will

21  be confidential, for Officer Antinini's

22  purposes.

23

24



```
1    *******************START CONFIDENTIAL*******************
2          ███      ███████████████
     █     ███    █ ████████████████████████
     █     ███      ██████████████████████████
     █   ███████    ████████████████████████████
     █        ███████████████████████████
     █          ███    █ █████████
     █          ███      ██████      ████████████████
     █          ███      ████    █████
     █          ███      ████████████████████████
     █   ██████████████
     █          ███      █████████████████████
     █   ████████████████████████████████████████████
     █   █ ███████████
     █          ███      █████████████████████
     █   ██████████████████████████████████
     █          ███      █ █████████████████
     █          ███    ████ ██████████████████    ██████████
     █               ████    ████████████    ███████████████    --
20
21
22
23
24   *******************END CONFIDENTIAL*******************
```



1          Q.    Do you know who would have been working

2     that day or who was working that day?

3          A.    I wasn't here.  I don't know.

4          Q.    After the narcotics unit, where were you

5     assigned?

6          A.    Briefly, back to the intelligence unit.

7          Q.    Do you know why Detective Sergeant Fisher

8     was assigned back to patrol?

9          A.    No, ma'am.

10    ███  ████████████████████████████████████

██    ████████████████████████████████████████████

██    ███  █████████████████████████████████████████

██    ██████

██                MS. BELLANTONI:   Off the -- so this is

15              confidential.

16

17

18

19

20

21

22

23

24





```
 1    *****************START CONFIDENTIAL*****************
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24    *****************END CONFIDENTIAL*****************
```



800.DAL.8779
dalcoreporting.com   DALCO

1        Q.    And so Sergeant Stufano was then the head

2   of the narcotics unit?

3        A.    Yes, ma'am.

4              MS. BELLANTONI:   That's not confidential,

5        that portion of it.

6        Q.    How long did you stay in the intelligence

7   unit once you transferred out or were reassigned out

8   of narcotics?

9        A.    A couple of weeks.

10       Q.    What were the circumstances under which

11  you were reassigned out of the narcotics unit?

12       A.    I don't know.

13       Q.    Who made the decision to --

14       A.    I don't know.

15       Q.    Did you ask to be assigned out of the

16  narcotics unit?

17       A.    No, ma'am.

18       Q.    Was there any disciplinary issue during

19  the time period you were in the narcotics unit?

20       A.    No, ma'am.

21       Q.    And who supervised you when you were in

22  the intelligence unit for a couple of weeks?

23       A.    Lieutenant Olifiers.

24       Q.    And what time period was this that you



1    were reassigned to the intelligence unit?

2         A.    End of the spring, beginning of the summer

3    of 2010.

4         Q.    And why weren't you allowed to stay in the

5    intelligence unit, if you know?

6         A.    I was reassigned to general

7    investigations.

8         Q.    Did you ask to be reassigned to general

9    investigations?

10        A.    No, ma'am.

11        Q.    Did you object to being reassigned to

12   general investigations?

13        A.    No, ma'am.

14        Q.    Who told you you needed to be reassigned

15   to general investigations?

16        A.    Lieutenant Olifiers.

17        Q.    And who made the decision to reassign you

18   to general investigations?

19        A.    I don't remember who the commanding

20   officer was at that time.

21        Q.    Do you know approximately how many arrests

22   you made while you were in the narcotics unit while

23   you were there?

24        A.    Not a lot.


800.DAL.8779
dalcoreporting.com
DALCO

1        Q.    What would be considered a very productive

2   arrest level or arrest number for the year in the

3   narcotics unit, if you know?

4               MR. SWEENEY:   Object to the form, but you

5        can answer.

6        Q.    Do you understand the question?

7        A.    I understand the question.   The --

8        Q.    Wait.   So let me rephrase that.   And I

9   don't mean your opinion.   Generally, what is the

10  consensus from being in the narcotics unit from the

11  people in the narcotics unit about what was a highly

12  productive level or number of arrests per year or

13  per month?

14               MR. SWEENEY:   At what point in time?

15               MS. BELLANTONI:   When he was there.

16       A.    At least a couple of arrests a week.

17       Q.    So between -- so approximately eight

18  arrests, eight to ten arrests, five to ten arrests

19  per month?

20       A.    Eight to ten arrests would be very

21  productive.

22       Q.    And during the time period that you were

23  in the narcotics unit for two years, were you able

24  to observe, from the arrest book, who or what -- the



1    number of arrests that were made per individual?

2         A.    I'm sure I could have.  I don't know that

3    I ever sat down and counted who had the most

4    arrests.

5         Q.    Was it talked about within the unit during

6    the two years you were there who was the highest

7    producer or who was bragging about being the highest

8    producer as far as productivity was concerned?

9         A.    It was never really talked about, bragged

10   about, because the two detectives that were making

11   the most arrests, they -- we all knew they were

12   making the most arrests.

13        Q.    And who were they?

14        A.    Detectives Mason and Fegan.

15        Q.    And did they work together or did they

16   have their own investigations --

17        A.    While I was assigned there?

18        Q.    Uh-huh.

19        A.    They worked separately.

20        Q.    And while you were there, when Officer

21   Antinini came into the unit, was he primarily

22   assigned to work with -- or did he end up working

23   mostly with Detective Fegan, or did he work with

24   other individuals?



60          **SERGEANT ROBERT WUTTKE**

1          A.     His primary partner was Detective Fegan.

2          Q.     Do you know if they had worked together

3     before?

4          A.     I don't know.

5          Q.     All right.  How long were you in the

6     general investigations unit?

7          A.     A couple of weeks.

8          Q.     And who was your supervisor?

9          A.     Sergeant -- or Detective Sergeant Joe

10    Clarke.

11         Q.     And is -- you said Joe?

12         A.     Yes.

13         Q.     Is it Clarke with an E?

14         A.     Yes.

15         Q.     Is Detective Sergeant Clarke Caucasian?

16         A.     Yes.

17         Q.     And at the time that -- at the time that

18    Sergeant Fisher was supervising or heading up the

19    narcotics unit, were there any African-American

20    either police officers or detectives assigned to

21    that unit?

22         A.     Yes, ma'am.

23         Q.     And who were they?

24         A.     Latheia Smith, Greg Addison, Courtney



1    Besley.   I think that's it.

2         Q.   Is Chris Hutchins Caucasian?

3         A.   Yes, ma'am.

4         Q.   And Chris Ibanez?

5         A.   Daniel Ibanez.

6         Q.   Is he Caucasian?

7         A.   Hispanic.

8         Q.   And whose decision was it, if you know, to

9    have -- in other words, did Sergeant Fisher request

10   the individuals who made it into his unit or who

11   were assigned to his unit, or did someone other than

12   Sergeant Fisher make that determination about who

13   would be assigned to the narcotics unit?

