```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ---------------------------------------x
 3   MURASHEA "MIKE" BOVELL,

 4                           Plaintiff,

 5                                Case No. 7:15-cv-08494-CS
          -vs-
 6
     MOUNT VERNON CITY, COMMISSIONER TERRANCE
 7   RAYNOR, DEPUTY COMMISSIONER RICHARD BURKE,
     CAPTAIN MICHAEL GOLDMAN, SERGEANT ROBERT
 8   WUTTKE and LIEUTENANT PAUL NAWROCKI,

 9                           Defendants.

10   ---------------------------------------x

11                                United States Courthouse
                                  White Plains, NY
12                                March 29, 2018
                                  2:11 p.m.
13

14   Before:
               HONORABLE CATHY SEIBEL
15
                                  District Judge
16


17
     APPEARANCES
18
     THE BELLANTONI LAW FIRM, LLP
19   AMY L. BELLANTONI
     Attorneys for the Plaintiff
20
     COUGHLIN & GERHART, LLP
21   OLIVER N. BLAISE, III
     SHANNON E. KANE
22   Attorney for the Defendants

23

24

25
```

```
 1        THE CLERK:  All rise.  Bovell versus Mount Vernon.

 2        THE COURT:  Good afternoon, Ms. Bellantoni, Mr. Blaise, and

 3   Ms. Kane.  You all can have a seat.

 4        MR. BLAISE:  Good afternoon.

 5        MS. BELLATONI:  Good afternoon.

 6        THE COURT:  I have got a number of items on the agenda.

 7   You can sit.  Give me one second.

 8        Let me start with the motions in limine, and let me start

 9   with some questions of things that I am sure you guys

10   understand, but I don't quite understand.

11        Relating to Ms. Romano-Maric, I gather the plaintiff

12   started seeing her in January of 2017; is that right?

13        MS. BELLATONI:  Yes.

14        THE COURT:  And has he been seeing her regularly since that

15   time?

16        MS. BELLATONI:  Yes.

17        THE COURT:  Up to today?

18        MS. BELLATONI:  Yes.

19        THE COURT:  And did you have anything to do with that or

20   did he decide to see her and find her by himself?

21        MS. BELLATONI:  So he was referred by a staff member of

22   Dr.  Maddalo's office and another treater.

23        THE COURT:  So it's just coincidence that it was right

24   after the defendants asked about garden-variety emotional

25   damages?
```

1        MS. BELLATONI:  Yes.  Correct.  Uh-huh.  I didn't even know

2   he was seeing her until I was notified, and I believe I notified

3   Mr. Sweeney either that day or very soon thereafter.

4        THE COURT:  All right.  And she is continuing to treat him.

5   All right.  What was the other question I had?  What is it

6   exactly that you plan to have her testify about here, and

7   specifically, what opinion has she rendered regarding what

8   effect the retaliation that's going to be the subject of this

9   trial, the alleged retaliation, has had on your client?  I

10  didn't see anything in what I read where she said that the

11  retaliation, as opposed to anything else going on in his life,

12  had a particular effect on him.

13       So what is it that you will be trying to elicit from her?

14       MS. BELLATONI:  So her testimony has been that Officer

15  Bovell's experiences at work have caused him the symptomatology

16  that he's experienced:  The stress, anxiety, headaches,

17  disruptions with his sleep.  And so part of that is the

18  harassment and allegations of or, you know, reports to her of

19  corruption within the department and how the department has

20  treated him, which is not the subject of this case; and part of

21  it is the -- well, that's half of it.

22       The other half of it is the way he has been treated by the

23  department in connection with his benefits and having his

24  physical therapy benefits terminated and the result --

25       THE COURT:  Has she said that?  Half of it?

1        MS. BELLATONI:  I can't say.  No.  I am -- I am not

2   quantifying 50/50 because I don't know.

3        THE COURT:  Because isn't that the difficulty here?  You

4   know, I don't know how she could, honestly, or any professional

5   could say he is suffering, and X percent of it is the

6   defendants' fault.

7        So why should she get to -- or your client for that

8   matter -- I mean, it seems to me your client could say, it was

9   very upsetting to me when I didn't get my benefits or when I --

10  actually, he got them.  So when I got hassled about my benefits,

11  or when my benefits were delayed, but he is not going to be able

12  to say, you know, up -- but for that, I wouldn't have the stress

13  and anxiety and headaches and sleeplessness and all that, and

14  neither can she.

15       So what's the jury supposed to do with her testimony?

16       MS. BELLATONI:  His benefits were terminated to the extent

17  that the department is required to provide physical therapy.

18       THE COURT:  I understand he didn't get the physical

19  therapy --

20       MS. BELLATONI:  But then --

21       THE COURT:  -- right away, but I am asking a different

22  question.

23       How could she, or anyone, attribute any portion of his

24  emotional distress to the conduct that's at issue at this trial?

25  And if she can't, then what's the jury supposed to do with her

1  testimony?

2       MS. BELLATONI:  So when -- typically, when there is a

3  plaintiff that seeks mental health therapy or treatment, and

4  during the course of discovery the defense attorney will try to

5  explore all the other reasons why this person is suffering from

6  the symptomatology that they are suffering from to explain the

7  effects of -- that their, let's say, depression; that the

8  depression is not attributed to my client; it's actually

9  attributed to problems with a death in the family or marital

10 problems or financial problems.

11      Well, in this case, unfortunately for, I guess, everyone,

12 all of the problems that Officer Bovell was experiencing came

13 from the department.

14      THE COURT:  Well, in your hypothetical, the -- what's the

15 direct testimony?  Is the doctor getting up there and saying,

16 because of the defendant, the client is suffering emotional

17 distress, and then the defendant -- because of what the

18 defendant is accused of this in case, the defendant is suffering

19 from emotional distress -- the plaintiff is suffering from

20 emotional distress, and then the defendant gets up and says, no.

21 It's not that.  It's all of these other things?  Or is this, in

22 your hypothetical, the doctor saying, there were five things

23 that contributed to his distress, and what the defendant is

24 accused of is one of them?  Because that's all she can say here.

25      MS. BELLATONI:  Well, I think that would be -- I think that

 1   would be reasonable to say that -- and not to point out

 2   harassment or discrimination and the things that aren't part of

 3   this trial -- but to say, so that there is no one -- no

 4   prejudice to my client and letting the jury speculate what the

 5   other issues are, that there were work-related issues that he,

 6   you know, reported to her that contributed to his, you know,

 7   symptoms and what he was reporting to her and how he was

 8   feeling, and part of that -- so part of that was --

 9       THE COURT:  Why does it have to be work related?  Why can't

10   it just be:  There were a bunch of things, and this is -- and

11   the business with his disability was one them?  Why does she

12   have to say the others were work related?

13       MS. BELLATONI:  Because I think it would allow the jury to

14   speculate that he had something else going on in his life and

15   was generally there because of -- because, you know --

16       THE COURT:  Well, he did.

17       MS. BELLATONI:  -- of his personal problems.

18       THE COURT:  He did.

19       MS. BELLATONI:  But the personal problems all stemmed from

20   the job, so he --

21       THE COURT:  Yes, but none of the job stuff is actionable

22   except for this one thing.

23       MS. BELLATONI:  I understand.  So --

24       THE COURT:  It seems to me prejudice from the jury hearing

25   that everything that's bothering this guy is the defendants'

1   fault is -- greatly outweighs whatever probative value it may

2   have in terms of the jury knowing whatever other issues he is

3   having arose from work.  Everybody's got issues.  He could be in

4   a bad marriage.  He could have had a death in the family.  He

5   could have had any number of things.  He could have seen, you

6   know, his partner got shot on the street.

7        I don't think that if the witness were to say, you know,

8   his symptoms had several causes, and this was one of them, that

9   they are going to think any worse of the plaintiff, but if they

10  hear his symptoms had several causes all related to how the

11  defendant was treated at work or all related to work, they could

12  well -- that could well prejudice the defendants.

13       MS. BELLATONI:  If I may, Judge, so we are absolutely not

14  seeking to have any evidence where Ms. Maric would say that it

15  was all because of what the defendants did at work, but simply,

16  like you said, his partner could have been shot in front of him,

17  and that could have been something that he complained to her

18  about, so that would be work related.  So just a neutral -- a

19  neutral statement.

20       THE COURT:  What does this add that it's work related?

21       MS. BELLATONI:  That this is not --

22       THE COURT:  What's the probative value of the fact that the

23  other issues are also work related?