14        A.   While I was there?

15        Q.   For those two years, during the time

16   period that you worked with the individuals you just

17   named.

18        A.   Somebody else was making decisions.

19        Q.   And who was that?

20        A.   I don't know.

21        Q.   Is that the point -- you had mentioned a

22   female in administration.  I don't know if she was

23   the chief or deputy chief --

24        A.   Chief Duncan?



```
 1        Q.    Duncan, yeah.  And what was her title,
 2   Chief Duncan?
 3        A.    Chief.
 4        Q.    And she was African-American?
 5        A.    No, ma'am.
 6        Q.    She was Caucasian?
 7        A.    Yes, ma'am.
 8        Q.    And would she have made the decisions as
 9   to who would be reassigned in the detective bureau?
10        A.    Ultimately, she would have say over any
11   decisions that were made with her assignments.
12        Q.    At that point in time when you were in the
13   narcotics unit, who -- well, withdrawn.
14              So after a couple of weeks in the general
15   investigations unit, why is it that you stayed only
16   in these units for a couple of weeks?  Had someone
17   left and there was an opening that they needed
18   assistance in that unit, or --
19        A.    I was playing pinball because I was
20   waiting to be promoted.  So I wasn't saying no to
21   anything.
22        Q.    Oh, okay.  Disconcerting.  So what were
23   you waiting to be promoted to?
24        A.    Sergeant.
```



1       Q.    When did you take the sergeant's exam?

2       A.    First sergeant's exam I took was in 2006.

3       Q.    Okay.  And where did you place on the

4    sergeant's exam?

5       A.    Number one.

6       Q.    And the list came out in 2006?

7       A.    I don't remember when the list was

8    certified.  It was either the end of 2006 or

9    beginning of 2007.

10      Q.    And how many positions were open at that

11   time?

12      A.    When the list was certified, ma'am?

13      Q.    Yes.

14      A.    I don't know.

15      Q.    Okay.  Do you know who was behind you in

16   second, third, fourth?

17      A.    Yes, ma'am.

18      Q.    And who was that?

19      A.    Vinny Dellamura, Joe Starace, Ed McCue,

20   Rob Scott, Vinny Stufano.

21      Q.    In that order or just randomly?

22      A.    No.  I'm pretty sure that was the order.

23   There was more people on the list, but I don't

24   remember the -- you know, the rest of it.



1          Q.    So were you promoted off that list?

2          A.    No, ma'am.

3          Q.    Who was promoted off the 2006, early 2007

4    sergeant's list?

5          A.    Vinny Dellamura, Joe Starace, Rob Scott,

6    Vinny Stufano.

7          Q.    And when did you next take the sergeant's

8    exam?

9          A.    2009.

10         Q.    And what was your position when the list

11   was certified?

12         A.    Two.

13         Q.    Who was number one?

14         A.    Greg Addison.

15         Q.    And do you know who's behind you?

16         A.    No.  I know some of the names that were on

17   the list.  I don't know the order.

18         Q.    Who was promoted off the 2009 list?

19         A.    Myself, Greg Addison, Sean Fegan, Adam

20   Grisanti --

21         Q.    Can you spell that?

22         A.    Grisanti, G-R-I-S-A-N-T-I.  Steven Sexton,

23   Jennifer Carpenter, Sean Harris, Anthony Mitchell --

24         Q.    They were all promoted?



1          A.   Yes, ma'am.   Anthony McEachin.   I think

2     that's everyone.   Giglio Rucci [ph.].

3          Q.   Was there a big turnover in employment

4     during that time period?

5          A.   There's always a big turnover in Mount

6     Vernon.

7          Q.   Do you know why?

8          A.   Because we don't get paid enough to do the

9     work we do.

10         Q.   Do you know if the sergeants and officers

11    that are on the job, do they live in Mount Vernon?

12    Do they live in the community?

13         A.   Some do.   Some don't.

14         Q.   All right.   So you were promoted off of

15    the 2009 sergeant's list; correct?

16         A.   Yeah.   I was promoted in June of 2010.

17         Q.   Any disciplinary issues between the time

18    that you started the narcotics unit and the time you

19    were promoted in June 2010?

20         A.   No, ma'am.

21         Q.   And what was your assignment at that time,

22    in June of 2000 --

23         A.   I was assigned as a patrol sergeant.

24         Q.   And how many patrol sergeants were there?



| | | |
|---|---|---|
| 1 | A. | Ten. |
| 2 | Q. | Who did you report to? |
| 3 | A. | Lieutenant Vincent Manzione. |
| 4 | Q. | And how long did you stay in that |
| 5 | position? | |
| 6 | A. | As a patrol sergeant, ma'am? |
| 7 | Q. | Yes. |
| 8 | A. | Until October of 2010. |





1   ******************START CONFIDENTIAL******************







800.DAL.8779
dalcoreporting.com











1

24    patrol





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   ******************END CONFIDENTIAL******************
```



1        Q.    During the time that you worked up until
2   this point in time, in the department, had anyone,
3   either directly accused you, or had you heard of
4   people having conversations or expressing the
5   opinion that you were bias or that you were racist
6   toward non-Caucasians?
7        A.    Yes, ma'am.
8        Q.    Okay.  And did I ask you that question
9   before?  I don't think I did.
10       A.    I don't know.
11             MR. SWEENEY:  We were expecting it though.
12       Q.    During what time period?
13       A.    I heard it throughout my career.
14       Q.    Oh, okay.  Do you have any reason to know
15  why anybody would -- would make those comments or
16  think that you would be racist?
17       A.    I have no idea.  Perhaps it's because of
18  the way I look.
19       Q.    Do you have any tattoos or markings that
20  would indicate to someone that you may not be
21  favorable toward non-Caucasians?
22       A.    No.
23       Q.    Okay.  Do you belong to any organizations
24  that are not favorable toward non-Caucasians?



## SERGEANT ROBERT WUTTKE

1      A.    No.

2      Q.    Other than how you look, have you had any

3  negative interaction with individuals who are not

4  Caucasian that may have been interpreted as your

5  being racist as opposed to a personality conflict?

6      A.    Negative interactions as far as what?

7      Q.    Just on the job, you had a disagreement

8  with someone who may not be Caucasian, and it's, in

9  your opinion, maybe more of a personality conflict

10  rather than a racist view toward that individual or

11  that group of individuals.

12      A.    As a police officer, I have been accused

13  numerous times of only doing what I'm doing because

14  the person is black and I am white.

15      Q.    And what types of things or decisions have

16  you made that have been challenged under the

17  category of being racist?

18      A.    Everything from writing a parking summons

19  to making an arrest to whether or not a police

20  report is going to be written.

21      Q.    Okay.  So we are talking about things that

22  involve the general community then and as you made

23  as a police officer in that context?

24      A.    No.  I've even heard it from police