24       MS. BELLATONI:  The added value is if Officer Bovell takes

25  the stand and -- or if -- excuse me -- Ms. Maric takes the stand

1  and testifies that he came to see her about a variety of issues,

2  you know, that's really not -- that's not accurate.  He is not

3  the type of person that's going to go to a therapist and just

4  start talking about -- about everything that's going on in his

5  personal life.  The only thing that drove him to go there was

6  everything that had to do with work, and by just having a

7  neutral statement that they were work-related issues; that, you

8  know, maybe a limiting instruction to the jury that there is to

9  be no speculation about what those issues were, and you know,

10 that the only issue here is retaliation, and you know, I think a

11 curative instruction to the jury would alleviate any prejudice

12 to the defendant.

13      THE COURT:  Well, let me ask Mr. Blaise and Ms. Kane.

14      Why wouldn't something very vague like work-related be

15 accurate and still not prejudicial because we all know it's hard

16 being a cop, and the fact that a cop went and saw a therapist

17 because of work-related issues doesn't suggest that the

18 defendants were responsible for any of those issues.

19      MR. BLAISE:  I hate to sound terribly uncreative, but you

20 took a lot of my arguments.  That would be the concern that we

21 have is that her testimony would be watered down so much that it

22 could be open and perceived as open-ended; that there are these

23 other things that, well, we can't tell you about, or just know

24 that there were work-related issues, and that they could worry

25 what those -- wonder what those work-related issues are, and we

 1    are going to be trying very hard not to discuss any of that.

 2        And also the fact that she is basically going to testify

 3    that he was upset about something from work.  He can provide

 4    that testimony himself.  I don't see -- unless she can be really

 5    specific about what it is the claim that we are here to present

 6    to them, I don't see what relevance or help that provides.

 7        THE COURT:  Well, that sort of goes back to my first

 8    question, Ms. Bellantoni:  What's her testimony going to be?

 9        MS. BELLATONI:  Well, with respect to the retaliation

10    claim, Officer Bovell has now been out of work for a

11    substantially longer period of time than he would have been if

12    he had received the --

13        THE COURT:  But she can't testify about that.  She is not a

14    physical therapist.

15        MS. BELLATONI:  She can testify to what he's been reporting

16    to her, which is pain associated --

17        THE COURT:  Well, that's just bolstering, then.

18        What is she going to testify about that he can't testify

19    about or his wife can't testify about or the defendants can't

20    testify about?  We know he has been out of work.  We know he has

21    the injury.  I doubt he is going to be -- I doubt the defendants

22    are going to dispute those facts.

23        So what is she going to testify to as his treating

24    physician that isn't already in the record and undisputed?

25        MS. BELLATONI:  That she's provided therapy for him and

```
 1    tools for him to be able to reduce the amount of anxiety and
 2    stress that he has been going to -- or been going through, that
 3    he's reported; the symptoms that he has been experiencing, which
 4    is -- I apologize.  I don't -- that's -- isn't that what every
 5    therapist and treating psychiatrist or psychologist would
 6    testify to?  I don't know how -- that's what they are reporting.
 7         THE COURT:  I am just asking you what she is going to
 8    testify to, and your answer was she is going to say what he
 9    reported to her.
10         MS. BELLATONI:  Well --
11         THE COURT:  That's --
12         MS. BELLATONI:  Additionally, how she treated.  So no, it's
13    not just that.  Yes, Judge.  It's also how she has provided him
14    with therapy and using her -- the tools and techniques that
15    she's learned as a social worker and --
16         THE COURT:  What is she going to say about to the extent
17    she can or cannot attribute those issues to the alleged -- to
18    the delays and requests that were made by DMA?
19         MS. BELLATONI:  Again, it goes back to what the officer is
20    telling her about his physical --
21         THE COURT:  But I am asking:  What is she going to say on
22    that subject?
23         MS. BELLATONI:  She would say --
24         THE COURT:  What's the testimony you are proffering?
25         MS. BELLATONI:  Okay.  She would say that he -- that she
```

1   physical -- that she observes him in a lot of physical pain, and

2   that he has reported to her that it's part of the retaliation he

3   has faced from the department.

4        THE COURT:  But what is she going to say on how much of his

5   anxiety and how much of his symptoms can be attributed to the

6   misconduct alleged here as opposed to other things?

7        MS. BELLATONI:  You are looking for a percentage, then.

8        THE COURT:  I assume she can't.

9        MS. BELLATONI:  I haven't asked.

10       THE COURT:  That's what I am looking for.

11       MS. BELLATONI:  Yes.  No.  I haven't asked her what

12   percentage.

13       THE COURT:  I assume she can't, and I assume -- and that's

14   what I wanted to know:  What are you proposing to ask her on

15   this subject?  Because she is going to -- it seems to me, she is

16   going to come in and say, he suffers from anxiety and whatever

17   other symptoms he suffers from, and this is based on a bunch of

18   things, and the way he was treated in connection with his

19   disability claim is one of them.  And I can't tell you how much

20   of it is that and how much of it is other things.  I am just

21   wondering how helpful that is to the jury.

22       I assume you don't plan to elicit this diagnosis of PTSD?

23   Am I wrong on that?

24       MS. BELLATONI:  I haven't really -- I haven't really -- I

25   have been thinking about that, but I haven't really made a

```
 1    decision on that.  I understand --

 2         THE COURT:  Well, she wouldn't say --

 3         MS. BELLATONI:  -- their position.

 4         THE COURT:  -- what happened with his disability is a

 5    trauma from which one gets PTSD, would she?

 6         MS. BELLATONI:  That's what her testimony has been, but --

 7         THE COURT:  She said what happened with his disability

 8    itself?

 9         MS. BELLATONI:  Oh, that only the retaliation part of it --

10         THE COURT:  Yes.

11         MS. BELLATONI:  -- in his disability?  No.  She has not

12    said that because we really haven't had that as an issue until

13    after the Court's decision.  So --

14         THE COURT:  Right.  Well, so this is your problem.  You say

15    you want to call this person, but you don't know what you are

16    going to ask her or what she is going to say.

17         MS. BELLATONI:  No.

18         THE COURT:  And it's very hard for me to know if it's

19    appropriate without knowing what you are going to ask her and

20    what she is going to say.

21         MS. BELLATONI:  Well, I would instruct her that the Court's

22    instructions are that because the other claims have been

23    dismissed, that she could only talk about the retaliation

24    portion of it and how that has affected her treatment and/or

25    diagnosis of Officer Bovell.
```

 1          THE COURT:  Right.  But we don't know what she is going to

 2     say on that subject.  That's the problem.  And you are calling

 3     her, and you can't tell me what she is going to say.

 4          All right.  Let me move on to just a couple of other

 5     questions.  Am I correct that the defendants plan to call both

 6     Goldman and Nawrocki, if I am saying his name right?

 7          MR. BLAISE:  Yes, Your Honor.

 8          THE COURT:  All right.  You plan to call them both.  And --

 9          MR. BLAISE:  Can I put a small caveat on that?

10          THE COURT:  Yes.

11          MR. BLAISE:  If we get to our case-in-chief, if we needed

12     to, yes, we will call them.

13          THE COURT:  Okay.  And the other question I had is

14     regarding the late-produced records, which the defendants are

15     not going to offer.

16          How are you planning to use them, if at all,

17     Ms. Bellantoni?

18          MS. BELLATONI:  For -- they are not on my exhibit list, so

19     it would just be in the course of cross-examination.

20          THE COURT:  All right.  All right.  Now let's go through

21     the motions starting with the defendants.

22          Defendant wants to preclude any evidence relating to the

23     dismissed claims apart from what might be necessary in Ms.

24     Romano-Maric's testimony.  The plaintiff is not objecting.  The

25     only remaining claim is that the city, through DMA, retaliated

```
 1    against the plaintiff for filing the EEOC charge and the
 2    supplemental materials; any proposed testimony relating to the
 3    dismissed claims is either irrelevant or unduly confusing.  The
 4    L-3 Communications versus OSI, 2006 Westlaw 988143 at page 2
 5    S.D.N.Y. April 13th.
 6          So all of the allegations regarding discrimination and
 7    retaliation that took place before mid-January of 2015, before
 8    DNA came into the picture, is irrelevant under 401 because it
 9    doesn't have a tendency to make a fact in issue more or less
10    probable than it would be without the evidence, and
11    generalizations about, you know, needing to provide the full
12    picture are unhelpful because the full picture isn't relevant;
13    and further, because the irrelevant allegations are of
14    wrongdoing by others employed by the defendant, it would be
15    highly prejudicial.  So evidence relating to the dismissed
16    claims is going to be inadmissible under 401 and 403 with the
17    caveats that I will get to in a second regarding Ms. Romano-
18    Maric.
19          To the extent the parties need to address whether
20    plaintiff's emotional distress may have causes other than the
21    defendants' alleged retaliation, when they discuss those with --
22    at least with Mr. Bovell and with Ms. Romano-Maric, they need to
23    refer to quote, "Other issues," unquote or quote, "Other
24    experiences," unquote, without stating or implying that they
25    relate to discrimination or the like.
```

1       Leaving the question of whether it can be said that they

2   arose at work; it seems to me the only relevance of the fact

3   that it arose at work as opposed to arising in life in general

4   would be that the jury -- I guess the argument Ms. Bellantoni

5   was trying to make is that the jury would think he was weak or

6   somehow not stable if he needed help because of issues in his

7   life, whereas if he needed help because of issues in his work,

8   that would be more admirable.  That's a pretty old-fashioned

9   view of people who go into therapy, I think.  It doesn't mean

10  people don't have it.