```
 1   officers, that you only wrote him a ticket because
 2   he's black.
 3        Q.    And what police officers have directly
 4   made those statements to you?
 5        A.    I have heard it from several people.
 6        Q.    Can you just name, to the best of your
 7   recollection, who has accused you within the
 8   department of being racist or for making decisions
 9   based on someone's race?
10             MR. SWEENEY:   Objection to the form of the
11        question.  But you can answer it, if you
12        understand it.
13        A.    You want names of people that have accused
14   me of being a racist?
15        Q.    Yes.
16        A.    Is -- is that what you're asking?
17        Q.    Yup.
18        A.    Directly to my face, I have heard it from
19   Sergeant Krista Mann, now deceased Detective Stanley
20   Rice.  Those are the only names I can think of off
21   the top.  I have heard it in a joking manner from
22   other officers, but very clearly in a joking manner,
23   usually after having heard -- you know, kind of
24   mocking what had been said already.
```



1        Q.    And the other officers are non-Caucasian?

2        A.    Some were.  Some weren't.

3        Q.    So even white officers have made jokes

4   or --

5        A.    Yes, ma'am.

6        Q.    -- or have disguised their comments as

7   jokes in connection with them believing you were

8   racist or you did something that lead someone

9   thinking you were racist?

10       A.    Yes, ma'am.

11            MR. SWEENEY:  Objection to form.  But you

12       can answer it, if you understand it.

13            THE WITNESS:  Can we take a 30-second

14       break, because I need to use the restroom.

15            MS. BELLANTONI:  Absolutely.

16

17                  (Recess taken.)

18

19   BY MS. BELLANTONI:

20       Q.    When you were promoted to sergeant along

21   with -- there were a lot of people that were

22   promoted along with you that you had mentioned.  Do

23   you recall, approximately, how many people had

24   gotten promoted --



```
 1        A.    There's a little confusion.  When I was

 2   promoted to sergeant, it was just myself and Greg

 3   Addison.

 4        Q.    Okay.

 5        A.    Off of that list was all those other

 6   people.

 7        Q.    Got it.  At different times?

 8        A.    Yes, ma'am.

 9        Q.    And everybody who was promoted off of that

10   list, they were promoted within the same year, if

11   you know?  Or how long does the list last?

12        A.    That particular list, I don't know.  It

13   could be up to four years long, as per the state.

14        Q.    And when you were promoted, you were

15   promoted by Commissioner Bell?

16        A.    No, ma'am.

17        Q.    Who promoted you?  Who was the

18   commissioner at the point in time you were promoted?

19        A.    Didn't have a commissioner.

20        Q.    Whose duties and responsibilities -- was

21   there a deputy commissioner?

22        A.    No, ma'am.

23        Q.    Who was at the head --

24        A.    Chief Duncan.
```



1      Q.    Okay.   Chief Duncan.   And at what point in

2   time did Commissioner Bell take the position as

3   commissioner?

4      A.    The end of the summer, beginning of the

5   fall.

6      Q.    Didn't you testify that you were promoted

7   on October 17th, 2010?

8      A.    No, ma'am.

9      Q.    Okay.   When was your promotion then?

10      A.    June of 2010.

11      Q.    June.

12      A.    October 17th was when I was notified I was

13   being demoted.

14      Q.    Oh, okay.   When you were in the position

15   of patrol sergeant, how many individuals did you

16   supervise?

17            MR. SWEENEY:   At what point in time?

18            MS. BELLANTONI:   Until he was no longer

19      patrol sergeant.

20            MR. SWEENEY:   As opposed to current

21      duties?

22            MS. BELLANTONI:   Yeah.   So just -- so from

23      June of 2010 until October of 2010.   Yup.

24      Q.    When you were working in the capacity as a