11      If -- and I am thinking out loud -- if the plaintiff and

12  the doctor are allowed to say that the reasons he -- the other

13  reasons he went to see her had to do with issues he experienced

14  at work, I would have to tell the jury, those issues are not

15  anything that the police department or the city are liable for,

16  and that they shouldn't speculate on what they were.  And, of

17  course, they will speculate probably, but they could speculate

18  that it's -- you know, he was in a shootout or he has a partner

19  he doesn't get along with or he has -- you know, his wife is

20  upset because he works an overnight shift or who knows; but I

21  think that I will allow him and Dr. Romano to say the other

22  issues were work related, but I will tell the jury that to the

23  extent there were other issues related to work, it's not any --

24  anything that the defendants or the police department are liable

25  for, and they shouldn't speculate on what those issues were, and

1    I think that protects both sides.

2         The defendants next want Dr. Romano-Maric from being

3    precluded from testifying at all, either under the discovery

4    rules or under Daubert.  The defendants argue she is not a

5    treating doctor because the plaintiff only started seeing her

6    after the case began, and suspiciously after they attempted to

7    confirm that the plaintiff was seeking only garden-variety

8    emotional damages; and they further say that she used the old

9    DSM in diagnosing the plaintiff; that she doesn't really use the

10   diagnosis in her work; that she essentially made up a definition

11   of trauma that's contrary to what her profession -- how her

12   profession defines it, and that she didn't do enough homework

13   before diagnosing him, and they argue that her notes shouldn't

14   come in.

15        Plaintiff argues she is a treating doctor so a written

16   report wasn't required, and the defendants know what she is

17   going to say, and that her methodology passes muster and

18   plaintiff is not going to offer her notes.

19        We have already discussed whether she is going to be

20   allowed to testify regarding instances of discrimination and

21   retaliation other than the one that's the subject of this trial,

22   and the answer to that is no.

23        The -- with respect to the discovery issue, Rule 26(a)(2)

24   requires a written report for a retained expert, but a treating

25   physician is not required to provide such a report.  Zanowic

```
 1    versus Ashcroft, 2002 Westlaw 373229 at March at page 2,

 2    S.D.N.Y. 2002.  See Spencer versus International Shops, 211

 3    Westlaw 4383046 at page 2, E.D.N.Y., September 20, 2011.

 4         Social workers, contrary to defendants' argument, have been

 5    held to be quote, unquote "treating physicians" for purposes of

 6    Rule 26.  See, for example, Pitterman versus General Motors,

 7    2016 Westlaw 2892537 at page 2, District of Connecticut, May 17,

 8    2016.

 9         So the fact that she is not a physician, she still gets

10    treated like one for purposes of Rule 26.  Whether somebody is a

11    treater or a consultant-slash-expert turns on for why the

12    patient saw the doctor, whether for treatment or testimony.

13    That's Zanowic at page 2.  Courts consider factors such as why

14    the plaintiff saw the doctor, the reason for the referral, how

15    often the doctor was consulted, whether medication was

16    prescribed, the time spent treating the patient and whether

17    there is a continuing relationship.  Ali versus Connick, 2016

18    Westlaw 3002403 at page 9, E.D.N.Y., May 23rd, 2016.

19         Seems here, based on the representations of counsel, the

20    plaintiff saw the doctor of his own volition because he wanted

21    the help.  He wasn't referred by his lawyer.  He was referred by

22    his medical doctor.  He's got an ongoing therapeutic

23    relationship with her.  They have seen each other regularly over

24    a year now, and that's a continuing relationship, so seems to me

25    she should be considered a treating doctor exempt from expert
```

1   disclosure under Rule 26.

2       Although she wasn't required to provide a written expert

3   report, under 26(a)(2)(B), a party seeking to use a treating

4   physician still must disclose more than just the identity.  The

5   party must disclose the subject matter which the witness is

6   expected to provide an opinion and a summary of the facts and

7   opinions to which the witness is expected to testify.  See

8   Barack versus American Honda Motor Company, 293 F.R.D. 106 at

9   109, District of Connecticut 2013, and Rule 26(a)(2)(C).

10      Here plaintiff only said that Ms. Romano-Maric was going to

11  testify about plaintiff's care and treatment as related to PTSD.

12  That's very general, but in no way includes a summary of the

13  facts and opinions to which the witness is expected to testify.

14  That's Barack at 111.

15      Under Rule 37, a party that fails to disclose under Rule 26

16  can't use that information unless there is substantial

17  justification or the failure was harmless.  See Rule 37(c)(1),

18  Bedasi versus Mr. Z Towing, 27 Westlaw 7839436 at page 2,

19  E.D.N.Y. April 29, 2016.  A failure to disclose witness

20  information is harmless if the other party was well aware of the

21  identity of the undisclosed witness and the scope of their

22  knowledge well before trial.  Fleet Capital versus Yamaha, 2002

23  Westlaw 31108380 at page 2, S.D.N.Y., September 23, 2002.  The

24  purpose of the rule is to prevent sandbagging the other side

25  with new evidence.  Marvel versus Kirby, 777 F.Supp 2d, 720 at

1   727.  S.D.N.Y. 2011.  Affirmed in part and vacated in part on

2   other grounds, 726 F.3d 119.

3        Here any failure to provide a summary of Ms. Romano-Maric's

4   testimony in the Rule 26 disclosures is harmless because, as

5   defendant concedes, it has some understanding of Ms. Maric's

6   opinions because it's reviewed her handwritten notes and taken

7   her deposition.  So I am not going to preclude her from

8   testifying due to plaintiff's failure to comply with Rule

9   26(a)(2)(C), which is not to say, Ms. Bellantoni, that you can

10  do this in other cases.

11       The next question is whether the testimony passes muster

12  under Daubert.  The plaintiff states she will be providing

13  expert opinion.  Daubert's reliability requirements apply even

14  though she is a treating doctor, Green versus McAllister

15  Brothers, 2005 Westlaw 742624 at pages 10 to 11, S.D.N.Y.

16  March 25, 2005.

17       Daubert enumerated a list of factors, which although not

18  constituting a definitive checklist or test, "A district court

19  might consider in evaluating whether a proffered expert opinion

20  has the required indicia of scientific reliability, including

21  whether the theory or technique had been or could be tested,

22  whether it had been subjected to peer review, its error rate and

23  its degree of acceptance within the relevant scientific

24  community."  That's Daubert 509 U.S. 593 to 94.

25       And General Electric versus Joiner, 522 U.S. 136 at 46

1  says, "Nothing in either Daubert or the Rules of Evidence

2  requires a district court to admit opinion evidence that is

3  connected to existing data only by the ipse dixit of the

4  expert."

5       The Daubert factors may or may not be pertinent in

6  assessing reliability depending on the nature of the issue, the

7  expert's particular expertise, and the subject of the testimony.

8  That's Kumho Tire, 526 U.S. 137 at 150.  Expert testimony can be

9  based on experience alone or in conjunction with other

10 knowledge, skill and training or education.  That's from the

11 Advisory Committee note 702.

12      It goes on to say that, "In certain fields, experience is

13 the predominant, if not sole, basis for a great deal of reliable

14 expert testimony."  And Kuhmo Tire intimates the same at 156.

15      I first have to determine whether the witness is qualified

16 as an expert on a particular matter and then whether the opinion

17 is reliable, and then whether it will help the trier of fact.

18 Although expert testimony can be very persuasive, see Nimely

19 versus City of New York, 414 F.3d 381 at 397, it's still

20 admissible if it's relevant and helpful.  By definition, expert

21 testimony that usurps either the role of the judge or the jury

22 is not helpful, but rather undertakes to tell the jury what

23 result to reach.  See U.S. versus Bilzerian, 926 F.2d 1285 and

24 1294, and U.S. against Duncan, 42 F.3d 97 at 101.