```
 1   patrol sergeant, how many people did you supervise?
 2        A.   I think I had nine or ten officers
 3   assigned to my squad.
 4        Q.   And were there any African-American
 5   officers assigned to that squad?
 6        A.   Yes, ma'am.
 7        Q.   And who were they, if you can recall?
 8        A.   Montega Day [ph.], Nick Smith, Behia
 9   Morris [ph.] --
10        Q.   Can you spell that?
11        A.   No, I can't.
12        Q.   Okay.  Morris --
13        A.   Sorry.
14        Q.   That's fine.
15        A.   Morris.  Yes, ma'am.
16        Q.   Morris, M-O-R-S-E or M-O-R-R-I-S?
17        A.   M-O-R-R-I-S.
18        Q.   Okay.
19        A.   Bear with me one moment.  I think that's
20   it.
21        Q.   Okay.  And so, of the ten, three were
22   African-American?
23        A.   That I can remember, yes.
24        Q.   Okay.  And so just to recap, you were
```

800.DAL.8779
dalcoreporting.com



DALCO

**SERGEANT ROBERT WUTTKE**

1    assigned to operations in December of 2010?

2        A.   No.  From October to December.

3        Q.   From October to December.  Okay.  And then

4    where were you assigned?

5        A.   Back to patrol.

6        Q.   Okay.  And so how long did you stay -- and

7    you were assigned to a patrol squad; correct?

8        A.   Yes, ma'am.

9        Q.   How long were you in that position?

10       A.   Just over a year.

11       Q.   And who did you report to?

12       A.   Lieutenant Dennis Lifrieri.

13       Q.   Did you work with a partner when you were

14   working on patrol?

15       A.   At that time?  No, ma'am.

16       Q.   At any time?

17       A.   Yes, ma'am.

18       Q.   When, before then?

19       A.   In the beginning of my career, I worked

20   what we referred to as sector baker, which is

21   traditionally a two-man patrol.

22       Q.   Was that with your field training officer

23   or just another patrolman?

24       A.   Just another patrolman.



1       Q.   Did you have any disciplinary proceedings

2   between the time that you were placed back in patrol

3   and when you were no longer in the patrol squad in

4   2011?

5       A.   That was up until 2012.  I'm sorry if I

6   misspoke.  But no, I did not.

7       Q.   ████████████████████████████████████

   ████████████████████████████

9            MS. BELLANTONI:  Well, just mark this as

10      confidential.

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*START CONFIDENTIAL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



14

15

16

17

18

19

20

21

22

23

24    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*END CONFIDENTIAL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



1    �letracted text

7

8        Q.    And where were you assigned?

9        A.    The detective's division.

10       Q.    And who reassigned you there?

11       A.    Trying to think who was in charge at that

12   particular moment.  I believe it was either Deputy

13   Chief or Chief John Roland.

14       Q.    Roland?

15       A.    Roland.

16       Q.    Was Commissioner Bell still the

17   commissioner?

18       A.    Actually, yes, you are right.  He was.  He

19   was still the commissioner.  So it would have been

20   Commissioner Bell.

21       Q.    Oh, okay.

22       A.    I'm sorry.  I forgot.

23       Q.    It's okay.  So it would have been

24   Commissioner Bell that made that decision and not a



1   deputy chief?

2       A.    Correct.

3       Q.    And were you approached by someone letting

4   you know you were going to be reassigned, or had you

5   been putting the word out, or did you approach

6   someone to try to be reassigned out of patrol?

7       A.    I was approached months prior to my

8   reassignment and asked, and I declined.  And I said,

9   if I change my mind or when I feel that I am ready,

10  I will let you know.

11      Q.    And who approached you?

12      A.    Captain Dante Barrera.

13      Q.    Do you know why he approached you?

14      A.    He had been a supervisor in the detective

15  division when I had worked up there originally.  He

16  knew my work ethic.  He knew what I was capable of.

17  And he felt that I was wronged by the police

18  department, and I think he felt that that was the

19  right thing to do.

20      Q.    To your knowledge, has anyone ever accused

21  Captain Barrera of making racial comments or being

22  racially disparaging towards non-Caucasians?

23      A.    No.

24      Q.    So did you -- was it the case that then



1   you went back to Captain Barrera --

2       A.   No, ma'am.

3       Q.   -- and eventually -- so how did it go

4   about that you were reassigned into the detective

5   bureau?

6       A.   After Captain Barrera passed away,

7   Lieutenant Manzione was put in charge.  I had gotten

8   my wits about me, gotten myself back in a place

9   where I thought that I would be capable, able, and

10  willing to do the detective work again.  And I

11  approached Lieutenant Manzione.

12      Q.   And to what unit were you assigned in the

13  detective bureau?

14      A.   General investigations.

15      Q.   And how long did you stay in general

16  investigations?

17      A.   Year-and-a-half.  Just under that.

18      Q.   So 2013, 2014?

19      A.   To the middle of 2013.

20      Q.   And who was your supervisor in general

21  investigations?

22      A.   Depending on the particular moment,

23  Lieutenant Manzione, Sergeant Stufano, or Sergeant

24  McEachin or -- I'm sorry -- Captain Adinaro.



1       Q.    And when were you reassigned from the

2    general investigations unit?

3       A.    May or June of 2013.

4       Q.    And where were you reassigned to?

5       A.    Major case squad.

6       Q.    Was that still in the detective division?

7       A.    Yes, ma'am.

8       Q.    Is that something that you requested, or

9    did they just move you?

10      A.    They moved me.

11      Q.    Who made that decision?

12      A.    Captain Adinaro.

13      Q.    Do you know?

14      A.    Yes.  Because they had -- excuse me.  They

15   hadn't had a major case squad or major case unit in

16   several years.  They were forming a major case unit

17   again.  Captain Adinaro approached me and told me

18   that he was reassigning me there.

19      Q.    During the time period that you were in

20   the general investigations unit, your title was

21   police officer or patrolman?

22      A.    Yes, ma'am.

23      Q.    And did you conduct investigations on your

24   own during that time period?



1          A.    Yes, ma'am.

2          Q.    Did you have a conversation with anyone in

3    connection with whether you were going to be

4    provided with your gold shield or promoted to

5    detective, considering the number of months or years

6    that you had --

7          A.    No.

8          Q.    -- been in the detective division?

9          A.    No, ma'am.

10         Q.    Did it cross your mind that -- well,

11   withdrawn.

12               Did you speak with anyone about your

13   desire to be promoted, or even if you had the desire

14   to be promoted to detective?

15         A.    At that time?

16         Q.    At any time.

17         A.    Yes.

18         Q.    When?

19         A.    Before I was promoted to sergeant in 2010.

20         Q.    And who did you talk to?

21         A.    Captain Barrera.

22         Q.    And what did he say?

23         A.    There's no detective shields available

24   right now.



1      Q.    Was that because there was no line or

2  there was nothing in the budget for a detective spot

3  or no opening in the detective spot?

4      A.    That's what I believed.  I'm sorry.

5  That's what I believe he meant by that.

6      Q.    Okay.  Did you come to learn that it meant

7  something else?

8      A.    No, ma'am.

9      Q.    And in 2010, who would have made the

10  decision to promote you to detective?

11     A.    Decision would have been made by the

12  mayor.

13     Q.    Who was the mayor at that time?

14     A.    Clinton Young.

15     Q.    And who was the commissioner?

16     A.    Depends on when in 2010.  At the time,

17  when I was questioning whether I was going to get a

18  detective shield, we didn't have a commissioner.

19     Q.    Who was the deputy commissioner?

20     A.    We didn't have one of those back then.  It

21  would have been Chief Duncan.

22     Q.    Was it Chief Duncan?

23     A.    Yes, ma'am.

24     Q.    And was there a point in time in 2010 when



1    there was a commissioner?  That would have been
2    Commissioner Bell?
3           A.    There you go.
4           Q.    And we know why that didn't happen or
5    wasn't going to happen.  Okay.  So once you had gone
6    back to the detective division in either general
7    investigations or major case squad, did you bring up
8    the topic of being promoted to detective or getting
9    a gold shield?
10          A.    No, ma'am.
11          Q.    Did it cross your mind?
12          A.    Yes, ma'am.
13          Q.    And did you talk to anybody about?
14          A.    No, ma'am.
15          Q.    Why?
16          A.    Didn't matter that much.
17          Q.    Why?
18          A.    Because it's financially not that much
19    more money, and after I had seen some of the people
20    that were issued detective shields that weren't
21    deserving of them, it didn't really mean anything to
22    me.
23          Q.    Lost its value?
24          A.    Yes, ma'am.



1       Q.    Can you please provide some examples of

2   individuals who received their detective shield

3   that, in your opinion or even other people's

4   opinions, shouldn't have or didn't earn that

5   promotion?

6       A.    Kelly Marlow, Patrick Gene Jerome.  Those

7   are the two that stick out in my head right now.

8       Q.    Okay.  And what was the consensus as to

9   why, if there was a consensus, or talk within the

10  department why Kelly Marlow shouldn't have been

11  promoted to detective?

12      A.    She didn't work in the detective division.

13      Q.    Who made the decision, if you know, to

14  promote her?

15      A.    I believe it was requested by then

16  Commissioner Chong to whoever the mayor was at that

17  time.

18      Q.    Clinton Young?

19      A.    I don't know if it was Clinton Young or if

20  it was Ernest Davis.