25      Here Ms. Romano-Maric is qualified.  She is a licensed

 1    social worker.  She has a master's degree.  She's been working
 2    in the field since 2004.  She's completed all the education
 3    requirements and attended specialized training.  The fact that
 4    she was quote, "Not big on diagnosis," unquote -- that's from
 5    her deposition -- doesn't make her unqualified to testify as an
 6    expert, but I am going to talk in a moment about that diagnosis.
 7    So I find that she is qualified.
 8        The defendants make three primary arguments as to why her
 9    methodology was inadequate to support her conclusions regarding
10    the PTSD diagnosis and its underlying causes.  One, that she
11    relied on the old version of the DSM; two, that she relied on
12    her own definition of trauma, which is idiosyncratic, and
13    doesn't comport with the definition in the scientific community;
14    and third, that she didn't do a differential diagnosis.
15        Plaintiff says that this all goes to weight, not
16    admissibility.  You know, the testimony was a little unclear
17    regarding what Ms. Romano-Maric referred to in reaching her PTSD
18    diagnosis.  She said she used a book that was in her office.
19    She thought it was the DSM-IV.  It might have been V.  She --
20    defendant is not arguing that her methodology, which is
21    essentially comparing what the plaintiff's experiencing to the
22    DSM to determine a diagnosis is not an approved methodology in
23    the field.  The problem is what she compared her patient's
24    symptoms to is not the accepted definition in the field.
25        The fact that she didn't review any of his medical records

```
 1    or speak with his treating doctors, co-workers, and family
 2    members, I think if that were the only issue, it would go to
 3    weight, not to admissibility.
 4         But there are other problems.  She used a definition of
 5    trauma other than what's in the DSM-V.  The DSM-V is very clear
 6    that the trauma that -- on which a PTSD diagnosis is based has
 7    to relate to death or serious violence, either experienced or
 8    observed or learned of on the part of a family member.  We don't
 9    have any of that here.  So her diagnosis would not be accepted
10    in the relevant community and would not pass peer review.
11         Further, the witness said that she came up with this
12    diagnosis, not for purposes of treating the defendant, but for
13    litigation.  She said she came up with it because the lawyers
14    asked for it, and that she didn't come up with it or need it for
15    her treatment.  She said that the plaintiff needed the cognitive
16    behavioral therapy or the dialectical behavioral therapy that
17    she was doing with him regardless of what his diagnosis was.  So
18    the diagnosis lacks the reliability it would have if it was
19    actually something that the doctor came up with for purposes of
20    treatment.  The -- you know, a treating doctor who needs to come
21    up with a diagnosis to guide his or her treatment plan has every
22    incentive to come up with the right one, and it's got some
23    reliability because it's actually used in the day-to-day
24    treatment.
25         Here the doctor had no need to come up with this diagnose.
```

 1   It wasn't necessary for her treatment, so it isn't like ordinary

 2   treating doctor testimony about causation and less reliable for

 3   that reason because it's nothing she relied on in treating him.

 4        So it's not a determination she made quote, "In the course

 5   of providing treatment," unquote.  Santoro versus Signature

 6   Construction, 2002 Westlaw 31059292 at page 4, S.D.N.Y.

 7   September 16, 2002.

 8        And to the extent it's expert testimony, it was -- it was

 9   undisclosed, although I think that it's harmless, but the

10   problem is it's not -- it's not reliable because it doesn't meet

11   the criteria that the profession has set for the -- for the

12   diagnosis.

13        You know, there is a simple methodology.  You compare the

14   patient's experience to what the DSM says.  So it's not her

15   methodology that's the problem.  It's the fact that she did it

16   wrong.  She checked a box that there was no basis to check, and

17   we don't even know what she would say about that diagnosis that

18   would be at all helpful to the jury.  We don't know what her

19   testimony on the subject would be because nobody has asked her.

20   Ms. Bellantoni doesn't proffer anything she plans to ask about

21   that diagnosis; and, you know, without a better proffer as to

22   how her testimony about the diagnosis is going to advance the

23   ball or some explanation as to how her diagnosis can be reliable

24   when it doesn't apply the fairly black-and-white test of what

25   constitutes trauma in the DSM-V, at this point, I don't see how

1    it passes Daubert, but even if it did, it doesn't seem to have

2    much probative value at all.  The witness can testify about the

3    symptoms that the plaintiff displays, but the fact that she has

4    labeled it PTSD, I don't see what it really adds, and so under

5    403, I would preclude it because it would -- the diagnosis

6    itself would have little probative value, and the prejudicial

7    effect would be high in that, you know, the jury is going to

8    hear that there is this terrible diagnosis, and it's going to be

9    hard for the jury to parse out what is and is not the

10   responsibility of the defendants, and it seems to me it adds

11   almost nothing and creates a lot of confusion and wastes a lot

12   of time.

13       The fact that she didn't conduct a differential diagnosis

14   alone I don't think would justify precluding the testimony, but

15   these other problems do, particularly given the absence of real

16   probative value of the diagnosis itself.

17       The -- just give me one second.  I mean, the biggest

18   problem with this testimony is that the witness is going to say

19   that the defendant did have other experiences in his work life

20   apart from the retaliation that's going to be the subject of

21   this trial that have led to his symptomatology.

22       She has offered no opinion as to how the specific acts of

23   retaliation alleged in this case contributed to the plaintiff's

24   mental condition or the extent to which it did.  She hasn't

25   provided any testimony or opinion differentiating the non-

1   actionable causes of plaintiff's distress from the potentially

2   actionable ones, and I don't know that any responsible treater

3   could do that.

4        The -- so I think that given that it's the plaintiff who

5   bears the burden of showing that the proposed testimony is

6   relevant and admissible, the -- and hasn't shown that what

7   really -- what the proposed testimony regarding PTSD is or what

8   its relevance is, I am not going to let it in.  It wasn't part

9   of the witness's treatment.  It fails under the DSM criteria,

10  and it just wouldn't be helpful.

11       She will be allowed to testify as to what symptoms he had

12  and what treatment she gave.  She will have to say, I gather,

13  that he had several issues that were causing him distress; that

14  the way he was treated by the department in connection with his

15  disability claim was but one of them.  She can say that the

16  others were work-related but she cannot intimate or imply that

17  any of them arose from any wrongful conduct on the part of the

18  defendant.

19       And you are going to have to spend some time with her,

20  Ms. Bellantoni, to make sure she understands those parameters

21  because I don't want things slipping out, and I don't want to

22  have to ball out a witness in front of the jury.  And the same

23  with your client.  You are going to have to spend a lot of time

24  making sure he understands the parameters.

25       Now, if the defendants open the door, that's another story,

1    but right now all that's going to happen, all that the jury is

2    going to know is that he had a number of issues in his work life

3    that were causing him emotional distress, and how he was treated

4    after he applied for disability is one of them, and that the

5    others are not anything that the defendants are liable for, and

6    I would like to keep it that way.

7        The next motion has to do with medical records from

8    Dr. Debiec, D-E-B-I-E-C, and Dr. Bansal.  Defendant says, since

9    those doctors aren't testifying, the records are

10   unauthenticated.

11       Plaintiff says she can get them in with a 902(11)

12   certification with the certification these medical records would

13   fall under the hearsay exception for business records, but

14   902(11) does require certification by the custodian, and it also

15   requires that the proponent give the adverse party reasonable

16   written notice of the intent to offer the record and must make

17   the record and certification available for inspection so that

18   the party has a fair opportunity to challenge them.

19       So do you have those certifications in hand?

20       MS. BELLATONI:  I actually emailed the certification

21   language to Mr. Sweeney several weeks ago.

22       THE COURT:  Well, do you have the certifications?

23       MS. BELLATONI:  Certification in hand today?  No.

24       THE COURT:  Yes.

25       MS. BELLATONI:  I emailed -- no.  I emailed the

1    certification to Mr. Sweeney --

2          THE COURT:  But is it signed by the custodian?

3          MS. BELLATONI:  Oh, no.  I don't have them yet.  No,

4    everything is being subpoenaed to the Court.  So I don't have it

5    in hand, no.

6          THE COURT:  Well, you got to give -- let me look at the

7    rule and make sure I am right.  I think you need to make, not

8    only the records, but the certification available, certainly no

9    later than the morning of trial.  "Before the trial or hearing,

10   the proponent must give the adverse party reasonable written

11   notice of the intent to offer the record and must make the

12   record and certification available for inspection so that the

13   party has a fair opportunity to challenge them."

14         So I think you either need to have a witness here or you

15   need to give the certifications in advance.  So I don't care if

16   the documents show up here for trial.  If they don't come with a

17   certification or a witness, they are not coming in; but I don't

18   think there is going to be any real surprise about what the

19   certification says.  However, the defendants are entitled

20   theoretically to go out and try to interview the witness and see

21   if the certification is accurate.  I doubt they will do that.