21      Q.    Do you know whether -- or do you know

22  under what circumstances Chong had requested that --

23      A.    No, I don't.

24      Q.    Did they have any relationship?  Did they



 1    know each other prior to the promotion?  Or did they

 2    have a social relationship, if you know?

 3         A.    She worked as his secretary.

 4         Q.    Before she became a police officer?

 5         A.    While she was a police officer.  I'm

 6    sorry.  She worked as his clerk, administrative

 7    clerk.

 8         Q.    He was commissioner; correct?

 9         A.    Yes, ma'am.

10         Q.    For how long did she work as his

11    administrative clerk, if you know?

12         A.    I don't know.  I don't know.

13         Q.    Okay.  Was -- prior to being promoted to

14    detective, was she assigned -- prior to being the

15    administrative clerk, was she assigned to patrol?

16         A.    Yes, ma'am.

17         Q.    Had she ever been assigned anywhere but

18    patrol before --

19         A.    Yes, ma'am.

20         Q.    Okay.  Where?

21         A.    Personnel.

22         Q.    And do you know what position she held in

23    personnel?

24         A.    The personnel officer.



1        Q.    Is it your understanding that personnel

2   officers, at any time, conduct investigations?

3        A.    I'm sorry.  Do --

4        Q.    Yes.  The personnel officer title, does

5   that involve conducting investigations of any kind?

6        A.    No, ma'am.

7        Q.    Okay.  And what was either your opinion or

8   the rumor or consensus in the department as to why

9   Gene Jerome should not have been awarded the gold

10  shield?

11       A.    He hadn't done any detective work at that

12  point.

13       Q.    Who made the decision to -- to give him

14  that promotion?

15       A.    Chief Duncan.

16       Q.    Do you know, or is there speculation as to

17  why that decision was made?

18       A.    My speculation was because he was the PBA

19  president at the time.

20       Q.    And during that time period that he was

21  the PBA president and/or -- withdrawn.

22              Did he resign as the PBA president when he

23  was promoted to detective?

24       A.    No, ma'am.



1         Q.    Are you aware of any complaints by PBA

2    members that grievances were not being filed at any

3    time when Gene Jerome was the PBA president prior to

4    his becoming detective?

5         A.    I'm not aware of any.

6         Q.    What about after he became detective?

7         A.    I'm not aware of any.

8         Q.    It's your testimony that he had never been

9    assigned to the detective division --

10        A.    No.

11        Q.    -- prior to being promoted?

12        A.    That was not my testimony.

13        Q.    Okay.  So let's be clear then.  What, if

14   any, experience or assignments did he have to the

15   detective division prior to being promoted to

16   detective, if you know?

17        A.    He worked in -- he worked in RCIU, which

18   is our criminal identification unit.

19        Q.    Do you know for how long?

20        A.    I don't know the time frame, no.

21        Q.    Could it have been at least 18 months?

22        A.    I guess it could have been.  It could have

23   been.  I don't think it was, but it could have been.

24        Q.    Okay.  Anyone else that should have gotten



1    the -- withdrawn.

2             Anyone else that received a gold shield

3    that, in your opinion, or was the general consensus

4    that did not deserve it?

5        A.    Can you just rephrase or give me the time

6    frame that we're talking about again?

7        Q.    Between 2010 and the present date.

8        A.    And the present date?

9        Q.    Uh-huh.

10       A.    Oh, I can name plenty more.

11       Q.    Okay.

12       A.    Johnny Camacho.

13       Q.    When was that?

14       A.    Just recently.

15       Q.    Who made that decision?

16       A.    Whoever was in charge now.

17       Q.    Who's in charge now?

18       A.    I'm trying to think of when his promotion

19   was.  I believe it was -- I think Commissioner Kelly

20   was the commissioner at the time and the mayor,

21   Richard Thomas.

22       Q.    Anyone else?

23       A.    Michael Plunkett [ph.].

24       Q.    Who made that decision?


800.DAL.8779
dalcoreporting.com

1          A.    Same time frame.  So it would have been

2    Mayor Thomas.

3          Q.    Anyone else?

4          A.    Paul Roland.  That was a while ago though.

5    I'm sorry.  I should have mentioned that one

6    earlier.

7          Q.    And what year was that, approximately?

8          A.    2009 or 2010.

9          Q.    Anyone else?

10         A.    Richard Arzon.

11         Q.    Can you spell that?

12         A.    A-R-Z-O-N.

13         Q.    And what's the time frame?

14         A.    Richard Arzon was just recently, under

15    Mayor Thomas.

16         Q.    And why do you feel that Richard Arzon

17    should not have been promoted?

18         A.    He's never worked in the detective

19    division or done investigations.

20         Q.    Same with Paul Roland?

21         A.    Paul did work in the detective division,

22    but the time he was given the detective shield, he

23    was our property clerk.

24         Q.    Officer Plunkett?



96                SERGEANT ROBERT WUTTKE

1        A.    Never worked in the directive division or

2   done investigations.

3        Q.    Officer Camacho?

4        A.    Same thing.

5        Q.    Anybody else?

6        A.    I think that's it.

7        Q.    Richard Arzon is Caucasian?

8        A.    Hispanic.

9        Q.    Paul Roland?

10       A.    White.

11       Q.    Plunkett?

12       A.    White.

13       Q.    Camacho?

14       A.    Is Hispanic.

15       Q.    Kelly Marlow?

16       A.    White.

17       Q.    Gene Jerome?

18       A.    Black.

19       Q.    Now, the flip-side.  Are you aware of any

20  individuals who worked in the detective bureau, did

21  investigations or who worked there for at least 18

22  months who were not awarded, other than yourself,

23  the detective shield?

24       A.    Yes.



1      Q.    Who?

2      A.    Detective Edward McCue.

3      Q.    Anyone else?

4      A.    I'm trying to think of other people.  You

5    just got to bear with me.  It's a lot of names to go

6    through in my head.

7      Q.    Take your time.

8      A.    Detective Antinini.

9      Q.    When did he get his shield?  You said

10   "detective."  So ultimately, he was awarded --

11     A.    The same day that I got my shield.

12     Q.    Okay.  When was that?

13     A.    Beginning of January, 2014.

14         MR. SWEENEY:  So this is a category --

15         just so I'm clear, this is a category of

16         officers that either didn't get a detective

17         shield or didn't get it after 18 months?

18         THE WITNESS:  That's how I understood the

19         question.

20         MS. BELLANTONI:  Yes.  Yup.

21     Q.    Did Officer McCue eventually get the

22   shield?

23     A.    Yes, sir.  Yes, ma'am.  I'm sorry.  I

24   apologize.



1        Q.    That's all right.  And when was that?

2        A.    I don't remember.

3        Q.    Okay.  And anyone else?

4        A.    Wendel Griffin.  Or Wendel.  I'm not

5    really a hundred percent sure how to pronounce his

6    name.

7        Q.    Have you been criticized for not

8    pronouncing his name correctly?

9        A.    No, ma'am, because I never pronounce his

10   first name.

11       Q.    Did he eventually get his shield?

12       A.    Yes, ma'am.

13       Q.    And when was that, do you know?

14       A.    Same time I did, January of 2014.

15       Q.    Who made the decision to award the shields

16   in January of 2014?

17       A.    Who was in charge then?  Mayor Davis was

18   the mayor.  Commissioner Raynor was the

19   commissioner.

20       Q.    But do you know who, I guess, initiated

21   the process and under what circumstances --

22       A.    No, I'm not aware.  I was told one day by

23   Captain Adinaro that, you have done more than 18

24   months.  Thursday, you are getting your shield.



1          Q.    Anybody else?

2          A.    Off the top of my head, I can't think of

3    anybody else.

4          Q.    Other than yourself, Detective Antinini

5    and Detective Griffin, in January of 2014, did

6    anyone else receive their detective shield?

7          A.    Yes, ma'am.

8          Q.    And who would that be?

9          A.    I know Montega Jones was there.

10         Q.    Is she the wife of David Jones?

11         A.    Yes, ma'am.

12         Q.    And had she worked in the detective

13   division?

14         A.    Yes, ma'am.

15         Q.    Do you know for how long?

16         A.    No, ma'am.

17         Q.    Anyone else?

18         A.    There was somebody else.  And for the life

19   of me, I can't remember who it was.

20         Q.    Was it another female officer?

21         A.    I can't remember.

22         Q.    Do you know whether that individual ever

23   worked in the detective division -- that individual

24   ever worked or served in the detective division?



1        A.    Yes, ma'am.

2        Q.    Okay.  And where were they assigned; do

3   you know?

4        A.    I don't know, because I can't remember who

5   it was.  I want to say it was now detective Jamie

6   McKinney, but I'm not a hundred percent sure.

7        Q.    At the time that you and Detective

8   Antinini, Detective Griffin, Detective Jones, and

9   possibly Detective McKinney, were awarded gold

10  shields, were all of you -- or were each of these

11  individuals presently assigned to and working in the

12  detective division?

13       A.    Yes, ma'am.

14       Q.    Is it your understanding that, in order to

15  receive a gold shield for individuals to have worked

16  for at least 18 months in an investigative capacity

17  in the detective division, that, at the time that

18  they were awarded the gold shield, that they have to

19  presently, you know, under the policy and procedure

20  of the department -- have to presently be working in

21  the detective division?

22       A.    I don't know.

23       Q.    Or detective capacity?

24       A.    I don't know.