22         But the certification should be turned over.  We are going

23   to be starting on Wednesday, so turn it over on Tuesday.

24         The next motion was to preclude evidence on economic

25   damages.  That's consented to.

 1      The next motion is that plaintiff shouldn't be allowed to

 2 offer Nawrocki and Goldman's depositions because they are here,

 3 and the plaintiff should have to call them, and she didn't -- he

 4 didn't list them as witnesses.  Let me just check that.

 5      MS. BELLATONI:  No.  They are not listed as witnesses.

 6      THE COURT:  So what would allow you to use their

 7 depositions in Rule 32?  I mean, they are alive and well

 8 available, so you have to -- as I read Rule 32 -- have to show

 9 -- you can't use it against a party, here the City of Mount

10 Vernon, unless the party was present or represented at the

11 deposition.  Check.  It is used to the extent it would be

12 admissible under the rules of evidence if the deponent were

13 present and testifying.  Check.  And the use is allowed by

14 Rule 32(a)(2) through (8).  That's where I don't think you check

15 the box.

16      The argument is, at least so far as I saw in the papers, is

17 that under 32(a)(3), these were depositions of the party or

18 someone who, when deposed, was the party's officer, director,

19 managing agent or designee under 30(b)(6) or 31(a)(4).

20      Neither of those gentlemen is a party right now.  So

21 32(a)(3) is only met if, when deposed, the officer was the

22 defendant's officer, director, managing agent or designee.  The

23 -- whether somebody is a -- well, it clearly was not an officer

24 or director of the defendant, neither of them.  Neither of them

25 was designated under Rule 30(b)(6) or 31(a)(4), so managing

1    agent is the only place the plaintiff has to hang his hat.

2        Courts in this circuit consider five factors in determining

3    whether an employee is a managing agent:  One, whether the

4    individual is invested with general powers allowing him to

5    exercise judgment and discretion in corporate matters; two,

6    whether the individual can be relied upon to give testimony at

7    his employer's request in response to the demands of the

8    examining party; three, whether any person or persons are

9    employed by the corporate employer in positions of higher

10   authority than the individual designated in the area regarding

11   which the information is sought by the examination; four, the

12   general responsibilities of the individual respecting the

13   matters involved in the litigation; and five, whether the

14   individual can be expected to identify with the interests of the

15   corporation.  Redd versus New York State Division of Parole, 923

16   F.Supp.2d. 393 at 409, E.D.N.Y. 2013.

17       I don't think Goldman and Nawrocki meet this definition or

18   meet these standards.  They are both officers with the police

19   department.  There are many individuals who are in a position of

20   higher authority with the city, such as the commissioner and the

21   mayor.  The city wouldn't have relied on them to give testimony

22   on its behalf at the time, considering he was a named defendant

23   at the time, and their interests may not have aligned; and there

24   is nothing suggesting that these individuals have discretion or

25   general powers in matters of the City of Mount Vernon.  They

1   have some discretion within the police department, but I don't
2   think a lieutenant and a captain are the equivalent of a member
3   of the C suite of a corporation, for example.  So I don't think
4   that their depositions are admissible in plaintiff's
5   case-in-chief, but plaintiff, notwithstanding the failure to
6   list them, will be allowed to call them live in his case.  If he
7   wants to do that, make sure you tell Mr. Blaise and Ms. Kane, so
8   that they can have the officers here.
9        Plaintiff's motions to preclude the late-produced document,
10  that's unopposed.  Plaintiff doesn't plan to use them except
11  perhaps on cross, so we don't have to worry about how the
12  plaintiff would authenticate them.
13       Both parties want some sort of instruction on 207-c.  They
14  differ as to what it should be.  I think it would be helpful in
15  probably toward the beginning of the case to give some sort of
16  instruction about what 207-c is.  I think the issue here is
17  going to be -- you will correct me if I am wrong -- that part of
18  the reason Mr. Bovell resisted the requests of DMA is because he
19  was under the belief that unless they were the subject of a
20  collective bargaining agreement, they were improper.
21       Now, based on my reading of the law, he is incorrect about
22  that, but he still may want to explain why he resisted.  He may
23  want the jury to understand:  I wasn't resisting because I am a
24  jerk.  I was resisting because I thought these requests were
25  improper.  And that's okay, but the jury should understand that

 1    a request is not improper just because it hasn't been bargained

 2    for.

 3          The case law is pretty clear that the city can sort of fill

 4    in the blanks when there is no bargaining on the subject, but

 5    there are certain aspects of this case that have been discussed

 6    in the case law.  For example, the City of Schenectady case, 650

 7    NE 2d 373 said that the injured officer can't be required to

 8    waive confidentiality in all of his medical records, only those

 9    relating to the applicable injury or sickness absent collective

10    bargaining.

11          One of the claims the plaintiff has made here is that DMA

12    wanted the plaintiff to provide records from previous treatment

13    before the injury.  That might or might not be Kosher under City

14    of Schenectady.  If the defendant's knee was injured on the job,

15    but previously he had a bad knee, it might be completely

16    reasonable for DMA to want to see those records.  On the other

17    hand, if his knee was injured on the job, and they are asking

18    for records relating to his elbow, that's clearly under, City of

19    Schenectady, not Kosher.  I don't know what the evidence is

20    going to be.

21          MS. BELLATONI:  But, Your Honor, if I may, it was the left

22    knee.  It was a different knee, just so that you -- the Court is

23    aware of it.  His right knee was injured on the job, and it was

24    the left knee that had the prior surgery.  So it was a different

25    knee.

 1          THE COURT:  But wasn't the left knee implicated because --

 2     I thought that was part of your case that because his right knee

 3     didn't -- because he didn't get PT on the right knee, he started

 4     having problems with the left knee?

 5          MS. BELLATONI:  Oh, that is part of our damages, but at the

 6     beginning of when DMA it was assigned, that's the point in time

 7     where they were looking for the medical records or they had just

 8     been disclosed by the city with respect to the left knee.  So

 9     that wasn't even an issue at the time, overcompensation.

10          THE COURT:  Well, I think the jury -- I will tell the jury

11     that the city is not allowed to ask for medical records apart

12     from those required with respect to the applicable injury or

13     sickness in the absence of an agreement to that effect with the

14     plaintiff's union and that there wasn't one here.

15          Now, whether -- I think I also have to tell them that even

16     if they conclude that DMA asked for information it was not

17     entitled to ask for, whether that conduct can be attributed to

18     the City of Mount Vernon; and if so, whether it can be regarded

19     as retaliation for protected activity are separate issues that

20     they are going to have to decide based on other facts in the

21     record.  I wouldn't want them to think that the subject of this

22     trial is, did the DMA have a right to ask for these records?

23          With respect to the other stuff, sort of what I would put

24     under the umbrella of DMA hassling Mr. Bovell, again, I don't

25     really know what the evidence is going to be.  It sounds like he

1  was going to say, they were calling me all the time, and they

2  are going to say, yeah, because he was never returning the

3  calls.  But I think with respect to the other activities, you

4  know, it's got -- it seems to me there needs to be a rule of

5  reason.  There is not going to be a particular, you know, number

6  of phone calls that, you know, you are allowed.  It seems to me

7  it varies with circumstances.

8      So, again, I don't know.  I don't have a lot of detail on

9  what else Mr. Bovell is going to say DMA did that was

10  unreasonable; but I think, you know, with respect to -- I should

11  tell the jury something like -- with respect to matters apart

12  from medical records, you know, what the employer through its

13  agent can require of the injured officer has to be reasonable.

14  You know, I don't think anybody thinks it would be all right to

15  call the injured officer morning, noon and night and say, "Are

16  you better?  Are you better?  Are you better?"

17      But they are allowed to call to check in and see how he is

18  doing, you know, reasonably.  And, again, if -- even if DMA was

19  unreasonable, the jury still has to decide whether that conduct

20  is attributable to the city, and whether the -- and if it is,

21  whether it's retaliation.

22      I am not really clear how a lot of this is going to come in

23  because I didn't see that either side is calling anyone from

24  DMA.  So I will be interested to see how this whole thing

25  unravels.

1           I don't know how, Ms. Bellantoni, you are planning on

2    connecting up what DMA did to your client to retaliate on the

3    part of the city.

4           MS. BELLATONI:  Are you asking me?

5           THE COURT:  Well, sure.

6           MS. BELLATONI:  So Lieutenant Nawrocki and Captain Goldman

7    directed my client to do things consistent with cooperation with

8    DMA that, again, as you had just stated, we are arguing he was

9    not obligated to do.