```
 1        Q.   All right.  So after you were assigned in
 2   May or June of 2014 to the major case squad, how
 3   long did you spend in that squad?
 4        A.   Four months.  Five months.
 5        Q.   And then where were you assigned?
 6        A.   Back to general investigations.
 7        Q.   And why?  Under what circumstances?
 8        A.   They were short in general investigations,
 9   and I was the junior officer, junior person in the
10   detective division that was assigned to the major
11   case squad.
12        Q.   And how long did you spend in general
13   investigations?
14        A.   Until February of 2014.
15        Q.   And by that time, you had already received
16   your shield?
17        A.   I received my shield in January of 2014.
18        Q.   And then where were you assigned in
19   February of 2014?
20        A.   Back to patrol.
21        Q.   In what capacity?
22        A.   Sergeant.
23        Q.   Who made that decision?
24        A.   Mayor Davis was the mayor.  Commissioner
```



1    Raynor was the commissioner.

2        Q.   Okay.  But do you know who made the

3    decision, who made the recommendation that you be

4    reassigned to patrol?

5        A.   That's -- in my experience, this is the

6    usual protocol when you get promoted to sergeant.

7        Q.   Oh, that's when you made your promotion?

8        A.   I got promoted in February of 2014.

9        Q.   Okay.  A month after you got your shield?

10       A.   Yes, ma'am.

11       Q.   Were you already on the list at the point

12   in time that you received your detective shield?

13       A.   Yes, ma'am.

14       Q.   And how long did you remain as a patrol

15   sergeant?

16       A.   Still am, ma'am.

17       Q.   Okay.  So from February 2014 to the

18   present?

19       A.   Yes, ma'am.

20   ██ ████████ █ █████████████ █

██ █████████████ ██ █████████ ███████████

██ ███████████████ ████████████ ████████

██ ████████████ ██████████ ██████

██ ██████



 1   ▮      ▮▮▮▮▮▮▮▮▮▮▮▮      ▮▮▮

 2            MS. BELLANTONI:   Okay.   So this is

 3   confidential.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24





1   ******************START CONFIDENTIAL******************



**SERGEANT ROBERT WUTTKE**

1











108                     **SERGEANT ROBERT WUTTKE**















1

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24        ********************END CONFIDENTIAL******************



1        Q.    I'm going to turn your attention to your

2   supervision of Officer Bovell.

3        A.    Uh-huh.

4        Q.    So at some point in time, Officer Bovell

5   returned to patrol from the detective bureau;

6   correct?

7        A.    Yes.

8        Q.    Do you remember at what point in time that

9   was?

10       A.    No.

11       Q.    All right.  I'm going to show you what's

12   been marked as Plaintiff's Exhibit Number 3 -- 13,

13   which is Bates stamped number 0009, which is a

14   personnel order.  Does that refresh your

15   recollection as to when Officer Bovell was

16   transferred to patrol?

17       A.    Yeah.  January 1st, 2014.

18       Q.    And at that time, was he assigned to your

19   squad?

20       A.    No, ma'am.

21       Q.    Whose squad, if you can recall, was he

22   assigned to?

23       A.    I don't know.  I was still in the

24   detective division on January 1st of 2014.



1      Q.    Just -- okay.  So in February, when you

2   were promoted and went to the position of a patrol

3   sergeant, at that point in time, was Officer Bovell

4   assigned to your squad?

5      A.    We didn't have the same squad system as we

6   did when I was first a patrol sergeant.  I was in a

7   squad of myself, another sergeant, and lieutenant.

8   There was squads assigned to day tours, 4 to 12s,

9   midnights.  I worked a rotating shift.  So he was

10  not assigned to my squad.

11     Q.    Okay.  Did you have supervisory authority

12  over him at any point in time after he was

13  transferred back into patrol?

14     A.    Yes, ma'am.  After my transfer back.

15     Q.    After his transfer there, and you got

16  there after your promotion?

17     A.    Yes, ma'am.

18     Q.    So from that point in time until the time

19  that Officer Bovell was out on leave in and around

20  September of 2014, how often were your schedules

21  aligned?  In other words, what was your -- what was

22  the regularity of your supervision over Officer

23  Bovell?

24     A.    To the best of my recollection, it was



1   either one day or two days every three weeks.

2        Q.    Had you had any prior contact or

3   experience with Officer Bovell, either in a

4   professional or social context?

5        A.    Of course.

6        Q.    Okay.  Yes?

7        A.    Yes, ma'am.  I'm sorry.

8        Q.    Okay.  And what had been your interaction

9   with Officer Bovell?

10       A.    When I was in the detective division, he

11  was working narcotics.  So we would see each other

12  at work.  I'm sure there were times that either he

13  or I worked overtime or we could have both been

14  working overtime and ended up crossing paths.

15       Q.    Did you ever work together on any specific

16  assignments?

17       A.    Not that I can recall.

18       Q.    And when you said you worked in the

19  narcotics unit, was that the two solid years that

20  you were assigned there or a different point in

21  time?

22       A.    No.  I said he worked in narcotics.  I was

23  assigned to the detective division.  He was assigned

24  to narcotics, which is part of the detective