10          THE COURT:  Like what sort of things did they direct him to

11   do that you think were unreasonable?

12          MS. BELLATONI:  Well, I don't know that the standard is

13   unreasonable.  It's still going to be our position that all he

14   was required to do under the law was provide an authorization

15   for his medical records to obtain treatment that was requested

16   by the duty -- the duty doctor for the city, and to attend the

17   IME.  This is --

18          THE COURT:  Well, where do you get that from; that he is

19   not -- they are not allowed to do anything but -- I mean, it's

20   clearly not the law that the city can only require him to do

21   those two things which are set forth in the statute because in

22   City of Schenectady, they asked him to do a couple of other

23   things -- I can't remember what they were -- that hadn't been

24   the subject of bargaining, and the court said that was okay if I

25   remember correctly.  Let me take a look.  I happen to have it

1    right here.  Oh, yeah, it had to do with light duty, for

2    example, or undergo surgery.  So --

3         MS. BELLATONI:  So undergoing surgery is --

4         THE COURT:  Hold on.  Let me finish my thought.

5         MS. BELLATONI:  Sorry.

6         THE COURT:  They said -- in that case they said -- the

7    argument was that 207-c doesn't authorize surgery or light duty

8    absent bargaining, and they said, unquestionably, the

9    legislature contemplated that municipalities would, where

10   appropriate and reasonable, require police officers to submit to

11   corrective surgery or forfeit benefits under the statute; and

12   likewise, I am not -- I forget exactly where it is, but they can

13   require the officer to work on light duty.

14        So it certainly cannot be right, and I will not tell the

15   jury it's right, that the obligations of the injured officer are

16   limited to those set forth in the statute.  That's clearly not

17   the law.  They have to be reasonable and appropriate, and that's

18   at page 487, and I'm inclined to tell the jury something like

19   that.

20        Now, Mr. Bovell can testify.  He can say, look, the reason

21   I refused is because I was under the impression that they could

22   only ask me to do the things in the statute, and I will tell the

23   jury that's admitted to explain why Mr. Bovell reacted as he

24   did, but he is incorrect.  They are allowed to ask him to do

25   things that are not specifically set forth in the statute.

1        The one thing we know is they are allowed to ask for a

2   waiver, but it has to be limited to the applicable injury unless

3   it's been the subject of bargaining.  So it's certainly not

4   going to be -- the jury is not going to have the impression,

5   which I think is -- would be completely wrong, that the

6   department is limited to asking -- is -- cannot make any

7   requests of the officer except for those set out in the statute,

8   but I think what they do ask has to be reasonable and

9   appropriate.

10       So I am inclined to give an instruction along those lines.

11  I still don't understand how, even assuming that DMA went

12  overboard, you are going to connect up whoever went overboard

13  with your client's protected activity.  Maybe that's why

14  Mr. Blaise thinks we are not going to get to the defense case.

15  I don't know.  We will have to wait and see.

16       I had a question.  There was a reference to some recording

17  in which it was alleged that -- that there was some reference to

18  the defendant's disability and his protected activity in the

19  same conversation.  Can someone enlighten me what that is?

20       MS. BELLATONI:  Yes.  In November, I believe it was the 6th

21  or 7th of 2015 -- apologies -- 2014, my client was out on

22  disability having been injured that September, two months

23  earlier, and had called up Lieutenant Nawrocki; had a

24  conversation with him and had stated in substance that he needs

25  to call out for the next day, which was I believe the 7th of

```
1    November, and also for the 10th of November, which is his
2    surgery, and Officer Bovell referenced, I am calling out
3    tomorrow because I have, you know, I have a meeting with the
4    federal agency, and Lieutenant Nawrocki said, oh, yes, the EEOC
5    thing, and acknowledged that he had knowledge of the protected
6    activity, which went to my motion in limine to be able to
7    present just the fact that my client had filed the August 2014
8    complaint with the EEOC, which two months later Lieutenant
9    Nawrocki, who was also directing my client to cooperate with
10   disability management, and is also putting disciplinary letters
11   in his file for not cooperating with the disability management,
12   acknowledges that he knew about the EEOC complaint; and just
13   subsequently, and just in addition to that, you know, my client
14   having filed the supplemental complaint with the EEOC in January
15   of 2015, he was out injured at that point in time.  So it's just
16   going to --

17        THE COURT:  Well --

18        MS. BELLATONI:  We will offer to have him testify that out
19   of the blue he is injured and he files a complaint, and then we
20   don't have anyone on the phone saying that they knew about it.
21   The city is going to stipulate they knew about it.

22        MR. BLAISE:  Which I thought we already did.  We -- we will
23   stipulate that the city, specifically Lieutenant Nawrocki and
24   Captain Goldman, knew that Officer Bovell had filed an EEOC
25   claim.
```

1        THE COURT:  And will they say they knew of the protected

2   activity in January 2015?  Because this is part of the issue.  I

3   mean, where at summary judgment the only fact giving rise to an

4   inference of retaliation was the close temporal proximity

5   between the referral to DMA on January 29th and all that

6   followed and the supplementation of the EEOC complaint on

7   January 15th.  That was it.  There was nothing else, really.

8        The -- there wasn't a similar proximity between the

9   original complaint in August of 2014 or the mediation in

10  November of 2014.  So the fact that they were aware of those

11  earlier acts of protected activity, I don't know what that gets

12  you.  The only one as to which there was an inference was the

13  January 15th.  Did Goldman and Nawrocki know that there was a

14  supplementary submission made January of 2015?

15        Do you have any evidence of that, Ms. Bellantoni?

16        MS. BELLATONI:  As I sit here, no.

17        THE COURT:  So --

18        MS. BELLATONI:  Other than it's been stipulated to by

19  defense counsel.

20        THE COURT:  Well, did they stipulate that they knew about

21  the January 15th?

22        MS. BELLATONI:  Yes.

23        THE COURT:  Oh, well, that's your evidence, then.

24        MS. KANE:  No.

25        MS. BELLATONI:  That the city knew.  That was part of the

1   stipulation, that the city knew.

2        MS. KANE:  The city knew, but not specifically Lieutenant

3   Nawrocki.

4        MS. BELLATONI:  Not specifically Lieutenant Nawrocki and

5   Lieutenant Goldman.

6        THE COURT:  So what you are going to have is your argument

7   is going to be the city knew.  The people who I think were

8   retaliating didn't know, but nevertheless, you should infer that

9   they sicced DMA on him to retaliate even though they didn't

10  know.

11       MS. BELLATONI:  I'm not affirmatively saying they didn't

12  know, but no, I don't have evidence that they knew.

13       THE COURT:  So how do you get past Rule 50 here?  I mean,

14  there is no evidence that the people who are allegedly

15  responsible for the retaliation were aware of the protected

16  activity.  They were aware of earlier protected activity, but

17  there is no inference of discrimination arising from that

18  activity as I found at summary judgment.  Maybe I didn't spell

19  it out so well, but I think what I said was, essentially, there

20  is an inference from temporal proximity between the January

21  activity and the January -- what I am calling the siccing of DMA

22  on Mr. Bovell, but there is no such similar inference based on

23  the activity that was two and five months earlier; certainly not

24  as to the five months earlier, as to the August activity.

25  November -- let me think out loud.  November 2014 to

 1   January 2015, I suppose you could argue that that's close

 2   enough.  So the -- I guess the plaintiff can argue that Nawrocki

 3   knew of the November 2014 activity and that what he did in

 4   January and thereafter was retaliatory.  If it's stipulated that

 5   Nawrocki knew of the November 2014 activity, then do you need

 6   this recording for anything else?  I guess --

 7        MS. BELLATONI:  There would be no other -- there would be

 8   no other reason to have the recording.

 9        THE COURT:  Well, I am just asking.

10        MS. BELLATONI:  No.  It doesn't provide anything else.

11        THE COURT:  One of the motions that the plaintiff made was

12   that the prior protected activity should be admitted to complete

13   the narrative, and the plaintiff wants to show that there was an

14   original EEOC complaint filed on July 30th and a mediation on

15   November 7th, and the defendants say no, the only protected

16   activity that could possibly support a claim here is the

17   January -- November 7th to January 29th is just about on the

18   borderline of what the circuit would allow.  So I will allow the

19   plaintiff to prove up that there was an EEOC mediation in

20   November as well as that he filed papers in January.  Still not

21   clear on how he is going to connect this up to the retaliation.