```
 1   division.
 2        Q.    Yes.   Okay.   So that's not -- so you were
 3   in the detective division, but not in the narcotics
 4   unit?
 5        A.    That's correct.
 6        Q.    Where were you assigned?
 7        A.    General investigations.
 8        Q.    And what was the time frame?
 9        A.    I was in general investigations from 2012
10   to 2000 -- middle of 2013 and then back again at the
11   end of 2013.
12        Q.    So was it during that time frame that you
13   were both working, at some point, in the detective
14   division?
15        A.    Yes.
16        Q.    Being in two different units, you had no
17   common investigations and no opportunity to work
18   with each other; correct?
19        A.    Correct.
20        Q.    Okay.   So at some point in time, you were
21   asked to conduct a performance evaluation on Officer
22   Bovell?
23        A.    Yes.
24        Q.    A yearly evaluation; correct?
```



1        A.   Yes, ma'am.

2        Q.   How often were those yearly evaluations

3    done -- that was silly.

4             At what point during the year are the

5    yearly evaluations typically conducted?

6        A.   April.

7        Q.   And before April of 2014, had you

8    evaluated any subordinates in the manner in which

9    you were evaluating Officer Bovell and others in

10   April of 2014?

11       A.   I may have done end-of-probation

12   evaluations the first time I was a supervisor in

13   2010, but annual personnel evaluation on an officer

14   that was not coming off probation that had been with

15   the department, I don't recall ever doing -- well,

16   that was the first set of evaluations I did.

17       Q.   Okay.  And when you are doing

18   end-of-probation evaluations, is it the case that

19   you are typically just making sure that the person

20   is competent for the position and hasn't deviated

21   from the policies and procedures significantly, such

22   that they shouldn't be recommended for termination?

23       A.   We use the exact same form.

24       Q.   Okay.



1        A.    So the structure is exactly the same.    But
2    it's just to -- I don't know the purpose of it,
3    aside from documentation that they have completed
4    their probation, and the supervisor is signing off
5    on it.
6        Q.    So if -- so as you sit here, you are not
7    sure whether you even conducted those evaluations in
8    2010?
9        A.    Yeah.    I don't know if I did.    I think I
10   did, but I am not going to say I did a hundred
11   percent.
12       Q.    And if you did, at the most, the
13   individual or individuals that you evaluated, you
14   would have been supervising for two months?
15       A.    Yes, ma'am.
16       Q.    Who would -- who, in 2010, assigned you
17   the tasks of evaluating individuals that you, at
18   most, had supervised for a period of two months?
19       A.    End-of-probation evaluations have to be
20   done by the supervisor that is currently assigned as
21   the squad supervisor.
22       Q.    Is that a written policy?
23       A.    I don't know.
24       Q.    Is that a policy nonetheless, as you



1    understand it?

2         A.    Uh-huh.

3         Q.    How long is probationary period?

4         A.    18 months.

5         Q.    And when you are conducting those

6    investigations, did you seek input from the

7    individual who supervised them during the preceding

8    16 months?

9         A.    Yes.

10        Q.    And do you recall who that was in 2010?

11        A.    No.

12        Q.    Okay.  So in April of 2014, you conducted

13   the annual evaluations for the people that you were

14   supervising in patrol; correct?

15        A.    Yes, ma'am.

16        Q.    Who -- who were they?  Who were you

17   evaluating in April of 2014?

18        A.    I would have to see a list to give you a

19   hundred percent of the names.  I know Police Officer

20   Pacino is on there, Police Officer O'Rourke, Police

21   Officer Bovell, Police Officer Williams.  I know

22   there's more.  I can't remember who else is on the

23   list.  I would need to see the list.

24        Q.    Who was those individuals' supervisor



1    prior to your moving into the position of patrol

2    sergeant?

3        A.    I don't know.

4        Q.    Had you supervised each of the individuals

5    that you named from February 2014 to April of 2014?

6        A.    At some point or another, yes.

7        Q.    Other than Officer Bovell, were any of the

8    other officers -- had any of the others -- had any

9    of the other officers transferred into the patrol

10   division from another division during the time

11   period immediately preceding their evaluation?

12       A.    I don't believe so.

13       Q.    So they had all been pretty much in the

14   patrol division for a significant amount of time

15   before their evaluation was conducted?

16       A.    I believe so, yes.

17       Q.    Were any of them probationary evaluations?

18       A.    The set that I did in April, no.

19       Q.    Right.  And so we talked about policy and

20   procedure about probationary evaluations and how

21   whoever was supervising those individuals must be

22   the one to do that evaluation.  Is there a similar

23   policy for patrol sergeant, that the individual --

24   individuals that you are supervising in April of

800.DAL.8779
dalcoreporting.com

DALCO

1   2014 must be evaluated by you, because, at that

2   point in time, you are their supervisor?

3       A.   Yes, ma'am.

4       Q.   And how many other patrol sergeants were

5   there in April of 2014?

6       A.   Seven to nine.  I'm not a hundred percent

7   sure.

8       Q.   And is there any written policy that you

9   are aware of that requires that the individual who

10  is the patrol supervisor in April of 2014 must be

11  the individual who performs the evaluation?

12      A.   A written --

13      Q.   Policy or procedure.

14      A.   There's an order that comes out every year

15  in the middle of March that all officers are to

16  complete the annual evaluation on whoever is under

17  their command.

18      Q.   And prior to performing Officer Bovell's

19  evaluation in April of 2014, did you seek out any

20  other supervisor who may have supervised Officer

21  Bovell for the preceding year to gain perspective on

22  his actual performance, since you had only

23  supervised him for February, March, and a portion of

24  April and, to that extent, one to two days every



1  three weeks?

2      A.   No.

3      Q.   Did you feel comfortable evaluating

4  Officer Bovell's performance when you had only

5  supervised him for two or two-and-a-half months and

6  only to the extent that you supervised him one to

7  two days every three weeks?

8      A.   I've never felt comfortable about doing

9  the evaluations the way they are being done

10 currently, because, as supervisors, we don't have

11 the day-to-day interaction with the police officers

12 as we used to have when we were in the old squad

13 system.

14     Q.   When did that squad system -- when did

15 that change over into the present system?

16     A.   January of 2014.

17     Q.   And do you know whose decision that was,

18 or --

19     A.   I believe it was an agreement between the

20 PBA and the department and the city.

21     Q.   Did you express any concern, or did you

22 make any complaint to any of your supervisors about

23 having to evaluate the performance of an individual