22   If Nawrocki wanted to retaliate, he certainly had opportunities

23   to do it earlier, but whatever.  But I am going to have to give

24   the jury an instruction -- and I am open to suggestion on what

25   it should be -- to the effect that, you know, there is -- they

 1  shouldn't speculate about what the subject was, and that there
 2  is no claim in this case that the department did anything wrong
 3  except the retaliation.

 4      I am open to suggestion, Mr. Blaise.

 5      MR. BLAISE:  Well, I -- I don't know how much of a
 6  suggestion -- just a concern or a question -- in a very basic
 7  sense, how are we supposed to refer to the protected activity?
 8  Saying "protected activity" is kind of a mouthful and legalistic
 9  and isn't -- I think that's going to be confusing and engender
10  questions with the jury.  What does that even mean?  That's
11  lawyer-speak.

12      He filed a complaint.  I think that's fine.  It's generic.
13  I understand or I guess, you know, Ms. Bellantoni may want to
14  embellish or give -- provide more information about what that
15  complaint is.  Obviously, the city, the less information about
16  what that complaint is, you know, we don't want -- if you say
17  EEOC, from our perspective, that raises a red flag.  You know, I
18  am looking at, you know, anything that comes out that he filed a
19  complaint, well, that complaint was dismissed.

20      Do you say that to the jury or does that have negative
21  implications?

22      THE COURT:  It's part of the plaintiff's burden to show
23  that he engaged in Title VII protected activity.  Obviously, the
24  jury needs to know that --

25      MR. BLAISE:  Correct.  Which we stipulated.

1      THE COURT:  -- the complaint ultimately didn't go anywhere.

2      The fact that -- and that -- look, they are not stupid.

3  They are going to figure out that he filed a complaint of some

4  sort against the city because the city knew about it.

5      What they need to know is that it didn't go anywhere, and I

6  am open to suggestion as to how to word that.

7      MR. BLAISE:  Basically, he filed a complaint against the

8  city.  That complaint was dismissed.  However, he still has a

9  retaliation claim arising out of the fact that he -- you know,

10  he is alleging because he filed that complaint, even though that

11  complaint was dismissed.

12      So the dismissed stuff isn't -- you don't concern yourself

13  with that.  You can't hold the city liable for that.  However,

14  you have to decide whether the city did, in fact, retaliate

15  against him through the administration of his 207 claim because

16  he filed those -- that underlying complaint.

17      THE COURT:  Yeah.  I think it has to be something like

18  that.  All right.  We will work on something.

19      Speaking of lawyer-speak, his 207 claim, I don't know if

20  there is a better way to put that to the jury, either.  Maybe by

21  the end of the trial --

22      MR. BLAISE:  Liken it to the injury or just --

23      THE COURT:  Yes.

24      MR. BLAISE:  -- disability claim?

25      THE COURT:  Whatever you want to call it.  You know, maybe

1   by the end of the trial, they will be speaking 207-speak as

2   well.

3        MS. BELLATONI:  Just for the record, Your Honor, just so

4   that it's clear, I would object to the term that it's dismissed.

5   I would object if there was an instruction to the jury that his

6   claims were dismissed, which would lead to speculation that they

7   shouldn't engage in, I think what I have seen in the cases that

8   talk about what level of information is provided in cases where

9   the retaliation claim survives and all the other claims are

10  dismissed is that just a simple statement that there was a

11  filing with the EEOC.  Some cases allow there was a filing of

12  discrimination.  Some cases just say there was a filing of a

13  complaint with the, you know, EEOC, and that those claims are

14  not the subject of this case.  You are not to speculate with

15  respect to them at all, and the plaintiff has no burden to prove

16  or offer any evidence about those claims.  They are not

17  relevant.

18       MR. BLAISE:  City's perspective, that doesn't go far

19  enough.  It leaves them open to speculate about whether those

20  claims are still out there.

21       THE COURT:  Well, they probably -- to the extent they

22  speculate -- will say to themselves, wow, I wonder if they were

23  dismissed or settled or what, and they are going to say, I don't

24  know what happened with them.  You know, which is probably where

25  they should be.  I think we have to say he made a claim.  He

1  made a complaint against the EEOC.  You shouldn't speculate

2  about what it might have entailed.  The allegations in that

3  complaint are not the subject of this case.  The only issue here

4  is whether the defendant retaliated against the defendant for

5  his participation in proceedings relating to the complaint

6  because it's really -- the complaint itself is way too far --

7  not way too far -- but too far temporally removed to support an

8  inference of retaliation based on activities at the end of

9  January, but his participation in the subsequent proceedings is

10  close enough.

11     MR. BLAISE:  I liked it when you said it didn't go

12  anywhere.

13     THE COURT:  Well, that's somewhat better than dismissed.

14     Look, they didn't go anywhere, but that was, in part,

15  because of the way the case here was pleaded.  Unlike a lot of

16  these cases where there is really nothing to the original

17  complaint, here there might have been something to it.  So I am

18  not going to tie myself up in knots to figure out language that

19  would tell the jury the complaint didn't go anywhere, which

20  invites them to hold that against Mr. Bovell when the reasons

21  why it didn't go anywhere actually don't have to do with the

22  merits.

23     The -- I think the most the jury needs to be told is that

24  he made a complaint.  They shouldn't speculate about what it

25  might have entailed.  Those allegations in that complaint are

 1   not the subject of this case.  The only issue is whether the

 2   defendant retaliated for that activity, and it seems to me that

 3   protects both sides.  It avoids the harm to the plaintiff that

 4   it might ensue if the jury thought, oh, this is a guy who makes

 5   bogus complaints.  It avoids -- and it still protects the

 6   defendant because it tells the jury that the only thing they can

 7   possibly hold the defendant liable for is retaliation.

 8        It wasn't a frivolous complaint or, you know, a complaint

 9   that was so meritless that the jury should reasonably hold it

10   against him.

11        The only other motion I think is the plaintiff's motion to

12   preclude the defendants from introducing evidence that other

13   officers were referred to DMA.  Plaintiff says that's

14   irrelevant; that the claim is not -- the referral itself is --

15   was wrong, but that what the city demanded of the defendant was

16   wrong; what it demanded of the plaintiff through DMA was wrong.

17   And the plaintiff says if the evidence that other officers were

18   referred is allowed, then the plaintiff has to be able to show

19   that those officers were black or engaged in protected activity;

20   but she still thinks it should be kept out under 403.

21        Defendant says it's relevant whether other officers were

22   referred to DMA because that's our legitimate nondiscriminatory

23   reason for the challenge to employment action, and that it's not

24   relevant that other officers referred to DMA were black.

25        It seems to me that it is relevant that the city referred

```
 1   other officers to DMA, and that the city should be permitted to
 2   introduce evidence to that effect.  It is the city's legitimate
 3   non-retaliatory reason for the referral and what followed.  The
 4   fact that other people who were referred to DMA, some of them
 5   were black, is not relevant because the fact that the plaintiff
 6   is black is not relevant because we don't have a discrimination
 7   claim.
 8        If there -- if the plaintiff has evidence that the other
 9   officers who were referred to DMA also engaged in Title
10   VII-protected activity in close enough temporal proximity to
11   raise an inference of retaliation or otherwise, or that they
12   otherwise were retaliated against for protected activity, that
13   may be admissible.  If there is any such evidence, the plaintiff
14   has to bring it to my attention before offering it.
15        Is there any such evidence?
16        MS. BELLATONI:  I don't know about the temporal proximity.
17   I know there is -- there are other individuals who were referred
18   to DMA in connection with their 207-c benefits who did engage in
19   protected activity, but I can't make a representation to the
20   Court at this point in time that there were -- as to what the
21   temporal proximity is.
22        THE COURT:  So that's going to be one issue.
23        Another issue is going to be, you know, how many are we
24   talking about?  If there are 50 officers who got referred and,
25   you know, three of them engaged in protected activity, that's
```

1   really not going to raise any sort of inference.

2        So absent any further proffer, evidence regarding the

3   situations of those other officers is out.  Evidence of the

4   existence of the other officers can come in.  Just the fact

5   that, as I understand the evidence is going to be, that once an

6   injury looks like it's going to be long term rather than short

7   term, it is the procedure to refer.

8        Now, if the plaintiff has evidence that that's not the case

9   and that there are other situations where it was done in close

10  enough proximity to raise an inference of retaliation or an

11  inference of retaliation otherwise arises from the

12  circumstances, I will agree with you.

13       I think that covers the motions in limine.  I hope as we

14  get closer to trial, you will be able to stipulate to a lot of

15  the records to save time, so please talk about that.

16       So we are going to -- because we are going to have

17  Dr. Romano, I guess we will pick the jury on the 4th and go

18  right into the testimony, and we will get everything done except

19  for Dr. -- I guess she is not a doctor -- Ms. Romano on the 9th.