24 that you hadn't really supervised substantially at



1    the time that you had to evaluate him?

2         A.    Official complaints or --

3         Q.    No, anything.

4         A.    Of course.

5         Q.    Who did you complain to?

6         A.    I spoke to my partner, who was another

7    sergeant.

8         Q.    Who's that?

9         A.    Robert Scott.

10        Q.    Was he in the same position?

11        A.    Yes.  Patrol supervisor as well.

12        Q.    And was he also responsible for doing an

13   evaluation of an individual or individuals that he

14   had not supervised for longer than roughly two or

15   three months?

16        A.    He was in the position that he was doing

17   evaluations on people that he may have seen once or

18   twice every three weeks.

19        Q.    And what criteria -- well, let me just

20   back up.  Did you receive any training or

21   instruction or mentoring, whether formally or

22   informally, in connection with completing these

23   written evaluations or the criteria to use when

24   evaluating your subordinates?



**SERGEANT ROBERT WUTTKE**                                     123

1      A.    Yes.

2      Q.    From whom?

3      A.    Lieutenant Gallagher.

4      Q.    And when was that?

5      A.    End of March, beginning of April 2014.

6      Q.    Because -- was that because you sought

7  that out, or it was offered to all the patrol

8  sergeants?

9      A.    No.  It was because I sought it out.

10      Q.    And what did he instruct you?

11      A.    He briefly explained what needed to be in

12  there, how to pull stats or how to have the stats

13  pulled, what to look for, and to be as generic and

14  brief as possible, because the way the evaluation is

15  being done didn't really make much sense to anybody.

16      Q.    And who ultimately reviewed those

17  evaluations?

18      A.    I don't know who ultimately reviewed them.

19  I finished -- after I completed them, Lieutenant

20  Gallagher reviewed them.

21      Q.    And, to your knowledge, did those

22  evaluations have any bearing on raises or promotions

23  or reassignments to other squads or divisions?

24      A.    To my knowledge, I don't believe so.



1          Q.    Then what's -- what was the purpose of
2     the -- as far as you know, having worked in the
3     department, what is the purpose of the performance
4     evaluations?
5          A.    To keep the accredited agency status.
6          Q.    Through what agency?
7          A.    DCJS.
8          Q.    And do you know whether those evaluations
9     are provided to DCJS?
10         A.    I don't know.  I know it's a DCJS
11    requirement for an accredited agency to make sure
12    that there's yearly evaluations done on all the
13    members.
14         Q.    Yearly evaluations or qualifications?
15         A.    Yearly evaluations.
16         Q.    Is it also a requirement that
17    qualifications be conducted on a yearly basis?
18         A.    What type of qualifications?
19         Q.    Firearm qualifications, any kind of
20    training --
21         A.    I believe firearm qualification is a
22    yearly requirement.
23         Q.    What about physical endurance and --
24         A.    No, ma'am.



1        Q.    That's not a requirement?

2        A.    Not that I know of.

3        Q.    Was it ever a requirement?

4        A.    Not that I know of.

5        Q.    Who, if anyone, did you -- well,

6   withdrawn.

7              What criteria did you consider in your

8   evaluation of Officer Bovell?

9        A.    Sick time, summons productivity, arrest

10  productivity, and any complaints that I had heard

11  of, heard or investigated.

12       Q.    Formal complaints or informal complaints?

13       A.    Both.

14       Q.    And the criteria that you used, was that

15  criteria that had been provided to you by Lieutenant

16  Gallagher?

17       A.    Yes, ma'am.

18       Q.    Did you take into consideration any other

19  criteria that you did not discuss with Lieutenant

20  Gallagher?  In other words, maybe Lieutenant

21  Gallagher said, you know, you should consider sick

22  time and productivity, but you decided you were

23  going to add in, you know, complaints and whether

24  anyone was complaining about the individual.



**SERGEANT ROBERT WUTTKE**

 1        A.    No, ma'am.

 2        Q.    Okay.  So everything that you considered

 3   came from the direction of Lieutenant Gallagher?

 4        A.    The suggestion of Lieutenant Gallagher,

 5   yes.

 6        Q.    Okay.  With respect to sick time, what if

 7   any information did you have in connection with his

 8   evaluation?

 9        A.    I'm sorry.  I don't understand your

10   question.

11        Q.    So you said sick time was something that

12   you considered when you were conducting the

13   evaluation?

14        A.    Yes.

15        Q.    And were there any issues with respect to

16   Officer Bovell's sick time?

17        A.    I'm trying to think time frames.  You will

18   have to just bear with me for a second.  Personally,

19   I didn't believe there was an issue with his sick

20   time at any point.

21        Q.    Who did you speak to?  Or who spoke to

22   you?  Or what information did you receive?  And who

23   did you receive it from, if any, with respect to

24   Officer Bovell's sick time and possible disciplinary



1  action in connection with that?

2          MR. SWEENEY:  Objection as to the form,

3      but you can answer it.

4      A.   Can you clarify it?  There's a lot there.

5      Q.   You said you personally didn't believe

6  there was an issue with his sick time --

7      A.   Yes.

8      Q.   -- which leads me to think that someone

9  did think there was an issue.  Was there someone

10  else that did believe it was an issue?

11      A.   I don't believe that the issue was

12  directed towards Officer Bovell.

13      Q.   Well, irrespective of who it was directed

14  toward, where did it come from?

15      A.   Captain Hastings.

16      Q.   To you?

17      A.   To all the patrol supervisors.

18      Q.   In a meeting?

19      A.   In an email.

20      Q.   Do you still have a copy of that email?

21      A.   I do.

22          MS. BELLANTONI:  Okay.  If you can provide

23      it to Mr. Sweeney.

24          THE WITNESS:  Yes, ma'am.



1

2     DOCUMENT/INFORMATION REQUESTED:

3

4         Q.   So, in substance, what did the email say?

5         A.   All patrol supervisors are to monitor or

6     are to check the sick time of members under their

7     command and ensure compliance with the department's

8     chronic sick policy.

9         Q.   I'm not going to ask you to go from

10    memory.  So I'm going to show you what's been marked

11    as Plaintiff's Exhibit 18, which is Bates stamped

12    138 through 141.  And it's entitled, "Administrative

13    Guide, Chronic Absence Control, issued 1993, revised

14    2009."  Is that -- just take a look at the document.

15        A.   Yeah.

16        Q.   Is that, to your knowledge, the policy

17    that was in place at the time that you performed

18    Mr. Bovell's or Officer Bovell's evaluation?

19        A.   Yes, ma'am.

20        Q.   Were you given any directions from Captain

21    Hastings about how to or what steps to take in order

22    to identify individuals who were abusing sick time?

23        A.   I'm confused by your question.

24        Q.   So you were given an email that spoke to