20  We will have her on the 9th, and then --

21       MR. BLAISE:  We have an issue with that potentially.

22       So our IME, Dr. Levin, has to be out of town basically by

23  Thursday at noontime he has got to be leaving to get on a plane,

24  he is away Thursday and Friday for a long-scheduled conference

25  so he --

```
 1        THE COURT:  So why is it we have him Thursday morning?
 2        MR. BLAISE:  Well, that was so we would have to do him
 3   Thursday morning and carry him over to the following week.
 4   Thursday morning is fine with us.
 5        THE COURT:  I mean, I don't mind going out of order to
 6   accommodate witnesses, and I'd just as soon try to get as much
 7   out of the way as possible.  So if he can come -- the morning
 8   should be enough for him?
 9        MR. BLAISE:  I would think so.
10        MS. BELLATONI:  I would think so.  I would hope so.
11        MR. BLAISE:  What time does court open so we can just tell
12   him Thursday morning and assure him he will be --
13        THE COURT:  What time is his plane?  Do you know?
14        MR. BLAISE:  I think it's early afternoon.  I think it was
15   like 2:00, so he wanted to be out of here --
16        THE COURT:  From LaGuardia or from JFK?
17        MR. BLAISE:  To be honest, I didn't ask.
18        THE COURT:  I mean, I am happy to start -- it sometimes
19   depends on how far the jurors are coming from.  If we don't have
20   anybody from Sullivan County, I can start at 9:00.  If we have
21   somebody who has got a two-hour drive, I would rather start at
22   9:30.  If --
23        MR. BLAISE:  If we start at 9:00 or 9:30, Your Honor, I
24   think that would be --
25        THE COURT:  He will be done by 11:30.  He will make his
```

1    plane.  If something bizarre happens and he needs to leave, we

2    will pick him up again on Monday.  I am not going to make him

3    miss his flight.

4         MR. BLAISE:  Thank you.

5         THE COURT:  All right.  Jury selection:  Eight jurors.  I

6    always like to have more than the minimum just in case we lose

7    one or two.

8         MR. BLAISE:  Six and two?

9         THE COURT:  Well, we don't really have alternates in the

10   civil cases.  However many we pick, that's how many are on the

11   jury.  I did see -- was it this case -- that you -- both sides

12   do consent to a less-than-unanimous verdict?

13        MR. BLAISE:  Correct, I think.

14        THE COURT:  It says a joint pretrial order.

15        MS. BELLATONI:  Yes.  That was in it.  Yes.

16        THE COURT:  So if we had eight, does that mean 7-to-1 or

17   6-to-2?  Maybe you should talk about that.  Usually when it's a

18   short trial like this, if it's going to go over a weekend, I

19   like to have at least one spare and usually two.  Just, you

20   know, if somebody gets a flat tire and somebody gets sick, and

21   then we don't have enough jurors.

22        So why don't you figure we will have eight, and you can

23   talk amongst yourselves as to whether you are agreeing to 7-to-1

24   or 6-to-2 or 5-to-3, and you can let me know.

25        The way I do the jury selection, and you have got my

proposed voir dire questions, which I will get to in a minute,
the way I do it is I put 14 in the box.  The first juror I ask
every question on the list, and I ask the others to read along.
If I get a yes answer, I follow up.  With respect to the second
juror, I ask the juror to read down the list of questions 1
through 22 and tell us if he or she has a yes answer.  I don't
ask all of those questions aloud.  I do ask all the part two
questions aloud 1 through 10.

So after the first juror, we are only hearing from the
jurors on the questions that raise an issue, and if the juror's
answer raises an issue, and I follow up, and I don't ask
everything you would like me to ask, don't wait.  Stand up and
say, Judge, could you please ask the juror whatever you want me
to ask.  I don't want to get to the end and then hear from you
that you have questions as to juror number two or juror number
six.  I want to ask them all at once and then have the -- once
we have got 14, I will ask you for your challenges for cause.
If there are any, once we refill those seats, then you will
exercise your strikes in three rounds of one strike apiece.
That way get rid of six, and we will have eight left.

Did anybody have anything about their voir dire form that
was giving them a heart attack or otherwise bothering them?  All
right.  Good.

And my law clerk sent you the paragraphs that I intend to
tell the veneer, just generally what the case was about.  Was

1    there anything in there that anybody wanted to discuss?

2         MS. BELLATONI:  No, Your Honor.

3         MR. BLAISE:  We just had a question or a comment about the

4    reference to the EEOC, and I think in light of the discussion we

5    had a few minutes ago, I -- city would request that just the

6    language about, you know, he filed a complaint with the EEOC

7    language be added just saying that the substance of the

8    complaint, what happened to it isn't your concern.  That's not

9    what we are here for.

10        THE COURT:  I will add something, a shorter version of the

11   longer instruction that I will give the jury once -- once the

12   EEOC thing comes up in the testimony, I will give the

13   instruction we talked about for purposes of just telling the

14   veneer, generally what the case is about, I will give something

15   shorter.  I will just say something about, the case is not

16   about -- something like the allegations in that complaint are

17   not the subject of this trial.  Rather, Officer -- and I should

18   -- I am sorry.

19        After the second sentence of the second paragraph where I

20   say the filing of such a complaint is a protected activity, I

21   will say, the allegations in that complaint are not the subject

22   of this trial, rather, Officer Bovell argues -- no.  I am sorry.

23   That's not going to work.  Hold on.

24        Okay.  I will put it after the first sentence in the second

25   paragraph, Officer Bovell claims that the defendants unlawfully

1    retaliated against him for filing a complaint with the Equal

2    Employment Opportunity Commission or EEOC.  The allegations in

3    that complaint are not the subject of this trial, but the filing

4    of such a complaint is a protected activity under Title VII of

5    the Civil Rights Act of 1964, which prohibits an employer from

6    retaliating against an employee who participates in such

7    activities.  Officer Bovell argues that the retaliation against

8    him arose in connection with his claims for benefits.

9         Is any -- are any of you going to have anybody else at

10   counsel table with you?  A tech person or a paralegal or

11   anything?  I assume your client will be with you.

12        MS. BELLATONI:  He will be here.

13        THE COURT:  Just the two of you?

14        MS. BELLATONI:  Should be, yes.

15        MR. BLAISE:  And we may have a representative from the

16   city.

17        THE COURT:  If you are going to have anybody, can you make

18   sure you get the name to my law clerk by Monday because I will

19   just want to put that in the questionnaire?

20        Make sure you premark your exhibits, and I would like

21   courtesy copies of the premarked exhibits unless they are so

22   voluminous that that's not practical, but we don't mark your

23   exhibits here.  You mark them.  You copy them.  You give them to

24   the other side.  You give them to me before we start.  And also

25   an exhibit list would be helpful.  Don't create one just for me,

 1    but if you are creating one for yourself that you can share,

 2    that would be helpful.

 3         And we will start Wednesday, and we will go -- what I do is

 4    if the lawyers have any issues for me, I take them up at 9:00,

 5    and I start with the jury at 9:30, and I am kind of a Nazi about

 6    keeping them busy and keeping on track.  So if you tell me that

 7    you have something you need to discuss, I will be here at 9:00.

 8    Otherwise, I am coming out at 9:30, and I am getting the jury;

 9    and if you say, oh, Judge, just one thing, I am going to say,

10    no.  Save it for the break or save it for lunch.  I like to keep

11    them busy, and I like to be on time.  So I will stay after 5:00.

12    I will do things over lunch, but I don't want them sitting back

13    there and cooling their heels.

14         If you are going to have -- I don't know if you are

15    planning to use electronics.  If you have stuff that you need to

16    bring in, monitors, screens, whatever, speak to Ms. Cama about a

17    convenient time to do that before the morning of trial.

18         Am I correct that the only patient records that are going

19    to come in are either the plaintiff's or going to be redacted?

20    I don't know why records of anybody else would come in, frankly.

21         MS. BELLATONI:  No.  Yes.  No.

22         THE COURT:  Okay.

23         MS. BELLATONI:  There would be no other records other than

24    the plaintiff.

25         THE COURT:  We don't have to worry about redaction.

1        Any other issues?

2        MR. BLAISE:  No.  I think the housekeeping things that I --

3    we can discuss on our own, but I think we are set.

4        THE COURT:  All right.

5        Off the record for a second.

6        (Discussion off the record.)

7        THE COURT:  Back on the record.

8        MR. BLAISE:  I don't know.  Let me bring it up.

9        THE COURT:  We will stay off.

10       (Discussion off the record.)

11       THE COURT:  All right.  I will see you guys next Wednesday.

12       (Time noted:  3:47 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25